UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CURTIS JOHNSON,

          Plaintiff,

    v.

SERENITY TRANSPORTATION, INC., et al.,

          Defendants.

Case No.  15-cv-02004-JSC

**ORDER GRANTING IN PART MOTION TO DISMISS THIRD AMENDED COMPLAINT**

Re: Dkt. No. 51

In this putative class action, Plaintiffs Curtis Johnson ("Johnson") and Anthony Aranda ("Aranda, and together "Plaintiffs") filed suit against their employer, Defendants Serenity Transportation, Inc. ("Serenity Transportation"), its owner David Friedel ("Friedel"), as well as Service Corporation International ("SCI"), SCI California Funeral Services, Inc. ("SCI California"), the Neptune Society of Central California, Inc. ("Neptune Society"), Lifemark Group, Inc. ("Lifemark"), and the County of Santa Clara (the "County" and collectively, "Defendants").  (Dkt. No. 50.)  The gravamen of Plaintiffs' Third Amended Complaint ("TAC") is that Plaintiffs, mortuary drivers, have been misclassified as independent contractors and denied the benefits of California and federal wage-and-hour laws.  Now pending before the Court is Defendants' motion to dismiss.  Defendants seek dismissal of all claims against Friedel for failure to plead alter ego liability, all claims against SCI, SCI California, Neptune, Lifemark, and the County (together, the "Customer Defendants") for failure to plead that they are joint employers, as well as dismissal of various causes of action for failure to state a claim.  (Dkt. No. 51.)  Having considered the parties' submissions, and having had the benefit of oral argument on October 15, 2015, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss.

**BACKGROUND**

## I.      Complaint Allegations

Plaintiffs are "mortuary transportation drivers who carry dead bodies and other human remains from various locations (including nursing homes, hospitals, and homes) to Defendants' facilities." (Dkt. No. 50 ¶ 1.)  Johnson worked as a driver for Defendants from January 1, 2012 to August 23, 2013, and Aranda from approximately August 2012 to March 2015.  (*Id.* ¶¶ 6-7.)  They bring this putative class action on behalf of themselves and the other 40-plus drivers that Defendants have employed during the relevant period.  (*Id.* ¶ 17.)

### *Serenity Transportation & Friedel*

Defendant Serenity Transportation is a mortuary transportation company that employed Plaintiffs within the meaning of the Fair Labor Standards Act ("FLSA"), California Labor Code, and applicable Industrial Welfare Commission wage order ("IWC Wage Order") to transport decedents.  (*Id.* ¶¶ 8, 17.)

Friedel is the owner, shareholder, CEO, and Board Member of Serenity Transportation, and an employer of Plaintiffs within the meaning of the FLSA, California Labor Code, and IWC Wage Order.  (*Id.* ¶ 9.)  Friedel "is the alter ego" of Serenity Transportation, which he operates for the purpose of concealing violations of the Labor Code.  (*Id.*)  Friedel dominates and controls the actions of Serenity Transportation and knowingly advised the company to treat the drivers as independent contractors to avoid employee status.  (*Id.*)  Friedel fails to respect Serenity Transportation's corporate form by failing to adequately capitalize it, failing to properly maintain its minutes and corporate records, maintaining sole ownership of all Serenity Transportation stock, using his personal home as the location for board meetings, and otherwise failing to conduct board meetings in compliance with the law.  (*Id.*)

Together, Serenity Transportation and Friedel assign drivers to 24-hour shifts, five days a week, resulting in 120-hour work weeks.  (*Id.* ¶ 18.)  The drivers are made available 24 hours a day to SCI, SCI California, Lifemark, Neptune, and the County's Office of the Medical Examiner-Coroner.  (*Id.*)  Serenity Transportation and Friedel recruit and supervise drivers and advertise available driver positions online.  (*Id.* ¶ 19.)  The advertisements specify that drivers must be

2

United States District Court
Northern District of California

available for on-call shifts 24 hours a day and that the employer enforces a professional attire dress code. (*Id.* ¶ 19.) Once hired, Serenity Transportation and Friedel schedule drivers for shifts and retain the right to change the shifts at their discretion. (*Id.*) Friedel is personally involved in drafting hiring criteria, interviewing drivers, and scheduling their shifts. (*Id.* ¶ 19.) Together, Serenity Transportation and Friedel promulgated "Client Policy Standards" that required drivers to obey a dress code, report to dispatch their status throughout the day, notify dispatch if the driver checks out of service before shift's end, complete Serenity Transportation invoice information, keep the driver's vehicle clean, and notify Serenity Transportation of any need for personal time off. (*Id.* ¶ 22.) Serenity Transportation and Friedel's policy also provides that continuous violations of customer standards could result in termination of the driver's contract or the driver being removed from a route. (*Id.*) Friedel is personally involved in monitoring and enforcing these policies. (*Id.*)

On both their website and in advertisements, Serenity Transportation and Friedel refer to the drivers as "staff." (*Id.* ¶ 29.) Serenity Transportation and Friedel lease equipment to drivers, including vehicles, radios, and stretchers. (*Id.*) Initially, when Serenity Transportation was founded in 2010 it classified the drivers as employees, but Friedel, in his capacity as a member of the corporation's Board of Directors, recommended that Serenity Transportation reclassify the drivers as independent contractors, and Serenity Transportation followed suit in February 2011. (*Id.* ¶¶ 29, 35.)

Drivers work for Serenity Transportation and Friedel continuously for many months or years. (*Id.* ¶ 33.) The drivers are, however, subject to termination by Serenity Transportation and Friedel at any time for any reason. (*Id.* ¶ 35.) Drivers are not required to possess a special license or undergo special training to perform Serenity Transportation's transportation services. (*Id.* ¶ 34.)

*Joint Employer Allegations*

Serenity Transportation and Friedel served as labor contractors for SCI, SCI California, Neptune, Lifemark, and the County by providing drivers on an ongoing basis to meet those entities' needs. (*Id.* ¶¶ 20, 33.) SCI and SCI California provide funeral and end-of-life services in

Alameda County and across the United States.  (*Id.* ¶¶ 11-12.)  Neptune and Lifemark provide cremation, removal, and end-of-life services in Alameda County and across the United States.  (*Id.* ¶¶ 13-14.)  The County provides investigation, removal, and autopsies in Santa Clara County.  (*Id.* ¶ 15.)  SCI, SCI California, Neptune, Lifemark, and the County all employed Plaintiffs by permitting them to work, exercising control over their wages, hours, and working conditions, and engaging them.  (*Id.* ¶¶ 11-15.)  The work that Plaintiffs and drivers generally performed for these Defendants was labor within the entities' usual course of business.  (*Id.*)

The Customer Defendants control the means and methods by which drivers carry out their jobs by directing drivers as to how to handle and remove decedents.  (*Id.* ¶ 23.)  While Drivers were at each Joint Employer's location, drivers were under that Joint Employer's supervision and control.  (*Id.* ¶¶ 24-26.)  Specifically, SCI and SCI California promulgated detailed policies governing drivers' work, including requiring a particular type of identification band, specific labeling procedures, and a protocol for witnessing removal of human remains.  (*Id.* ¶ 24.)  SCI and SCI California retain the right to change these policies at any time.  (*Id.*)  They also retain the right to require that drivers receive ongoing training to provide services in compliance with the entities' service guarantee; detail the time period in which drivers must respond to calls; and require drivers to follow a professional dress code.  (*Id.*)

Neptune worked with Serenity Transportation and Friedel to create policies governing the drivers' work, subject to change by Neptune, which include "instructions on how and where to record information about the deceased (including paperwork), how to handle the deceased, and the order in which Drivers were to complete tasks."  (*Id.* ¶ 25.)

Lifemark also worked with Serenity Transportation to create policies governing drivers' work subject to Lifemark's change.  (*Id.* ¶ 26.)  Lifemark's policies include instructions on "how and where to record information about the deceased, how to handle the deceased, and how Drivers should conduct themselves when arriving at and leaving Lifemark properties."  (*Id.*)

The County also promulgated detailed policies governing the drivers' work subject to Change by the County at any time.  (*Id.* ¶ 27.)  These policies include identification and removal protocol at the County Coroner, including "the timeframe in which STI Drivers [are] expected to

4

1    respond to different types of calls . . . ; the amount of time that Drivers [are] required to wait at the

2    scene if the deceased [is] not ready to be transported; and 'stand-by' and 'dry-run' time." (*Id.*)

3    The County requires drivers to keep records of service completion, and retained the right to keep

4    its own records of runs. (*Id.*)   The County also requires drivers to follow a dress code, refrain

5    from displaying insignia besides the County Coroner's, specified rules for driver's vehicles'

6    appearance and equipment and retains the right to inspect these vehicles at any time. (*Id.*)   The

7    County supplies some of the driver's equipment and otherwise requires that drivers act in

8    accordance with instructions given by County staff at the scene. (*Id.*)

9            *Payment Allegations*

10          Defendants paid Plaintiffs under a common compensation plan and policy where drivers

11   are paid a flat rate that Defendants set for each completed dispatch. (*Id.* ¶ 37.) All Defendants

12   participate in this scheme "including by requiring Drivers to fill out proprietary paperwork on

13   which Driver time is recorded." (*Id.*)   As a result, drivers are not compensated for time spent

14   awaiting calls. (*Id.*)   This payment system fails to provide either minimum wage or overtime

15   payment to drivers. (*Id.*)

## II.    Procedural History

17          Plaintiff Johnson initiated this action in Alameda County Superior Court on June 12, 2014

18   alleging that Serenity Transportation and Friedel violated certain provisions of the California

19   Labor Code. (Dkt. No. 1.)  While the case was pending in state court, Johnson amended the

20   complaint to add SCI and Neptune as defendants and to add a claim under the FLSA. (Dkt. No. 1

21   ¶ 1; Dkt. No. 32-1.)  SCI properly and timely removed the case to federal court. (Dkt. No. 1.)

22   Johnson then filed a Second Amended Complaint ("SAC") adding Plaintiff Aranda and naming

23   Lifemark, SCI California, and the County as defendants. (Dkt. No. 16.)  The Court then granted

24   Plaintiffs leave to file a Third Amended Complaint ("TAC"), which removed certain previously-

25   alleged causes of action and added others. (Dkt. No. 49.)

26          The now operative TAC includes ten causes of action against various groupings of

27   defendants under federal and California labor law.  The gravamen of almost all of Plaintiffs'

28   claims against all Defendants is that drivers have been misclassified as independent contractors

United States District Court
Northern District of California

5

1    when they are really employees, and therefore Defendants have denied them the benefits of federal

2    and California wage-and-hour laws.  Defendants have moved to dismiss all claims against Friedel

3    and the Customer Defendants as well as three of the ten causes of action for failure to state a claim

4    upon which relief may be granted.

5                                    **LEGAL STANDARD**

6          A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege

7    "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

8    *Twombly*, 550 U.S. 544, 570 (2007).  A facial plausibility standard is not a "probability

9    requirement" but mandates "more than a sheer possibility that a defendant has acted

10   unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations

11   omitted).  For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual

12   allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the

13   non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

14   2008).  "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of

15   sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare*

16   *Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see*

17   *also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a

18   claim on the basis of a dispositive issue of law").

19         Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under

20   which a party is only required to make "a short and plain statement of the claim showing that the

21   pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic

22   recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678

23   (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations of law and unwarranted inferences

24   are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir.

25   2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint

26   or counterclaim may not simply recite the elements of a cause of action, but must contain

27   sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

28   defend itself effectively.").  The court must be able to "draw the reasonable inference that the

United States District Court
Northern District of California

6

1    defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a

2    complaint states a plausible claim for relief . . . [is] a context-specific task that requires the

3    reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

4          If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

5    request to amend the pleading was made, unless it determines that the pleading could not possibly

6    be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

7    banc) (internal quotation marks and citations omitted).

8                                   **DISCUSSION**

9          Defendants move to dismiss the TAC on three main grounds: (1) failure to allege a basis

10   for Friedel's liability; (2) failure to demonstrate that the Customer Defendants qualify as

11   Plaintiffs' joint employers for the purposes of liability; and (3) failure to allege sufficient facts to

12   state a claim upon which relief may be granted for the second, third, and seventh causes of action.

13   The Court will address each in turn.

14   **A.     The TAC Adequately Alleges Grounds for Defendant Friedel's Liability**

15          1.     <u>Alter Ego Liability</u>

16         Plaintiffs allege that Friedel is the alter ego of Serenity Transportation such that he is liable

17   for the corporation's violations. (Dkt. No. 51 ¶ 9.) "The alter ego doctrine arises when a plaintiff

18   comes into court claiming that an opposing party is using the corporate form unjustly and in

19   derogation of the plaintiff's interests."[1] *Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 300 (1985).

20   Under the doctrine, "[a] corporate identity may be disregarded—the 'corporate veil' pierced—

21

22   _____

[1] Both parties cite both federal and state law when describing the requirements of alter ego
23   liability. The Court here is sitting not in diversity, but in original federal jurisdiction based on the
     FLSA claim, and supplemental jurisdiction over the remaining claims. (*See* Dkt. No. 51 ¶¶ 2-3.)
24   Still, in determining whether alter ego liability applies, the federal court looks to the law of the
     forum state. *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010); *see also Gerritsen v.*
25   *Warner Bros. Entm't Inc.*, --- F. Supp. 3d ----, No. CV 14-03305 MMM (CWx), 2015 WL
     4069617, at *19 n. 126 ("Whether to pierce the corporate veil is a question of state law.") (citing
26   *Dusharm v. Elegant Custom Homes, Inc.*, 302 F. App'x 571, 572 (9th Cir. 2008)). There is
     separate federal law on alter ego liability, which generally is applied when determining whether
27   the court can exercise personal jurisdiction over a party based on alter ego theory. Ultimately, this
     may be a distinction without a difference because California alter ego law is substantially similar
28   to federal law. *See Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764,
     769 (9th Cir. 1992).

United States District Court
Northern District of California

where an abuse of the corporate privilege justifies holding the [owner] of a corporation liable for the acts of the corporation." *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523, 538 (2000). "There is a strong presumption against disregarding corporate identities and finding a person to be the alter ego of a corporation." *Tarel Seven Design, Inc. v. Magni Grp., Inc.*, No. SA CV 89-210 AHS (RWRX), 1990 WL 118290, at *4 (C.D. Cal. May 30, 1990) (citing *In re Christian & Potter Aluminum Co.*, 584 F.2d 326, 338 (9th Cir. 1978)). To overcome this presumption and state a claim for alter ego liability, a plaintiff must adequately allege that (1) there is such unity of interest that the separate personalities [of the entity and the shareholder] no longer exist and (2) that failure to disregard [their separate entities] would result in fraud or injustice. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001); *see also Mid-Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (1992) (same). The party asserting alter ego liability bears the burden of establishing it. *See U.A. Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). Conclusory allegations of alter ego status are inadequate; instead, the "plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each." *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040-41 (N.D. Cal. 2014) (citation omitted); *see also Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1116 (C.D. Cal. 2003).

When assessing whether there is unity of interest between a corporation and an individual for the purposes of piercing the corporate veil under alter ego liability, courts consider, among other factors:

> the commingling of funds and other assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to seek authority to issue stock or issue stock under existing authorization; the representation by an individual that he is personally liable for corporate debts; the failure to maintain adequate corporate minutes or records; the intermingling of the individual and corporate records; the ownership of all the stock by a single individual or family; the domination or control of the corporation by the stockholders; the use of a single address for the individual and the corporation; the inadequacy of the corporation's capitalization; the use of the corporation as a mere conduit for an individual's business; the concealment of the ownership of the corporation; the disregard of formalities and the failure to maintain arm's-length transactions with the corporation; and the attempts to segregate liabilities to the corporation.

United States District Court
Northern District of California

*Digby Adler Grp. LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1106-07 (N.D. Cal. Feb. 6, 2015) (citations omitted).  Some courts have held that a plaintiff need only plead two or three of these factors to adequately plead unity of interest.  *See Daewoo Elecs. Am. Inc. v. Opta Corp.*, No. C 13-1247 JSW, 2013 WL 3877596, at *5 (N.D. Cal. July 25, 2013) (citation omitted); *Pac. Mar. Freight, Inc. v. Foster*, No. 10-CV-0578-BTM-BLM, 2010 WL 3339432, at *6 (S.D. Cal. Aug. 24, 2010) (citing authority holding that the identification of unity of interest plus two or three factors was adequate).

The TAC alleges more than mere conclusory allegations that courts generally find insufficient.  *See Gerritsen v. Warner Bros. Entm't Inc.*, --- F. 3d ----, No. CV 14-03305 MMM (CWx), 2015 WL 4069617, at *20 (C.D. Cal. Jan. 30, 2015) (collecting cases where plaintiffs merely alleged that the individual was the alter ego of the corporation). Plaintiffs specifically allege why there was such a unity of interest and ownership: Friedel "dominated and controlled the actions" of Serenity Transportation, failed to adequately capitalize Serenity Transportation, failed to properly maintain minutes and corporate records, maintained sole ownership of all stock, used his personal home as the location for board of director meetings, and failed to conduct board meetings as required by corporate by-laws and state law.  (Dkt. No. 51 ¶ 9.)  Based on these allegations, some factors weigh in favor of finding unity of interest, including domination or control by a sole individual, the failure to maintain adequate corporate minutes or records, an inference of use of a single address for the individual and the corporation, and inadequacy of the corporation's capitalization.  *See Digby Adler Grp., LLC*, 79 F. Supp. 3d at 1106-07.  The TAC is silent as to the other factors, so they weigh against finding alter ego liability.  Still, Plaintiffs have adequately alleged at least four elements in support of finding alter ego liability, which his enough to show unity of interest at the pleading stage.  *See Daewoo Elecs. Am. Inc.*, 2013 WL 3877596, at *5.

Defendants' reliance on *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938 (N.D. Cal. 2015), is misplaced.  There, the Court found that the three elements—equitable ownership, use of same offices and employees, and identical officers and directors—were not enough to establish unity of interest for the purposes of personal jurisdiction after evidence of alter

ego liability was actually submitted and reviewed.  *Id.* at 956.  Not so here, where the Court reviews only the four corners of the complaint.

Next, "California courts generally require evidence of some bad-faith conduct to fulfill the second prong of alter ego liability, [and] that bad faith must make it inequitable to recognize the corporate form."  *Smith v. Simmons*, 638 F. Supp. 2d 1180, 1192 (E.D. Cal. June 23, 2009).  A plaintiff's difficulty collecting judgment from a corporation is not an inequitable result that warrants application of the alter ego doctrine.  *Neilson*, 290 F. Supp. 2d at 1117.  Defendants harp on this rule, urging that there is no inequitable result solely based on the idea that Plaintiffs may not be able to obtain relief from Serenity Transportation alone.  But this is not what Plaintiffs allege.

Instead, Plaintiffs urge that the inequitable result is that Friedel will be unjustly enriched by having directly profited from having unlawfully instructed Serenity Transportation to violate the California Labor Code by classifying the drivers as independent contractors instead of employees—*i.e.*, by receiving a windfall as the corporation's sole shareholder from funds that otherwise would have been paid to the drivers as further wages or benefits but for his law-breaking advice.  Courts have rejected a plaintiff's attempts to argue that an allegation of unjust enrichment is enough to meet the inequitable result prong where the plaintiff alleges no facts explaining *how* the alleged alter ego benefited from the purported misconduct.  *See, e.g.*, *Gerritsen*, 2015 WL 3958723, at *28 (citation omitted).  But here, Plaintiffs have alleged facts about Friedel's role in the wrongful classification of drivers as independent contractors, and their allegations give rise to an inference of unjust enrichment because he is alleged to be the sole shareholder of the company—in other words, he alone benefitted from the misclassification.  On the one hand, Plaintiffs concede that they can offer no case law that holds that allegations of unjust enrichment of a sole shareholder are enough to satisfy the inequitable result prong.  Defendants, for their part, urge that a sole shareholder's unjust enrichment cannot be enough for inequitable result, or all shareholders would always be liable as alter egos in similar circumstances.  But this argument ignores the allegation that Friedel is alleged to be the *sole* shareholder of the company. And Defendants likewise offer no authority that holds that such allegations are not enough to plead

1    alter ego liability, instead relying solely on the presumption against alter ego.  While such

2    presumption exists, Defendants have not met their burden of showing that Plaintiffs' allegations

3    are insufficient to overcome the presumption of corporate separateness on a motion to dismiss.

4    This is enough to meet the inequitable result prong at this stage of the litigation.  Defendants' only

5    other argument against alter ego is their assertion at oral argument that Friedel was *not* the sole

6    shareholder of Serenity Transportation as Plaintiffs allege, such that finding alter ego adequately

7    pleaded here would result in holding all shareholders to answer in every independent contractor

8    classification case.  But this argument relies on facts outside the four corners of the TAC, which

9    the Court does not consider on a 12(b)(6) motion to dismiss.  Thus, while Plaintiffs may not be

10    able to prove on the merits that Friedel was Serenity Transportation's alter ego, they have

11    sufficiently pleaded alter ego allegations to survive Defendants' motion.

12            2.       Liability under California Labor Code § 2753.4

13          The first eight causes of action in the TAC allege liability against Friedel, in part, for

14    having advised Serenity Transportation to treat drivers—who were initially classified as

15    employees—as independent contractors knowing that they were, in fact, employees.  Plaintiffs'

16    allegations arise under California Labor Code § 2753, which provides in relevant party that a

17    person "who, for money or other valuable consideration, knowingly advises an employer to treat

18    an individual as an independent contractor to avoid employee status for that individual shall be

19    jointly and severally liable with the employer if the individual is found not to be an independent

20    contractor."  Cal. Labor Code § 2753(a).  The statute also includes a carve-out, noting that it does

21    not apply to a "person who provides advice to his or her employer" or a licensed attorney

22    providing legal advice.  *Id.* § 2753(b).

23          The TAC alleges that Friedel was the CEO of Serenity Transportation.  (Dkt. No. 46 ¶ 9.)

24    Thus, because he is alleged to be an employee of the company, Defendants contend that the

25    subsection (b) carve-out applies and Friedel is not vicariously liable under Section 2753.

26    Defendants made this same argument in their opposition to Plaintiffs' motion for leave to file the

27    TAC, and the Court noted that because neither party had offered "any case law addressing whether

28    a defendant alleged to be an employee can still be subject to liability for advice provided in some

United States District Court
Northern District of California

11

other capacity[, t]he Court cannot conclude absent further briefing that Plaintiffs' Section 2753 claim against Friedel" fails.  (Dkt. No. 49 at 5.)  Defendants still do not cite any case law in support of their position.  They note that "no other case has squarely addressed the issue of liability based upon [Section] 2753 for individuals wearing 'numerous corporate hats[.]'"  (Dkt. No. 51 at 26 n.4.)  Indeed, neither Plaintiffs nor the Court has found authority addressing this issue, which is not altogether surprising given that the law only went into effect in 2012.

Defendants argue generally that, as a matter of logic, when a person performs as both employee and in other roles for his employer—like a member of board of directors—his employment relationship always precludes Section 2753 liability.  On the one hand, this approach finds support in the legislative history of Section 2753, which explains that the addition of the section "was necessary because employers frequently relied on the services of employment consulting firms to find ways to streamline the business and cut costs."  *Noe v. Super. Ct.*, 237 Cal. App. 4th 316, 330 (2015) (citation omitted).  Thus, the purpose of Section 2753 was to combat outside consultants.  *See id.* & n.7.  On the other hand, the statute is to be construed broadly in favor of protecting employees—*i.e.*, those individuals misclassified by the employer. *Id.* (citations omitted).  This weighs in favor of extending liability to employees acting in distinct capacities.  Moreover, in other contexts, California courts have recognized the distinction between employee and a board member and found liability only where the defendant was acting in the capacity of the particular position that could give rise to liability.  For example, in *Gaillard v. Natomas Co.*, 208 Cal. App. 3d 1250 (1989), the court declined to apply the business judgment rule to officer-director defendants because the actionable conduct arose out of their role as officer employees, not as directors.  *Id.* at 1265.  With no direct authority to rely on, and since the Court it required to interpret the Labor Code broadly to protect employees, *see Noe*, 237 Cal. App. 4th at 330, the Court concludes that, as pleaded, Section 2753 liability may attach where an officer-director provides misclassification advice in his role as director.

Defendants further contend that Plaintiffs have not alleged that Friedel received money or valuable consideration for providing the misclassification advice, so the claim fails anyway.  But Plaintiffs have alleged that Friedel was the sole shareholder of Serenity Transportation.  (Dkt. No.

51 ¶ 9.)  Drawing all inferences in Plaintiffs' favor as required, one could reasonably infer that Friedel received the cost-savings benefit—*i.e.*, withheld wages and benefits—that resulted from Serenity Transportation classifying drivers as independent contractors instead of employees. Thus, Plaintiffs have stated a claim for Friedel's vicarious liability under Section 2753, as well. The Court therefore declines to dismiss Friedel from this action.[2]

**B.     Whether the TAC Adequately Pleads that Defendants SCI, SCI California, Neptune, Lifemark and the County are Joint Employers with Serenity Transportation**

Defendants next contend that Plaintiffs have failed to allege that SCI, SCI California, Neptune, Lifemark, and the County are liable to Plaintiffs as "joint employers" under the FLSA and California law.   The joint employer doctrine recognizes that "even where business entities are separate, if they share control of the terms of conditions of an individual's employment, both companies can qualify as employers." *Guitierrez v. Carter Bros. Sec. Servs., LLC*, No. 2:14-cv-00351-MCE-CKD, 2014 WL 5487793, at *3 (E.D. Cal. Oct. 29, 2014) (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 769-60 (9th Cir. 1979)).  "While [the] plaintiff is not required to conclusively establish that defendants were her joint employers at the pleading stage, [the] plaintiff must at least allege *some* facts in support of this legal conclusion." *Hibbs-Rines v. Seagate Techs., LLC*, No. C 08-05430 SI, 2009 WL 513496, at *5 (N.D. Cal. Mar. 2, 2009) (citation omitted).

1.     Joint Employer under the FLSA

---

[2] Plaintiffs also allege that Friedel himself was an "employer" of drivers.  An individual manager can be liable as an employer where he has a significant role in company operations and supervision of employees, particularly where he has a say on financial matters.  *See Boucher v. Shaw*, 572 F.3d 1087, 1094 (9th Cir. 2009); *Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 398 (N.D. Cal. 2012) (noting that employer status under the FLSA "has been found where a manager had the authority to hire and fire employees, instructed employees regarding time cards, maintained employment records, filled out wage sheets, and paid the bills") (citation omitted); *cf. Baird v. Kessler*, 172 F. Supp. 2d 1305, 1311 (E.D. Cal. 2001) (concluding that a managers who did not "control the purse strings" were not individually liable as employers even though they set work schedules, drafted employee handbooks, recommended or reviewed terminations, and maintained employment records).  Drawing all inferences in Plaintiffs' favor, the TAC adequately alleges that Friedel, as sole shareholder of Serenity Transportation, was a joint employer. Defendants do not appear to challenge Plaintiff's claims against Friedel directly as an employer, so even if the alter ego and vicarious liability claims were inadequately pleaded, Friedel would remain in the case.

United States District Court
Northern District of California

a.   *Legal Standard*

A defendant must be an "employer" of the plaintiff to be liable under the FLSA.  *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).  The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The statute defines "to employ" as "to suffer or permit to work."  *Id.* § 203(g).  "[T]he Ninth Circuit has held that the definition of employer under the FLSA should be construed to mean that an individual is subject to liability under the FLSA where an individual exercises control over the nature and structure of the employment relationship, or economic control over the relationship."  *Arias v. Raimondo*, No. 2:13-cv-00904-TLN-EFB, 2015 WL 1469272, at *4 (E.D. Cal. Mar. 30, 2015) (citations omitted).

"Two or more employers may be "joint employers" for the purposes of the FLSA."  *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1232 (C.D. Cal. 2007).  "All joint employers are individually responsible for compliance with the FLSA."  *Id.*; *see also* 29 C.F.R. § 791.2(a).  Whether an entity is a "joint employer" under the FLSA is a question of law.  *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997).

The Supreme Court has explained that the "economic reality" of an employment situation determines whether an employer-employee relationship exists under the FLSA.  *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33 (1961).  "The FLSA itself does not specifically address the concept of joint employers."  *Adedapoidle-Tyehimba v. Crunch, LLC*, No. 13-cv-00225-WHO, 2013 WL 4082137, at *3 (N.D. Cal. Aug. 9, 2013).  However, the Department of Labor promulgated regulations that provide guidance for when joint employment may exist.  *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1112 n.4 (9th Cir. 2001) ("We give deference to the DOL's regulations interpreting the FLSA.").  These regulations provide that

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share

the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).  Thus, the regulations indicate that "joint employment will generally be considered to exist when 1) the employers are not 'completely disassociated' with respect to the employment of the individuals and 2) where one employer is controlled by another or the employers are under common control."  *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 918 (9th Cir. 2003).

The Ninth Circuit, in turn, has adopted a four-part "economic reality" test to determine when the employer-employee relationship exists.  *See Bonnette*, 704 F.2d at 1470.  These factors include whether the employer:  "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.*; *see also Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (confirming applicability of the *Bonnette* factors for the economic reality test).  In *Torres-Lopez v. Mary*, the Ninth Circuit added to this analysis eight secondary "non-regulatory" factors that support joint employer status, including whether:

(1) the work done by the employee was analogous to a specialty job on the production line; (2) the responsibility under the contract was standard for the industry and could be passed from one contractor to another without material change and little negotiation; (3) the purported joint employer owns or has an interest in the premises and equipment used for the work; (4) the employees did not have a business organization that could shift as a unit from one worksite to another; (5) the services rendered were piecework and did not require special skill, initiative or foresight; (6) the employee did not have an opportunity for profit or loss depending upon the employee's managerial skill; (7) there was permanence in the working relationship and (8) the service rendered was an integral part of the alleged joint employer's business.[3]

---

[3] The *Torres-Lopez* factors derive from the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1872.  *See Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226,

United States District Court
Northern District of California

*Id.* at 640; *Moreau*, 356 F.3d at 947-48.  The first and eighth *Torres-Lopez* factors, however, do not have much bearing outside of the production-line employment context.  *Moreau*, 356 F.3d at 952.  The Ninth Circuit has since clarified that the *Bonnette* factors weigh most heavily in the analysis.  *See Moreau*, 356 F.3d at 946-47 (noting that the court "focused primarily on [the] four *Bonnette* factors"); *see also, e.g.*, *Rios v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL 2067847, at *2 (N.D. Cal. July 24, 2006) (noting that the *Bonnette* factors are most important) (citations omitted).

In addition to pleading facts in support of the *Bonnette* and *Torres-Lopez* factors, a plaintiff seeking to hold multiple entities liable as joint employers must plead specific facts that explain how the defendants are related and how the conduct underlying the claims is attributable to each defendant.  *See Freeney v. Bank of Am. Corp.*, No. CV 15-02376 MMM (PJWx), 2015 WL 4366439, at *18 (C.D. Cal. July 16, 2015); *Adedapoidle-Tyehimba*, 2013 WL 4082137, at *5.  Ultimately, all of these factors are meant to guide a court's analysis, but the ultimate determination must be based "upon the circumstances of the whole activity."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Bonnette*, 704 F.2d at 1470 ("The [ ] factors . . . provide a useful framework for analysis . . . but they are not etched in stone and will not be blindly applies.").  At the motion to dismiss stage, a plaintiff need only allege facts demonstrating some of the *Bonnette* or *Torres-Lopez* factors to survive.  *See, e.g.*, *Guitierrez*, 2014 WL 5487793, at *5-6.

      b.   *Application to the Customer Defendants*

      i.   *Bonnette* Factors

**Power to Hire and Fire**.  The first *Bonnette* factor is whether the alleged joint employer has the power to hire and fire the purported employees.  Here, the TAC alleges that Serenity Transportation and Friedel placed job advertisements, interviewed, and hired drivers, then provided them to the Customer Defendants as a labor contractor.  (Dkt. No. 50 ¶¶ 19-20.)  Thus, the Customer Defendants plainly have no hiring authority.  With respect to firing, the TAC alleges generally that the Customer Defendants retain and exercise the right to remove drivers from their work rotation.  (Dkt. No. 50 ¶ 35.)  In contrast, however, the TAC also explicitly alleges that Serenity Transportation and Friedel retain and exercise the right to terminate a driver's

United States District Court
Northern District of California

1   employment.  (*Id.*; *see also id.* ¶ 22 (noting that failure to comply with policies could result in the

2   driver's contract termination).)  Plaintiffs argue in their opposition that removal of a driver from

3   his work rotation for a particular Customer Defendant "effectively terminates the Driver from that

4   Defendant and is indicative of employment status."  (Dkt. No. 52 at 12.)  But the TAC does not

5   allege that removal of a driver from a work rotation terminates the driver's role—as a driver for

6   Serenity Transportation.  Thus, the first *Bonnette* factor weighs against a finding of joint employer

7   status for all of the Customer Defendants.

8       ***Control over the Employees' Work Schedules or Conditions.***  The second *Bonnette* factor

9   is whether the entity had control over the employees' work schedules or conditions.  This factor

10  provides a scintilla of support for a finding of joint employer status.   The Court discounts the

11  conclusory allegation that all "[e]ach of the Defendants has retained extensive control over the

12  wages, hours, and working conditions of Plaintiffs and other Drivers."  (Dkt. No. 50 ¶ 17.)  The

13  TAC alleges that the Customer Defendants promulgated detailed policies that governed the work

14  that the drivers performed.  (*Id.* ¶¶ 23-27.)  Similarly, with respect to each Customer Defendant,

15  Plaintiffs allege that when drivers were on their locations or performing work for them, they were

16  under that Customer Defendant's supervision and control.  (*Id.*)  But the TAC lacks factual

17  allegations to support this legal conclusion.  These allegations are too vague and conclusory to

18  support a plausible inference of joint employment under the relevant pleading standards.

19      Turning to the more specific allegations against each Customer Defendant, SCI and SCI

20  California enacted policies requiring drivers to use particular labeling and removal protocol;

21  requiring that drivers receive training; detailing the time period in which drivers were to respond

22  to calls; and specifying that drivers dress "in a professional manner."  (*Id.* ¶ 24.)  Merely requiring

23  drivers to dress professionally while on the job plainly does not give rise to joint employer

24  liability; this "policy" does not even identify the particular clothing that the drivers must wear.

25  And while one identified policy is that SCI and SCI California require that drivers receive

26  training, Plaintiffs do not allege that the training comes from those entities or has anything to do

27  with those entities' policies.  Thus, the claim against SCI and SCI California turns on those

28  entities' labeling and removal protocol and policies detailing the time period in which drivers must

respond to calls.  There is no allegation that SCI and SCI California control the drivers' driving routes or schedules.  These allegations provide some indication that SCI and SCI California had limited control over the employees' work conditions, but the inference is weak at best.

Turning to Neptune, Plaintiffs allege that the entity created policies with instructions on how and where drivers must record information about the deceased, how to handle the deceased, and the order in which drivers were to complete tasks.  (*Id.* ¶ 25.)  The TAC does not detail what those policies were—*i.e.*, what tasks were included and, how they were enforced, if at all.  Further undercutting any inference of Neptune's control is the allegation that Neptune "worked with STI and Friedel" to create the policies.  (*Id.*)  Even drawing all reasonable inferences in Plaintiffs' favor, that Neptune did not have its own policies governing the drivers but rather created policies with the drivers' actual employer undercuts the conclusion that Neptune itself exercised control over the drivers' working conditions through these policies.

The same is true of Lifemark, which is alleged to have worked with Serenity Transportation and Friedel to create policies and procedures including instructions on how and where to record information about the deceased, how to handle the deceased, and how drivers should conduct themselves while located on Lifemark property.  (*Id.* ¶ 26.)  As above, the TAC does not detail what those policies are; without them, the Court has no ability to suss out the extent to which the policies actually indicate Lifemark's control over the drivers' working conditions.  Nor does the TAC allege that Lifemark itself monitored or enforced the policies.  Thus, as written, the allegations against Neptune and Lifemark give rise only to an anemic inference that the entity exercised control over the drivers' work conditions and schedules.

The County presents a slightly different picture.  The TAC alleges that the County promulgated policies about the timeframe in which drivers must respond to different types of calls, the amount of time drivers were required to wait at the scene if the deceased was not ready to be transported, and "stand-by" and "dry-run" time.  (*Id.* ¶ 27.)  This is enough, at this stage of litigation, to plausibly establish that the Customer Defendants exercise control over the driver's work conditions.  Defendants urge that the work conditions or requirements relating to timing and manner of decent pick-up that they are alleged to have imposed were merely "for the sake of

United States District Court
Northern District of California

18

tracking dead bodies" and contend that they are therefore insufficient like the policies in *Moreau v. Air France*, 356 F.3d 942, 951 (9th Cir. 2004), which were imposed "to ensure compliance with various safety and security regulations[.]"  But there are no allegations in the TAC that the Customer Defendants' policies are meant to ensure compliance with laws, ordinances, or regulations.  To be sure, the control that the Customer Defendants are alleged to exercise could be stronger—for example, there are no allegations here that the Customer Defendants were involved in day-to-day oversight of driver's work.  But the allegations against the County are enough to satisfy this *Bonnette* factor.

Thus, the second *Bonnette* factor provides some support for a finding of joint employer status for the County, and minimal support for such finding as to SCI, SCI California, Neptune, and Lifemark.

**Control over the Rate and Method of Employees' Payment.** The third *Bonnette* factor is whether the alleged employer determined the rate and method of the employees' payment.  The TAC alleges in a conclusory fashion that "[a]ll Defendants participate in the compensation scheme, including by requiring Drivers to fill out proprietary paperwork on which Driver time is recorded."  (Dkt. No. 50 ¶ 37.)  In the TAC, Plaintiffs impliedly allege that they signed an employment contract with Serenity Transportation.[4]  (*See* Dkt. No. 50 ¶ 22 (Serenity

---

[4] Defendants attached a copy of Plaintiff Johnson's employment contract to their motion to dismiss. (Dkt. No. 51-1.)  On a 12(b)(6) motion, a court may consider documents incorporated by reference into the complaint.  *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) (citing Fed. R. Civ. P. 12(b)).  "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claims."  *Id.*  "The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for the purposes of a motion to dismiss."  *Id.*  This "incorporation by reference doctrine" has been extended "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint."  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The incorporation by reference doctrine permits the Court to consider Plaintiff Johnson's employment agreement with Serenity Transportation.  Plaintiffs refer to an employment contract in the TAC and states that Serenity Transportation retained the right to terminate for any or no reason.  Plaintiffs contend that it was improper for Defendants to submit the contract, but do not challenge its authenticity, and in fact quote from the document in their opposition.  (*See* Dkt. No. 52 at 12-13 n.8.)  Although Plaintiffs stated at oral argument that they dispute the authenticity of the contract, their dispute was limited to the duration provision only: they contend that Plaintiff Johnson signed a 1-year contract, not a 2-year as the contract Defendants submitted.  However, the

United States District Court
Northern District of California

Transportation and Friedel's policies notified drivers that violations could result in contract termination).)  The employment contract indicates that drivers receive a percentage of the fees for services that the Customer Defendants pay.  (Dkt. No. 51-1 at 7.)  While this makes clear that the Customer Defendants' initial fee contributes to the ultimate determination of how much drivers received, it is Serenity Transportation alone that was actually responsible for determining the rate at which drivers were ultimately paid.  This is not enough to plausibly infer that the Customer Defendants have control over the payment that the drivers receive.

**Maintenance of Employment Records for the Employees.** The final *Bonnette* factor considers whether the Customer Defendants maintain employment records for the employees.  The TAC does not allege that SCI, SCI California, Neptune, or Lifemark maintain employment records for the drivers.  As for the County, the TAC alleges that the County requires drivers to keep records and retains the right to keep records of the runs.  (Dkt. No. 50 ¶ 27.)  But it does not allege that the County actually maintains such records.  Thus, this factor weighs against a finding of joint employment status against all Customer Defendants.

Plaintiff's argument that it has no knowledge regarding whether other Defendants [besides the County] retained employment records" because those Defendants "have not substantially responded to any discovery requests" misses the mark.  (Dkt. No. 52 at 13.)  This approach— allowing Plaintiffs to cure pleading defects at the back end through facts gleaned through discovery rather than pleading facts in the complaint—flips the relevant pleading standard on its head.  *Twombly* and *Iqbal* require a plaintiff to plead enough facts from which a plausible inference of joint employment status can be drawn to survive dismissal, and *thereafter* proceed to discovery, not the other way around.

ii.  *Torres-Lopez* Factors

The Court now turns to the second through seventh *Torres-Lopez* factors.  *See Moreau*, 356 F.3d at 952.  As for the second factor, there are no allegations that "responsibility under the

---

Court does not rely on the duration of the contract in its analysis and Plaintiffs did not challenge the authenticity of any other provision of the agreement, so the Court will consider it.

20

contract was standard for the industry and could be passed from one contractor to another without material change and little negotiation[,]" so this factor weighs against a finding of joint employer status. *Torres-Lopez*, 111 F.3d at 640. Similarly, there are no allegations that SCI, SCI California, Neptune or Lifemark has an interest in any of the equipment the drivers used—*i.e.*, the cars or other equipment used to transport the bodies, so the third factor weighs against a finding that they are joint employers. The TAC alleges that the County "retained the right to supply some of the equipment, including body bags, plastic sheeting, and body shrouds." (Dkt. No. 50 ¶ 27.) On the other hand, the TAC does not allege that the County actually supplied any of this equipment or had any ownership or other interest in the drivers' cars. Thus, this factor provides a modicum of support for a finding of joint employer status only for the County. There are no allegations pertaining to the fourth *Torres-Lopez* factor, but the fifth and sixth weigh in favor of joint employer status inasmuch as the TAC alleges that the services rendered were piecework as drivers received a flat rate per run and required no special skill or license requirement and that the drivers had no opportunities for profit or less depending on their managerial skill. Seventh, Plaintiffs allege that there was permanence in the working relationship, but at the same time allege that the Customer Defendants could remove a driver from their work route at any time and were provided to the Customer Defendants as labor contractors on a per-call basis. This factor is therefore a wash. In short, the third (ever so slightly), fifth, and sixth factors support a finding of joint employment as for the County, and only the fifth and sixth support such a finding as to SCI, SCI California, Neptune and Lifemark.

But besides a mechanical application of these factors, the facts of *Torres-Lopez* itself are also instructive. There, the nominal employer effectively had no employees at all, but instead functioned more as an employment agent or broker to funnel workers to the grower, which then exercised control over most aspects of the field work. 111 F.3d at 637. In other words, the purported joint employer—not the nominal employer—exercised control over the workers. Not so here, where Serenity Transportation and Friedel hire, train, supervise, and fire drivers, and function not as an employment agent or broker, but as a labor contractor providing its own driver-employees to perform services for its customers. In short, the secondary *Torres-Lopez* factors,

1    especially in light of the weak showing of a single *Bonnette* factor, do not compel the Court to

2    conclude that the Customer Defendants are joint employers.

3                                              *   *   *

4          The *Bonnette* factors weigh the heaviest in the joint employment analysis under federal

5    law, *see Moreau*, 356 F.3d at 946-47, and as set forth above, only one of the factors provides any

6    support for a finding of joint employer status.  Plaintiffs are unable to cite a case suggesting that a

7    single *Bonnette* factor is enough for joint employment even at the pleading stage.  Analysis of the

8    secondary *Torres-Lopez* factors likewise provides only minimal support for such a conclusion.

9    Ultimately, as the Ninth Circuit instructs, the factors are just a guide and what matters is the

10   totality of the circumstances alleged. *See Rutherford*, 331 U.S. at 730; *Bonnette*, 704 F.2d at 1470.

11   In light of the *Bonnette* and *Torres-Lopez* factors, and viewing the economic realities test as a

12   whole, the TAC does not adequately allege that any of the Customer Defendants are actually

13   functioning as joint employers of the drivers.  Plaintiff shall have leave to amend to cure the

14   defects discussed above.

15          2.       Joint Employer Under California Law

16          The Court reaches the same conclusion applying California law, which has its own test for

17   determining joint employment.

18                   a.       *Legal Standard*

19          In actions to recover unpaid minimum wages pursuant to Cal. Labor Code § 1194, as here,

20   "the standards to determine whether Defendants are directly liable are set out in *Martinez v.*

21   *Combs*, 49 Cal.4th 35 (2010), where the California Supreme Court held that the definition of

22   'employer' for minimum wage purposes is provided in the orders of California's Industrial

23   Welfare Commission ("IWC")[.]"  *Ochoa v. McDonald's Corp.*, --- F. Supp. 3d ----, No. 14-cv-

24   02098-JD, 2015 WL 5654853, at *2 (N.D. Cal. Sept. 25, 2015); *see Martinez*, 49 Cal. 4th at 52;

25   *see, e.g.*, *Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1429 (2010); *Betancourt v.*

26   *Advantage Human Resourcing, Inc.*, No. 14-cv-01788-JST, 2014 WL 4365074, at *2-3 (N.D. Cal.

27   Sept. 3, 2014); *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 394-95 (C.D. Cal. 2014);

28   *Taylor v. Waddell & Reed Inc.*, No. 09-cv-02909 AJB (WVG), 2013 WL 435907, at *3 (S.D. Cal.

*United States District Court*
*Northern District of California*

22

Feb. 1, 2013) (citation omitted); *Arredondo v. Delano Farms Co.*, No. CV F 09-01247-LJO-DLB, 2012 WL 2358594, at *9 (E.D. Cal. June 20, 2012) (citation omitted).  The IWC Wage Order provides three alternative definitions for the term "to employ."  *Martinez*, 49 Cal.4th at 64.  It means: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship."  *Id.* at 64.

Notably, Plaintiffs argued that another test should primarily drive the determination—namely, the California common law employment relationship tests as governed by the multi-factor test in *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  In *Martinez*, the California Supreme Court expressly rejected the contention that California's common law test for defining employment is the sole test that applies to define employment in wage and hour actions pursuant to Section 1194.  *See* 49 Cal.4th at 50 n.12 (concluding that *Reynolds v. Bement*, 36 Cal.4th 1075 (2005) "spoke too broadly in concluding that the common law defines the employment relationship in actions under section 1194"); *see also id.* at 62-65 (holding that *Reynolds* does not apply).  Instead, *Martinez* stands for the proposition that the three definitions set forth in the IWC Wage Order control—in part due to legislative intent to expand the employer definition beyond the common law employment relationship and provide more protection than the federal law "economic realities" test.  *See id.* at 58-60.  However, "the IWC's definition of employment incorporates the common law definition *as one alternative*"—namely, under the third definition "to engage."  *Id.* at 64; *see also Taylor*, 2013 WL 435907, at *5 ("*Martinez* clarified that the common law test still plays an important role in the IWC's definition of the employment relationship as it incorporates the common law definition as one alternative.") (internal quotation marks and citation omitted).

Plaintiffs argue that since *Martinez*, a number of courts have continued to apply only the common law *Borello* right-to-control test without reference to Martinez or the IWC Wage Order definitions.  *See, e.g.*, *Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 988 (9th Cir. 2014); *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1100-01 (9th Cir. 2014); *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 530-31 (20124).  But the cases on which Plaintiffs rely

are distinguishable.  First, in those cases the parties agreed that the *Borello* test applied.  More importantly, the courts in those cases were determining whether a single entity had accurately classified workers as employees versus independent contractors, rather than whether secondary entities were joint employers, as is the case here.  *See Alexander*, 765 F.3d at 988; *Ruiz*, 754 F.3d at 1100-01; *Ayala*, 59 Cal. 4th at 530-31.  The only case Plaintiffs cite that involved a court determining whether a secondary entity counted as a joint employer is *Guitierrez v. Carter Bros. Sec. Servs., LLC*, No. 2:14-cv-00351-MCE-CKD, 2014 WL 5487793 (E.D. Cal. Oct. 29, 2014).  The *Guitierrez* court applied only the *Borello* test to determine whether the plaintiffs had adequately alleged that a certain entity was a joint employer under California law, but relied on *Ayala*, which, as described above, does not involve joint employer allegations.  In short, Plaintiffs' authority does not persuade the Court that the IWC Wage Order definitions discussed in *Martinez* should not govern the analysis of whether the Customer Defendants are joint employers under California law.

　　　Still, the question of the scope of *Martinez*'s application has not yet been resolved.  As one court in this District recently explained, "[a]lthough *Martinez* involved alleged minimum wage violations under California Labor Code § 1194, California courts have applied the *Martinez* definition to causes of action arising under other section of the Labor Code as well."  *Ochoa*, 2015 WL 5654853, at *2 n.3 (collecting cases).  The California Supreme Court has not yet decided whether *Martinez* applies to other wage-and-hour claims, *see Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 531 (2014) ("[W]e leave for another day the question what application, if any, the wage order tests for employee status might have to wage and hour claims such as these."), and recently granted review on the question of how broadly *Martinez* should apply, *see Dynamex Operations West, Inc. v. Super. Ct.*, No. S222732, 182 Cal. Rptr. 3d 644 (2015).  Despite some uncertainty, the Court agrees with the well-reasoned approach of the *Ochoa* court and others and will therefore apply *Martinez*—and the three IWC Wage Order definitions—to the wage and hour claims here.  *See Ochoa*, 2015 WL 5454853, at *2; *Futrell*, 190 Cal. App. 4th at 1429; *Betancourt*, 2014 WL 4365074, at *2-3; *Torres*, 300 F.R.D. at 394-95; *Taylor*, 2013 WL 435907, at *3; *Arredondo*, 2012 WL 2358594, at *9.

United States District Court
Northern District of California

24

United States District Court
Northern District of California

Notably in *Martinez*, the California Supreme Court also implied that *Borello* may not apply to wage claims at all because the facts are distinguishable.  49 Cal. 4th at 73 ("Assuming the decision in [*Borello*] has any relevance to wage claims, a point we do not decide, the case does not advance plaintiffs' argument.").  But, to date, the California Supreme Court has not held that *Borello* is inapplicable.  Thus, to the extent that *Borello* is relevant to any of the definitions of employer under the IWC Wage Order, the Court will still reference standards set forth in that case.

          i.   Exercise Control over Wages, Hours, or Working Conditions

Under *Martinez*, an entity employs workers if it "directly or indirectly, or through an agent or any other person, employs or exercises control" over their wages, hours, or working conditions.  IWC Wage Order No. 9-1002 § 2(G).  The language is disjunctive, and control over only one such factor will give rise to joint employer liability.  *See Martinez*, 49 Cal.4th at 59.  "While this language is potentially quite broad in scope, California courts have circumscribed it by denying employer liability for entities that may be able to influence the treatment of employees but lack the authority to directly control their wages, hours or conditions."  *Ochoa*, 2015 WL 5654853, at *3.

For example, in *Martinez*, the plaintiff workers sued a farmer and two produce merchants that sold the farmer's produce.  49 Cal.4th at 42.  The *Martinez* court held that the merchants were not joint employers.  While the merchant could decide how much to pay the farmer, which would then influence how much the farmer paid the workers, this was not enough to constitute control over wages.  *Id.* at 72.  Moreover, while the merchants instituted some policies pertaining to the manner and method of packing the produce, only the farmer decided which field the workers would harvest, hired and fired the workers, trained and supervised them, determined their rate and manner of pay, and set their hours.  *Id.*  Thus, only the farmer, not the merchant, had ultimate control over wages, hours, and working conditions and constituted an employer.  *Id.*  Other courts applying California law have reached similar conclusions.  *See, e.g.*, *Futrell*, 190 Cal. App. 4th at 1432-33 (on defendant's motion for summary judgment, noting that an entity that "does not control the hiring, hiring, and day-to-day supervision of workers" is not an employer); *Ochoa*, 2015 WL 5654853, at *5 (on defendant's motion for summary judgment, holding that McDonald's is not a joint employer of the employees its franchisees because "the authority to make hiring,

firing, wage, and staffing decisions at the [franchised] restaurants lies in [the franchisee] and its managers—and in them alone").

### ii. Suffer or Permit to Work

An entity can be held liable as an employer for "suffering or permitting to work" only if it "fail[s] to perform the duty of seeing to it that the prohibited condition does not exist." *Martinez*, 49 Cal.4th at 69 (internal quotation marks omitted). Put another way, the "basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Id.* at 70 (emphasis in original). Merely receiving the benefit of the employees' work is not enough to establish liability under the "suffer or permit to work" standard. *Id.*

In *Martinez*, the California Supreme Court concluded that the produce merchants were not employers because "neither had the power to prevent plaintiffs from working." *Id.* Instead, only the farmer "had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work." *Id.* The court reasoned that while the merchants "might as a practical matter have forced [the farmer] to lay off workers or to divert their labor to other projects" by no longer doing business with the farmer, but "[s]uch a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce." *Id.* Other courts have similarly underscored that an entity does not "suffer or permit" workers to work where they do not have hiring and firing power. *See, e.g.*, *Futrell*, 190 Cal. App. 4th at 1434; *Ochoa*, 2015 WL 5654853, at *7. This is true even where the entity monitors the workers' performance and can exercise influence over the workers' actual employer. *See, e.g.*, *Ochoa*, 2015 WL 5654853, at *7 (citations omitted).

### iii. Engage

Under *Martinez*, "to engage" means to create a common law employment relationship. *Martinez*, 49 Cal.4th at 64. Under the common law, "[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."[5] *Borello*, 48 Cal.3d at 350; *see also Futrell*, 190

---

[5] California's common law the test is so similar to federal law that at least one court in this District has declined to apply the California rules separately and instead applied the FLSA test even to

26

United States District Court
Northern District of California

Cal. App. 4th at 1434 (noting that the key factor is "control of details").  What matters is whether the hirer "retains all necessary control" over the operations, and the strongest factor is whether the hirer can discharge the worker without cause.  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 532 (2014).

California courts also consider "several 'secondary' indicia of the nature of a service relationship."  *Borello*, 48 Cal. 3d at 350; *Futrell*, 190 Cal. App. 4th at 1434.  These factors include the right to terminate at will, along with:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.*; *see also Futrell*, 190 Cal. App. 4th at 1434.  The factors "[g]enerally . . . cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Borello*, 48 Cal.3d at 350 (citation omitted).

        2.     <u>Application to the Customer Defendants</u>

Plaintiffs argue that the allegations in the TAC meet all three definitions of an employer under *Martinez*.

        a.     *Exercise Control Over Wages, Hours, or Working Conditions*

Plaintiffs contend that the Customer Defendants exercise control over both their wages and working conditions sufficient for a finding of joint employment.  With respect to wages, Plaintiffs insist that the Customer Defendants in part set the drivers' compensation, based on the allegation that "Drivers are paid a flat rate set by Defendants for each dispatch they complete."  (Dkt. No. 50

---

state law labor claims.  *See Rios v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL 2067847, at *2 (N.D. Cal. July 24, 2006) (where plaintiff brought both FLSA and state law claims, noting that "[b]ecause of the similarities underlying the FLSA and California laws at issue here, the court applies the FLSA's joint employer test to [plaintiff's] claims"); *see also Guitierrez*, 2014 WL 5487793, at *5 (noting that the California common law "right-to-control" test is similar to federal law's economic reality test).

¶ 37.)  But the employment contract indicates that drivers receive a percentage of the fees for services that the Customer Defendants pay.  (Dkt. No. 51-1 at 7.)  While this makes clear that the Customer Defendants' initial fee contributes to the ultimate determination of how much drivers receive, Serenity Transportation alone is alleged to have responsibility for determining the rate at which drivers were ultimately paid.  The California Supreme Court squarely rejected the exact argument that Plaintiffs now advance.  *See Martinez*, 49 Cal. 4th at 52 (concluding that the merchant's provision of funds to the farmer does not constitute control over the workers' wages even though the provision of funds affects the farmer's payments to the workers).  Thus, the TAC does not adequately allege that the Customer Defendants exercise control over the drivers' wages.

Nor does the TAC allege facts that give rise to a plausible inference that the Customer Defendants exercise control over the drivers' working conditions based on the policies they are alleged to have promulgated.  While the TAC includes some allegations regarding policies that the Customer Defendants promulgated with respect to the drivers' work and that certain Customer Defendants (namely, SCI and SCI California) required drivers to undergo training, mere imposition of requirements or oversight of workers' performance is not enough to make the overseeing entity a joint employer absent hiring and firing power.  *See Martinez*, 49 Cal.4th at 70; *Futrell*, 190 Cal. App. 4th at 1432-33; *Ochoa*, 2015 WL 5654853, at *5.

Plaintiffs rely on *Villalpando v. Exel Direct, Inc.*, No. 12-cv-04137 JCS, 2014 WL 1338297, at *5 (N.D. Cal. Mar. 28, 2014), for the proposition that general allegations that Defendants promulgated policies controlling the manner and means in which drivers were required to perform their work are sufficient to survive a motion to dismiss.  The *Villalpando* court concluded that the general allegations about the policies were "sufficient to put all of the Defendants on notice of the conduct that is the basis of Plaintiffs' claims."  *Id.* at *5.  The court further noted that "whether [the defendant] is, in fact, a joint employer with each of the retail Defendants is a question that will be the subject of discovery and may be addressed on the merits at a later stage of the case[,] [but] [a]t this early stage of the case, however, Plaintiffs' allegations . . . are sufficient" to meet pleading standards.  *Id.* at *6.  But in *Villalpando* the defendants did not assert that the allegations failed to adequately allege control.  The case did not even mention the

United States District Court
Northern District of California

relevant standards for pleading joint employment.  Instead, the court's focus appeared to have been the defendants' lament that the complaint simply alleged that defendants collectively had policies without specifying the policies of each one.  *See id.* at *5-6.  Here, in contrast, Plaintiffs have identified the specific policies that each Customer Defendant purportedly promulgated, but the identified policies are not enough to give rise to a plausible inference of joint employer status.

And indeed, besides conclusory allegations that the Court does not accept as true, there are no factual allegations supporting the proposition that the Customer Defendants could hire or fire drivers from their positions.  While they could request that a driver be removed from their rotation—*i.e.*, that the driver no longer performs pickups for them—there are no allegations that this removal affects the driver's employment with Serenity Transportation.  Thus, the allegations do not plausibly establish that removal from one Customer Defendant's routes does not result simply in the driver doing runs for other customers.  *See Martinez*, 49 Cal.4th at 70; *Futrell*, 190 Cal. App. 4th at 1432-33; *Ochoa*, 2015 WL 5654853, at *5.  Further, the TAC alleges that it was Serenity Transportation and Friedel that were responsible for day-to-day supervision of the drivers.  Thus, the TAC does not allege that the Customer Defendants exercised control over the drivers' working conditions as defined in *Martinez*.

For each of these reasons, the TAC does not allege that the Customer Defendants exercised control over the drivers' wages working conditions sufficient for a finding of joint employer status under the first prong of *Martinez*.

b.      *Suffer or Permit to Work*

Plaintiffs' argument as to the second prong fares no better.  Plaintiffs barely push back against Defendants' assertion that the TAC fails to allege that the Customer Defendants "suffered or permitted" the drivers to work under the meaning of *Martinez*.  Indeed, Plaintiffs' opposition dedicates a single sentence in support of the proposition that the TAC meets the suffer-or-permit-to-work standard.  (Dkt. No. 52 at 10:17-19.)  Specifically, Plaintiffs contend that the allegation that the Customer Defendants "helped set workers' wages and determined in part the workers' work location and hours established that it may have had knowledge of and failed to prevent the allegedly unlawful work from occurring[.]"  (*Id.*)

United States District Court
Northern District of California

1    However, just like the alleged joint employers in *Martinez*, as explained above, Serenity

2    Transportation is alleged to have exclusive power to hire and fire the drivers and to set their wages

3    and hours.  *Martinez*, 69 Cal.4th at 69.  While the Customer Defendants retain the right to request

4    that a driver be removed from their route, that does not remove the driver from Serenity

5    Transportation's employ; thus, like *Martinez*, "[s]uch a business relationship, standing alone, does

6    not transform the purchaser into the employer of the supplier's workforce."  *Id.*  Instead, Plaintiffs'

7    argument hits the same brick wall as with the analysis above: the TAC does not plausibly allege

8    that the Customer Defendants had hiring and firing power, so they did not suffer and permit

9    drivers to work, even if they exercised control or influence over the actual employer.  *See, e.g.*,

10   *Futrell*, 190 Cal. App. 4th at 1434; *Ochoa*, 2015 WL 5654853, at *7;  *Futrell*, 190 Cal. App. 4th at

11   1434; *Ochoa*, 2015 WL 5654853, at *7.  Thus, the TAC fails to adequately allege that the

12   Customer Defendants are joint employers under this second prong of *Martinez*.

13              c.    *To "Engage" and thereby Create a Common Law Employment Relationship*

14   As for the third prong, whether the Customer Defendants "engaged" drivers, the Court

15   considers whether the Customer Defendants created a common law employment relationship with

16   the drivers.  *Martinez*, 49 Cal. 4th at 64.

17   The primary inquiry is whether the Customer Defendants had the right to exercise control

18   over the drivers.  The inquiry is similar to the FLSA analysis.  Plaintiffs allege that SCI/SCI

19   California retained the right to control the drivers' work by enacting detailed labeling and witness

20   removal protocol requiring that drivers receive training, detailing the time period in which drivers

21   must respond to calls, and retaining the right to control driver dress code.  (Dkt. No. 50 ¶ 24.)

22   Neptune allegedly created policies and procedures including instructions on how and where to

23   record information, how to handle the deceased, and the order in which drivers were to complete

24   tasks.  (*Id.* ¶ 25.)  Similarly, Lifemark allegedly created policies and procedures about how and

25   where to record information about the deceased, how to handle the deceased, and how drivers

26   should conduct themselves when arriving at and leaving Lifemark properties.  (*Id.* ¶ 26.)  The

27   County, in turn, promulgated policies governing identification and removal protocol, including the

28   timeframe in which drivers were expected to respond, the amount of time that drivers must wait at

30

the scene, records drivers must keep, professional dress requirements, and certain vehicle and equipment requirements.  (*Id.* ¶ 27.)  These allegations are enough to plausibly establish that the Customer Defendants had some control over *some* of the details of the drivers' work.

As for the secondary factors, while Plaintiffs argue that the Customer Defendants had the right to terminate drivers as explained above, the actual allegations are that the Customer Defendants could remove drivers from their rotation.  Next, Plaintiffs allege that transportation of human remains is not a distinct occupation or business from the Customer Defendants, but rather was integral to their work: SCI and SCI California allegedly hired drivers themselves, and Neptune and Lifemark advertise and offer removal transportation services as part of their end-of-life services.  (Dkt. No. 50 ¶¶ 30-31.)  They have alleged that no skill, special training or specialized license is required to do the work (*id.* ¶ 34), and that drivers were made available to the Customer Defendants on an ongoing basis, which implies an indefinite working relationship (*id.* ¶ 33).

On the other hand, other secondary factors are not pleaded: while Plaintiffs allege in a conclusory manner that the Customer Defendants paid drivers by the job, the employment contract indicates that it was actually Serenity Transportation that paid drivers in such a manner.  Moreover, while the TAC alleges that the drivers spent some time at properties belonging to the Customer Defendants, their primary place of work was the road—*i.e.*, their cars—and there are no allegations that SCI, SCI California, Neptune, or Lifemark supply the instrumentalities or tools for drivers.  The County is alleged to have retained the right to supply some equipment, like body bags, plastic sheeting, and body shrouds, which provides some support on this factor only with respect to the County.  (*See id.* ¶ 27.)  They have alleged that the work was generally done with supervision, but the only supervision alleged in the TAC is from Serenity Transportation and Friedel.  (*See id.* ¶ 19.)  Finally, there are no allegations in the TAC regarding whether the drivers and Customer Defendants believed that they were creating an employer-employee relationship.

To be sure, Plaintiffs do "not have to satisfy every factor in order to establish an employment relationship" at the pleading stage.  *See Betancourt*, 2014 WL 4365074, at *6 (citation omitted).  Plaintiffs have not cited any cases holding that a weak showing of right to

control coupled with some secondary indicia of an employment relationship is enough.  However, looking holistically at all of the factors, given that the control alleged is weak and that there are no allegations that the Customer Defendants could hire and fire drivers, Plaintiffs have not plausibly alleged an employment relationship.  At oral argument, Plaintiffs contended that they could allege additional factors to support these factors.  Plaintiffs shall have leave to amend to include additional support for these factors.

*   *   *

As written, the TAC does not adequately allege any basis for joint employer liability under the standards set forth in *Martinez*.  Because Plaintiffs have therefore failed to plausibly establish a basis for the Customer Defendants' joint employer liability under either federal or California law, the Court will therefore dismiss all claims against the Customer Defendants with leave to amend.

## C.    Adequacy of Particular Causes of Action

### 1.    Second Cause of Action Based on "On Call" and "Standby" Time

In the second cause of action, Plaintiffs allege that Defendants are liable for failing to pay drivers minimum wage for all hours worked because drivers were not compensated for "on call" or "standby time" waiting for new pick-up assignments in violation of California Labor Code § 1194 and IWC Wage Order 9-2001.  (Dkt. N. 50 ¶¶ 70-89.)  Defendants move to dismiss this claim on the ground that the TAC contains insufficient allegations that Plaintiffs are entitled to be paid for their on-call and standby time.

California law requires employees to be paid for "all hours" worked "at the statutory or agreed rate and no part of this rate may be used as a credit against a minimum wage obligation." *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 323 (2005).  Thus, "a piece-rate formula that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked." *Cardenas v. McLane Foodservs., Inc.*, 796 F. Supp. 2d 1246, 1252 (C.D. Cal. 2011); *see also Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 49 (2013) (noting that employees compensated on a piece-rate basis must be paid minimum wage for all hours worked).  The gravamen of the

1   second cause of action is that Plaintiffs were assigned to 24-hour shifts 5 days a week and were

2   not paid for hours spent waiting for their next driving assignment.

3        "It is well established that an employee's on call or standby time may require

4   compensation." *Mendiola v. CPS Sec. Solutions, Inc.*, 60 Cal. 4th 833, 840 (2015); *see also*

5   *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944) ("Facts may show that the employee was

6   engaged to wait, or they may show that he waited to be engaged."); *see, e.g.*, *Madera Police*

7   *Officers Ass'n v. City of Madera*, 36 Cal.3d 403, 406 (1984) (concluding that officers' on-call

8   mealtime was compensable hours worked).

9        "California courts considering whether on-call time constitutes hours worked have

10  primarily focused on the extent of the employer's control." *Mendiola*, 60 Cal.4th at 840 (citations

11  omitted).  In fact, "[t]he level of the employer's control over its employees . . . is determinative" in

12  resolving whether the on-call or standby time constitutes compensable hours worked.  "When an

13  employer directs, commands, or restrains an employee from leaving the work place . . . and thus

14  prevents the employee from using the time effectively for his or her own purposes, that employee

15  remains subject to the employer's control.  According to [the definition of hours worked], that

16  employee must be paid." *Morillion v. Royal Packing Co.*, 22 Cal.4th 575, 583 (2000).  California

17  courts consider a number of factors when determining whether an employer had control during on-

18  call time, including:

19              (1) whether there was an on-premises living requirement; (2)
20              whether there were excessive geographical restrictions on
                employee's movements; (3) whether the frequency of calls was
21              unduly restrictive; (4) whether a fixed time limit for response was
                unduly restrictive; (5) whether the on-call employee could easily
22              trade on-call responsibilities; (6) whether use of a pager could ease
                restrictions; (7) whether the employee had actually engaged in
23              personal activities during call-in time.

24  *Mendiola*, 60 Cal.4th at 841 (quotation marks omitted) (quoting *Owens v. Local No. 169*, 971 F.2d

25  347, 351 (9th Cir. 1992)).  Courts also consider whether the "[o]n-call waiting time . . . is spent

26  primarily for the benefit of the employer and its business." *Gomez v. Lincare, Inc.*, 173 Cal. App.

27  4th 508, 523-24 (2009).

28        Here, Plaintiffs allege that drivers are assigned to 24-hour shifts, five days a week,

United States District Court
Northern District of California

1  resulting in 120-hour workweeks and that they are only paid when responding to calls.  (Dkt. No.

2  50 ¶¶ 18, 83.)  They allege that they can receive as many as seven or eight 2-hour calls per day.

3  (*Id.* ¶ 84.)  Plaintiffs allege that Serenity Transportation and Friedel require drivers to respond

4  immediately to notices of calls on the Nextel radios that Serenity Transportation provides and

5  that—at least on information and belief—the Customer Defendants expect drivers to be available

6  24 hours a day 7 days a week and to respond to dispatches within a specified timeframe.[6]  (*Id.*)

7  Plaintiffs further allege that these requirements "made it difficult for Drivers to engage in personal

8  activities when they were not responding to calls."  (*Id.*)

9        Applying the factors identified in *Mendiola* to these allegations, there are no on-premises

10  living requirement or excessive geographical restrictions alleged, so the first two factors weigh

11  against compensable on-call time.  With respect to the frequency of calls, Plaintiffs allege that at

12  most they receive eight 2-hour calls per day, which would result in 8 hours of on-call time;

13  drawing all inferences in Plaintiffs' favor, this could result in just a single hour between each shift,

14  which could be viewed as too restrictive to engage in personal activities.  Plaintiffs do not allege

15  what the average number of calls is per day.  Plaintiffs have alleged that drivers must respond to

16  calls immediately on their radios, but there is no indication that a radio response is unduly

17  restrictive.  Similarly, Plaintiffs have alleged that there is *some* fixed time limit for response set by

18  the Customer Defendants, but have not alleged what that time period was, so the Court cannot

19  conclude that it is unduly restrictive. The TAC is silent as to whether drivers could trade shifts or

20  assignments.  Finally, Plaintiffs allege that the requirements made it difficult for them to engage in

21  personal activities during on-call time, but not that they could not and did not engage in personal

22  activities.  On the whole, these factors do not plausibly allege that the on-call time was

23  compensable; only the time restrictions are plausibly alleged to be restrictive, but California courts

24  usually require more than a single factor.  *See Gomez*, 173 Cal. App. 4th at 524 (on-call waiting

25  time not compensable where no on-site living requirement or geographic restrictions and

26  employees had 30 minutes to respond by telephone and 2 hours to respond to a patient's home,

27

28  ────────────────
    [6] The TAC does not allege what that specified timeframe is for any Customer Defendant.

United States District Court
Northern District of California

1    could trade on-call responsibilities and had pagers provided by employer).

2        Plaintiffs rely on *Renfro v. City of Emploria, Kansas*, 948 F.2d 1529, 1535 (10th Cir.

3    1991), for the proposition that the TAC allegations are sufficient to state a plausible claim that

4    Plaintiffs' on-call time was compensable.  Not so.  First, *Renfro* involved whether time was

5    compensable under the FLSA, not California Labor Law; the standards are different, as federal

6    law considers the agreement between the parties and California law does not.  Even if *Renfro* were

7    binding on this Court, there the workers were required to report to duty within 20 minutes of being

8    paged and received as many as 13 calls during an on-call period.  *Id.* at 1535.  Here, in contrast,

9    Plaintiffs do not allege that they had to respond within 20 minutes; instead, they merely state

10   "within a specified time period."

11       In short, as presently written, Plaintiffs have alleged facts that they "waited to be engaged,"

12   not that they were "engaged to wait."  The second cause of action is therefore dismissed to the

13   extent that it asserts failure to compensate on-call time.

14       2.    Third Cause of Action for Unpaid Overtime Wages

15       Plaintiff's third cause of action alleges that Defendants failed to pay them overtime wages

16   in violation of California Labor Code § 510 and IWC Wage Order 9-2001 § 3.  (Dkt. No. 50

17   ¶¶ 90-97.)  Labor Code Section 510 "requires employees to be paid not less than one and on-half

18   times their 'regular rate of pay' for all hours in excess of eight [hours] in a day or 40 [hours] in a

19   week." *Gonzalez*, 215 Cal. App. 4th at 52 (citing DLSE Manual § 49.2.1.2).  "The 'regular rate of

20   pay' in a piece rate system is calculated by diving the employee's 'total earnings' for the week, or

21   in the alternative, to pay one and one-half times the employee's piece-rate for all overtime hours."

22   *Id.*

23       Defendants argue that Plaintiffs' overtime claim must be dismissed because Plaintiffs have

24   not shown that they worked in excess of 8 hour works days or 40 workdays precisely because they

25   have not shown that they are entitled to compensation for on-call time.  The Court declines to

26   dismiss this cause of action.  As discussed above, the TAC as written fails to establish a plausible

27   claim that Plaintiffs were entitled to compensation for their on-call time, so they were not entitled

28   to wages for the entire 24-hour shift.  However, the TAC still states a plausible claim for failure to

1    pay overtime based on the number of shifts and average shift length alleged.  Specifically,

2    Plaintiffs allege that they receive a maximum of eight 2-hour calls per day, which would result in

3    16 hours of compensable time responding to calls, which renders drivers eligible for overtime

4    payment that Plaintiffs allege Defendants fail to pay.  *See Gonzalez*, 215 Cal. App. 4th at 52.  This

5    cause of action is therefore plausibly alleged.

6              3.        Seventh Cause of Action Regarding Itemized Statements of Hours Worked

7              The seventh cause of action, a "pay stub" violation, arises under Labor Code Section 226

8    and IWC Wage Order No. 9 § 7.  Plaintiffs allege that Defendants have failed to comply with their

9    obligation to provide Plaintiffs, semi-monthly or at the time of each payment of wages, with

10   accurate, itemized written statements describing the total number of hours worked.  (Dkt. No. 50

11   ¶¶ 124-132.)

12             Labor Code Section 226 requires an employer's semi-monthly wage statement to include

13   an accurate itemized written statement including nine categories of information, including the total

14   number of hours worked.  Cal. Labor Code § 226.  "To recover damages under [S]ection 226,

15   subdivision (e), an employee must suffer injury as a result of a knowing and intentional failure by

16   an employer to comply with the statute."  *Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142

17   (2011).  The mere fact that the information was missing from the wage statement is not a

18   cognizable injury.  *See id.* at 1142-43 ( noting that the "deprivation of [the] information, standing

19   alone is not a cognizable injury") (internal quotation marks, citation, and footnote omitted); *see

20   also Milligan v. Am. Airlines, Inc.*, 577 F. App'x 718, 719 (9th Cir. 2014) (citation omitted)

21   ("[T]he injury requirement . . . cannot be satisfied simply because one of the nine itemized

22   requirements in [Section 226] is missing from a wage statement.").  However, "the types of

23   injuries on which a Section 226 claim may be premised include 'the possibility of not being paid

24   overtime, employee confusion over whether they received all wages owed them, difficulty and

25   expense involved in reconstructing pay records, and forcing employees to make mathematical

26   computations to analyze whether the wages paid in fact compensated them for all hours worked."

27   *Ortega v. J.B. Hunt Transp., Inc.*, 258 F.R.D. 361, 374 (C.D. Cal. 2009) (citation omitted).

28             Here, Plaintiffs allege that their wage statements did not show the actual and total number

United States District Court
Northern District of California

1    of hours worked and that, as a result, they have been precluded from accurately monitoring the

2    number of hours worked, determining whether they have been lawfully compensated for all hours

3    worked, and seeking any owed overtime.  (Dkt. No. 50 ¶¶ 126, 129.)  Courts have found that a

4    plaintiff's "inability to determine their hourly wage meets the minimal-injury requirement of

5    Section 226."  *Soto v. Diakon Logistics (Del.), Inc.*, No. 08-CV-33-L WMC, 2013 WL 4500693,

6    at *10 (S.D. Cal. Aug. 21, 2013); *Ortega*, 248 F.R.D. at 374.  Thus, Plaintiffs state a cognizable

7    claim for violation of Labor Section 226.

8    **D.      Leave to Amend**

9         Generally, when a complaint is dismissed, "leave to amend shall be freely given when

10   justice so requires."  *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010); *see*

11   Fed. R. Civ. P. 15(a).  The Ninth Circuit has "repeatedly held that a district court should grant

12   leave to amend even if no request to amend the pleading was made, unless it determines that the

13   pleading could not possibly be cured by the allegations of other facts."  *Lopez*, 203 F.3d at 1130

14   (9th Cir. 2000) (internal quotation marks and citations omitted).  However, leave to amend may be

15   denied "where the amendment would be futile."  *Gardner v. Martino*, 563 F.3d 981, 990 (9th Cir.

16   2009).  Further amendment may be denied as futile where a plaintiff has already amended the

17   complaint once.  *See Semiconductor Energy Lab Co., Ltd. v. Yujurio Nagata*, No. C 11-02793

18   CRB, 2012 WL 177557, at *8 n.6 (N.D. Cal. Jan. 23, 2012) (citing *Bonin v. Calderon*, 59 F.3d

19   815, 845 (9th Cir. 1995)).

20        Here, Plaintiffs have already amended her claims three times.  However, Plaintiff's first

21   and second amended complaints were filed as of right, and the Court granted Plaintiffs leave to

22   file the third upon Plaintiffs' request.  Thus, none of the amendments followed briefing on a

23   motion to dismiss, so the Court has not had an opportunity to put Plaintiffs on notice of any

24   deficiencies.  At oral argument, Plaintiffs represented that they can allege further facts to render

25   plausible at least some of the dismissed claims.  Accordingly, the Court will grant leave to amend.

26                                    **CONCLUSION**

27        For the reasons described above, the Court GRANTS IN PART and DENIES IN PART

28   Defendants' motion to dismiss.  Specifically, the Court declines to dismiss the claims against

United States District Court
Northern District of California

Friedel or the third and seventh causes of action.  However, the Court dismisses the claims against the Customer Defendants, but Plaintiffs shall have lead to amend to add allegations that establish that the Customer Defendants were joint employers for the purposes of the FLSA and the California Labor Code.  In addition, the Court dismisses with leave to amend the second cause of action to the extent that it asserts failure to compensate for on-call time.  Plaintiffs' amended complaint is due by November 16, 2015.

This Order disposes of Docket No. 51.

**IT IS SO ORDERED.**

Dated: November 2, 2015

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

38