1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    CURTIS JOHNSON,                          Case No. 15-cv-02004-JSC

8              Plaintiff,

9         v.                                  **ORDER RE: MOTION TO DISMISS
                                              FOURTH AMENDED COMPLAINT**
10   SERENITY TRANSPORTATION, INC., et
     al.,                                     Re: Dkt. No. 59

11             Defendants.

12

13        Plaintiffs Curtis Johnson ("Johnson") and Anthony Aranda ("Aranda," and together

14   "Plaintiffs") bring this putative class action against their employer, Defendants Serenity

15   Transportation, Inc. ("Serenity Transportation"), and its owner David Friedel ("Friedel"), as well

16   as alleged "Customer Defendants" Service Corporation International ("SCI"), SCI California

17   Funeral Services Inc. ("SCI California"), and the County of Santa Clara (the "County," and

18   collectively, "Defendants").  (Dkt. No. 58.)[1]  The Court previously dismissed the claims against

19   the "Customer Defendants"—*i.e.*, all entities other than Serenity Transportation and Friedel—

20   concluding that Plaintiffs' Third Amended Complaint ("TAC") had failed to allege sufficient facts

21   to plausibly infer the existence of joint employer status under either federal or California law.

22   *Johnson v. Serenity Transp., Inc.*, --- F. Supp. 3d ----, No. 15-2004-JSC, 2015 WL 6664834, at

23   *22 (N.D. Cal. Nov. 2, 2015).  Now pending before the Court is Defendants' motion to dismiss

24   claims against the Customer Defendants in the Fourth Amended Complaint ("FAC").  (Dkt. No.

25   59.)  Having considered the parties' submissions, and having had the benefit of oral argument on

26   January 21, 2016, the Court DENIES the motion.

27   _____

28   [1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

# BACKGROUND

## I.    Complaint Allegations

Plaintiffs are "mortuary transportation drivers [who] carry[ ] dead bodies and other human remains from various locations (including nursing homes, hospitals, and homes) . . . to Defendants' facilities." (Dkt. No. 58 ¶ 1.)  Johnson worked as a driver for Defendants from January 1, 2012 to August 23, 2013, and Aranda from approximately August 2012 to March 2015. (*Id.* ¶¶ 6-7.)  They bring this putative class action on behalf of themselves and the other 40-plus drivers that Defendants have employed during the relevant period.  (*Id.* ¶ 20.)

The factual background of this case was detailed in the Court's Order reviewing the TAC, which the Court incorporates here in full.  *Johnson*, 2015 WL 6664834, at *1-3.  However, the FAC has withdrawn claims against several former alleged Customer Defendants and has added allegations pertaining to the remaining Customer Defendants.[2]  Accordingly, the Court will recite here only the background relevant to the joint employer claims.

### *Serenity Transportation & Friedel*

Defendant Serenity Transportation is a mortuary transportation company that employed Plaintiffs within the meaning of the Fair Labor Standards Act ("FLSA"), California Labor Code, and applicable Industrial Welfare Commission wage order ("IWC Wage Order") to transport decedents.  (Dkt. No. 58 ¶¶ 8, 17.)  Friedel is the owner, shareholder, CEO, and Board Member of Serenity Transportation.  (*Id.* ¶ 9.)

Together, Serenity Transportation and Friedel assign drivers to 24-hour shifts, five days a week, resulting in 120-hour work weeks.  (*Id.* ¶ 17.)  Serenity Transportation contracts to provide drivers to SCI and SCI California 24 hours a day.  (*Id.* ¶ 18.)  Serenity Transportation contracts to provide drivers to the County 365 days a year, 24 hours a day, 7 days a week.  (*Id.* ¶ 19.)  Serenity Transportation and Friedel recruit and supervise Drivers and advertise available driver positions online.  (*Id.* ¶ 21.)  The advertisements specify that drivers must be available for on-call shifts 24 hours a day and that the employer enforces a professional attire dress code.  (*Id.*)  Once hired,

---

[2] Specifically, in the TAC Plaintiffs also brought claims against the Neptune Society of Central California, Inc., and Lifemark Group, Inc.  (*See* Dkt. No. 50.)

United States District Court
Northern District of California

United States District Court
Northern District of California

Serenity Transportation and Friedel schedule drivers for shifts and retain the right to change the shifts at their discretion. (*Id.*) Friedel is personally involved in drafting hiring criteria, interviewing drivers, and scheduling their shifts. (*Id.*) Together, Serenity Transportation and Friedel promulgated "Client Policy Standards" that require drivers to obey a dress code (specifically, to wear a two-piece dress suit), report to dispatch their status throughout the day, notify dispatch if the driver checks out of service before shift's end, complete Serenity Transportation invoice information, keep the driver's vehicle clean, and notify Serenity Transportation of any need for personal time off. (*Id.* ¶ 26; *see also* Dkt. No. 59-1 Ex. 1.)[3] The policy also provides that continuous violations of customer standards could result in termination of the driver's contract or the driver being removed from a route. (Dkt. No. 58 ¶ 26.) Friedel is personally involved in monitoring and enforcing these policies and supervising drivers' compliance. (*Id.*)

On both their website and in advertisements, Serenity Transportation and Friedel refer to the drivers as "staff." (*Id.* ¶ 42.) Serenity Transportation and Friedel lease equipment to drivers, including vehicles, a Nextel radio, stretchers, and other equipment. (*Id.*) Initially, when Serenity Transportation was founded in 2010, it classified the drivers as employees, but Friedel, in his capacity as a member of the corporation's Board of Directors, recommended that Serenity

---

[3] Defendants submitted the declaration of their attorney Jeffrey Hubins in support of their motion to dismiss. (Dkt. No. 59-1.) Attached to the Hubins Declaration are two documents: (1) the Serenity Transportation Client Policy Standards referenced in FAC Paragraph 26 (Ex. 1), and (2) the contract for services that Johnson and Serenity Transportation signed (Ex. 2). When adjudicating a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court generally cannot consider matters outside of the complaint without converting the motion into a motion for summary judgment. *See* Fed. R. Civ. P. 12(b)(6). However, courts may consider documents alleged in a complaint and essential to plaintiff's claims. *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998); *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds*, *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). A court may also "take judicial notice of documents on which allegations in the complaint *necessarily* rely, even if not expressly referenced in the complaint, provided that the authenticity of those documents is not in dispute." *Tercica, Inc. v. Insmed Inc.*, No. C 05-5027 SBA, 2006 WL 1626930, at *8 (N.D. Cal. June 9, 2006). The Court construes the Hubins Declaration as a request for judicial notice of Exhibits 1 and 2. So construed, the Court GRANTS Defendants' request to take judicial notice of Exhibit 1, as it is expressly referenced in the FAC. (Dkt. No. 58 ¶ 26.) So, too, will the Court take judicial notice of Exhibit 2, which is also referenced, albeit indirectly, in Paragraph 26. (*Id.* (noting that violation of Serenity Transportation's policies could result in "contract termination").)

1  Transportation reclassify the drivers as independent contractors, and Serenity Transportation

2  followed suit in February 2011.  (*Id.*)

3      Drivers receive as many as seven or eight calls per day, sometimes more, with each call

4  lasting two hours.  (*Id.* ¶ 98.)  Serenity Transportation and Friedel require drivers to immediately

5  respond to notices of calls on their work-issued Nextel radios.  (*Id.* ¶ 95.)  They have established a

6  default 75-minute response time for calls—as in, time to arrive at the scene—but want drivers to

7  respond within 45 to 60 minutes.  (*Id.*)  Because calls are frequently 30-60 minutes away from

8  drivers in traffic, they typically have to respond immediately or leave their location within 15

9  minutes to get to the call location.  (*Id.*)  If drivers do not respond immediately on their radios,

10  Serenity follows up with a phone call.  (*Id.* ¶ 98.)  Drivers' work-issued Nextel radios and/or

11  vehicles contained GPS tracking, and sometimes when drivers are not in the area in which they

12  typically responded to calls, Friedel calls them directly to inquire where they are.  (*Id.*)  Drivers

13  are unable to trade calls with ease.  (*Id.* ¶ 96.)  They are unable to refuse calls; if they do, they

14  could be taken off call rotation for the rest of the day.  (*Id.*)  While Plaintiffs attempted to engage

15  in personal activities while on call, they were often unable to do so and got as little as two hours of

16  sleep a night due to the frequency of calls.  (*Id.* ¶ 97.)  Plaintiff Johnson generally waited at home

17  for calls and found it difficult to do any personal activities while on shift.  (*Id.*)

18      Drivers work for Serenity Transportation and Friedel continuously for many months or

19  years.  (*Id.* ¶ 45.)  The drivers are, however, subject to termination by Serenity Transportation and

20  Friedel at any time for any reason.  (*Id.* ¶ 47.)  Drivers are not required to possess a special license

21  or undergo special training to perform Serenity Transportation's transportation services.  (*Id.*

22  ¶ 46.)

23      *Joint Employer Allegations*

24      Serenity Transportation and Friedel serve as labor contractors for SCI, SCI California, and

25  the County by providing drivers to meet their needs.  (*Id.* ¶ 24.)  SCI and SCI California (together,

26  the "SCI entities"[4]) provide funeral and end-of-life services in Alameda County and across the

27

28  [4] SCI filed a Certificate of Interested Parties indicating that SCI wholly owns SCI Funeral
Services, LLC, which in turn wholly owns SCI California.  (Dkt. No. 6.)  The Court therefore

United States.  (*Id.* ¶¶ 11-12.)  The County provides investigation, removal, and autopsies in Santa Clara County.  (*Id.* ¶ 13.)  Serenity Transportation has made drivers available to these Customer Defendants on an ongoing basis.  (*Id.* ¶ 45.)  On any given day, Serenity Transportation and Friedel provided approximately 9 to 12 drivers to the SCI entities, and the County.  (*Id.*)  The SCI entities routinely engaged five or more Serenity Transportation drivers each week.  (*Id.*)  The SCI entities and the County employ drivers by permitting them to work, exercising control over their wages, hours, and working conditions, and engaging them.  (*Id.* ¶¶ 11-13.)  The work that Plaintiffs and drivers generally perform for these Defendants is labor within the entities' usual course of business.  (*Id.* ¶¶ 11-13.)  The Customer Defendants control the means and methods by which drivers carry out their jobs by directing drivers as to how to handle and remove decedents. (*Id.* ¶ 27.)  While drivers are at each Customer Defendant's location, drivers are under that Customer Defendant's supervision and control.  (*Id.* ¶ 28, 33, 39.)

Specifically, the SCI entities have promulgated detailed policies governing drivers' work, including requiring a particular type of identification band, specific labeling procedures, a protocol for witnessing removal of human remains, and step-by-step procedures for removing infant and fetal remains.  (*Id.* ¶ 28.)  The SCI entities have referred to the identification and labeling procedures as "one of the most fundamental aspects of [its] business[.]"  (*Id.*)  Each SCI location has step-by-step specifications for drivers.  For example, one SCI company specifies where drivers are to park; the documents drivers must complete upon arrival; that drivers are to proceed to the delivery area and label the deceased according to SCI procedures; that drivers are next to place the shroud on a lift, the body on the lift, wrap the shroud, write the deceased's name on the shroud, and staple the paperwork to the shroud; slide the case onto the shelf head first with the feet showing; roll up the door, remove their vehicle, close the door, then exit the building through the office area.  (*Id.*)  These activities take drivers up to 30 minutes.  (*Id.*)  The SCI entities require drivers to respond to calls within 60 to 75 minutes and required drivers to be dressed "in a professional manner at all times."  (*Id.* ¶ 31.)  Because of the distances and traffic involved,

refers to the SCI entities together.

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiffs frequently had to leave for SCI calls immediately.  (*Id.*)  SCI has a policy that prohibits drivers from transferring multiple decedents for SCI at the same time.  (*Id.*)  Thus, if drivers have multiple SCI calls, SCI requires drivers to complete the first SCI call before proceeding to the next.  (*Id.*)  Plaintiff Aranda took numerous long distance trips for SCI that took approximately 15 hours round trip.  (*Id.* ¶ 32.)  Other drivers conduct these types of long-distance runs for SCI.  (*Id.*)

The SCI entities also retain the right to require that drivers receive ongoing training to provide services in compliance with the entities' service guarantee.  (*Id.* ¶ 29.)  Drivers have, in fact, received training from SCI regarding identification protocol, transfer of the deceased, and proper documentation of removal work.  (*Id.*)  In addition, as a matter of practice, drivers introduce themselves to families as representatives of SCI and distributed business cards to families with the names of SCI mortuaries and a place for the driver to write his or her name.  (*Id.*)  Plaintiffs understand that SCI wanted to give their own customers the impression that the drivers "were from SCI."  (*Id.*)

The SCI entities retain records of the drivers who make calls for them, the time period in which drivers are dispatched on SCI's behalf, and the drivers' identities.  (*Id.* ¶ 30.)  SCI also audits drivers' motor vehicle licenses.  (*Id.*)  Despite keeping these records, SCI does not pay drivers overtime compensation or make any effort to ensure that drivers are compensated for overtime hours.  (*Id.* ¶ 32.)

The County sometimes has Serenity Transportation drivers conduct five to six calls a day.  (*Id.* ¶ 19.)  Like SCI, the County has promulgated detailed policies governing the drivers' work subject to change by the County at any time.  (*Id.* ¶ 34.)  These policies include identification and removal protocol at the County Coroner, including the timeframe in which drivers must respond to different types of calls.  (*Id.*)  For example, when calls are within 12 miles from the County's facility (but not necessary from the driver), the County requires drivers to arrive at the scene within 45-minutes after a request for service.  (*Id.*)  Plaintiff Johnson recalls having to respond immediately to calls from the County coroner to arrive at the scene on time.  (*Id.* ¶ 35.)  The County also has policies about the amount of time drivers are required to wait at the scene if the deceased is not yet ready to be transported, and "stand by" and "dry run" time—*i.e.*, if the

1   deceased is not ready, they set forth a time frame for how long the driver must be on standby to

2   return to the scene.  (*Id.*)

3         The County has policies about identification: it prohibits drivers from placing

4   identification on the deceased, as the driver is only permitted to witness the identification that the

5   coroner makes.  (*Id.* ¶ 37.)  The County prohibits drivers from stopping at any location once en

6   route to the County's facility or from carrying more than one body in a transport vehicle at one

7   time unless the coroner instructs them otherwise.  (*Id.*)  The County also gives drivers instructions

8   about what materials to bring with them to the scene, where to place those materials at the scene,

9   and what actions the drivers should take at the scene.  (*Id.* ¶ 40.)  In addition to these

10  specifications about removals, the County requires drivers to wear a black suit on County calls,

11  and also has specifications about the appearance and equipment on driver vehicles and retains the

12  right to inspect the vehicles.  (*Id.* ¶¶ 38-39.)  The County supplies some of the drivers' equipment,

13  including body bags, plastic sheeting, and body shrouds.  (*Id.* ¶ 39.)

14        As part of the hiring process, new potential Serenity Transportation drivers are sent to the

15  County to conduct a Live Scan.  (*Id.* ¶ 23.)  The County also issues drivers identification numbers

16  and badges that drivers are expected to wear on County calls.  (*Id.* ¶ 22.)  The County retains a list

17  of current drivers, their identification numbers, and their photo IDs and also keeps records of

18  service completion and retained the right to keep records of runs.  (*Id.* ¶¶ 22, 36.)  In fact, the

19  County keeps logbooks of the drivers' runs and also received documentation from Serenity

20  Transportation regarding the hours that drivers worked for the County, including standby time and

21  call-response time.  (*Id.* ¶ 19, 36.)

22        The County also has influence over Serenity Transportation's termination decisions.  (*Id.*

23  ¶ 23.)  For example, the County suspended a driver from its contract—*i.e.*, removed the driver

24  from responding to County calls—for 30 days.  (*Id.*)  Friedel considered terminating the driver

25  after this incident, but when the County clarified that the infraction was minor, Friedel decided not

26  to terminate the driver.  (*Id.*)

27        Both the SCI entities and the County have employed other drivers who perform similar or

28  identical work to the work that drivers perform.  (*Id.* ¶ 41.)  These Customer Defendants have also

United States District Court
Northern District of California

"retained and exercised the right to demand that Plaintiffs and other Drivers be removed from their work rotation." (*Id.* ¶ 47.)

*Payment Allegations*

Defendants pay drivers under a common compensation plan and policy where drivers are paid a flat rate that Defendants set for each completed dispatch. (*Id.* ¶ 49.) This flat rate includes long-distance calls for the County that may last up to 15 hours. (*Id.* ¶ 32.) All Defendants participate in this scheme "including by requiring Drivers to fill out proprietary paperwork on which Driver time is recorded." (*Id.* ¶ 49.) As a result, drivers are not compensated for time spent awaiting calls. (*Id.*) This payment system fails to provide either minimum wage or overtime payment to drivers. (*Id.*)

## II.    Procedural History

The procedural history of this case was also detailed extensively in the Court's Order reviewing the TAC. *Johnson*, 2015 WL 6664834, at *3. In reviewing the TAC—which alleged ten causes of action against seven defendants—the Court dismissed the claims against the Customer Defendants on the grounds that the TAC did not adequately allege a basis for joint employer status under either federal or California law. *Id.* at *19. The Court also dismissed with leave to amend a cause of action based on "on call" and "standby" time to the extent that it fails to allege lack of compensation for on-call time. *Id.* at *21.

The now-operative FAC includes ten causes of action against various grouping of defendants under federal and California labor law. As before, the gravamen of Plaintiffs' claims against all Defendants is that drivers have been misclassified as independent contractors when they are really employees, and therefore Defendants have denied them the benefits of federal and California wage-and-hour laws. Defendants move to dismiss all claims against the Customer Defendants, contending that the allegations added to the FAC do not cure the deficiencies in joint employer status that the Court earlier identified in the TAC. As Defendants raised a new argument against liability in their reply—specifically, addressing liability under California Labor Code Section 2810.3, which does not require joint employer allegations—the Court permitted Plaintiffs to file a supplemental submission to address those arguments.

United States District Court
Northern District of California

**LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the sufficiency of a complaint as failing to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facial plausibility standard is not a "probability requirement" but mandates "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citations omitted). For purposes of ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the non-moving party." *Manzarek v. St. Paul Fire & Mar. Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotations and citations omitted); *see also Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law").

Even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), under which a party is only required to make "a short and plain statement of the claim showing that the pleader is entitled to relief," a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *see also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[A]llegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."). The court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64.

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

United States District Court
Northern District of California

1  request to amend the pleading was made, unless it determines that the pleading could not possibly

2  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

3  banc) (internal quotation marks and citations omitted).

**DISCUSSION**

4

5     Defendants move to dismiss all claims against the Customer Defendants on the grounds

6  that Section 2810.3 does not provide a statutory basis for liability against the SCI entities and the

7  FAC fails to demonstrate that the Customer Defendants are liable to Plaintiffs as "joint

8  employers" under federal or California law.[5]  The Court will address each proposed basis for

9  liability in turn.

10  **A.     Section 2810.3 Liability**

11     The FAC alleges a statutory basis for the SCI entities' liability that does not depend on

12  joint employer allegations: Labor Code Section 2810.3.  (*See* Dkt. No. 58 ¶¶ 90-94, 108-109, 124-

13  125, 135-136.)  Plaintiffs alleged this statutory basis for liability against the Customer Defendants

14  for the first time in the Second Amended Complaint ("SAC").  *See Johnson v. Serenity Transp.,*

15  *Inc.*, No. 15-cv-2004-JSC, 2015 WL 4913266, at *2 (N.D. Cal. Aug. 17, 2015).  California Labor

16  Code Section 2810.3 provides that a "client employer shall share with a labor contractor all civil

17  legal responsibility and civil liability for all workers supplied by that labor contractor for . . . the

18  payment of wages."  Cal. Labor Code § 2810.3(b).  The statute defines "client employer" as "a

19  business entity, regardless of its form, that obtains or is provided workers to perform labor within

20  its *usual course of business* from a labor contractor."  *Id.* § 2810.3(a)(1)(A).  "Usual course of

21  business" means the "regular and customary work of a business, performed within or upon the

22  premises or worksite of the client employer."  *Id.* § 2810.3(a)(6).  Exempt from this definition of

23  client employer is an entity "with five or fewer workers supplied by a labor contractor or labor

24  contractors to the client employer at any given time."  *Id.* § 2810.3(a)(1)(B)(ii).  Section 2810.3

25  _____

26  [5] As discussed above, while Defendants did not address Section 2810.3 in their opening brief, they
    argued in their reply that Section 2810.3 is inapplicable, and the Court permitted Plaintiffs an
27  opportunity to respond to these arguments.  Thus, while the Court ordinarily does not consider
    arguments that are raised for the first time in reply, under the circumstances present here the Court
28  will address this statutory argument.

United States District Court
Northern District of California

1    defines labor contractor, in turn, as "an individual or entity that supplies, either with or without a

2    contract, a client employer with workers to perform labor within the client employer's usual

3    course of business." *Id.* § 2810.3(a)(3).  The statute imposes pre-suit notice requirements.

4    Specifically, "[a]t least 30 days prior to filing a civil action against a client employer for violations

5    covered by this section, a worker or his or her representative shall notify the client employer of

6    violations under subdivision (b)." *Id.* § 2810.3(d).

7         The statute authorizes state enforcement agencies or departments to require client

8    employers or labor contractors to provide information, permits the Labor Commissioner, the

9    Division of Occupational Safety and Health, and the Employment Development Department to

10   adopt regulations and rules to enforce the statute.  *Id.* § 2810.3(j)-(k).  In addition, Section 2810.3

11   expressly states that it "shall not be interpreted to impose liability on a client employer for the use

12   of an independent contractor other than a labor contractor or to change the definition of

13   independent contractor."  *Id.* § 2810.3(o).  The statute exempts from liability a client employer

14   "that is a motor carrier of property based solely on the employer's use of a third-party motor

15   carrier of property" and one "that is a motor carrier of property subcontracting with, or otherwise

16   engaging, another motor carrier of property to provide transportation services using its own

17   employees and commercial motor vehicles[.]"  *Id.* § (p)(1)-(2).  Because Section 2810.3 became

18   effective on January 1, 2015, there is very little case law addressing its scope.  The statute's

19   legislative history suggests that it was enacted to protect workers' rights in the absence of control

20   by a third party.[6]

21              1.    The Court Will Consider Defendants' Arguments

22        Defendants raise a number of arguments as to why Section 2810.3 does not apply.

23   Plaintiffs urge the Court to decline to consider these arguments because Defendants have waived

24

25   _____

26   [6] Plaintiffs filed a request for judicial notice asking the Court to take notice of four documents
     culled from the legislative history of Section 2810.3.  (Dkt. No. 61-1.)  "In cases where the
     statutory language is ambiguous, courts may look to the statute's legislative history for guidance."
27   *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1132 (N.D. Cal. 2015) (citation omitted).
     Given the absence of caselaw and the question about the scope of Section 2810.3's reach, the
28   Court finds it appropriate to consider its legislative history.  The Court therefore GRANTS
     Plaintiffs' request for judicial notice.

United States District Court
Northern District of California

their right to move to dismiss the Section 2810.3 claims.  Specifically, Plaintiffs argue that because Defendants failed to raise these Section 2810.3 arguments in their motion to dismiss the SAC and the TAC, the Court should not allow them to raise them for the first time in their reply brief to dismiss the FAC.  And indeed, this argument is sound.  Rule 12(g)(2) states that "[e]xcept as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Rule 12(h)(2), in turn, provides that arguments which pertain to a plaintiff's "[f]ailure to state a claim upon which relief can be granted . . . may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial."  "To summarize, under Rule 12(g)(2) and Rule 12(h)(2), a party that seeks to assert a defense that was available but omitted from an earlier Rule 12 motion can only do so in a pleading, a Rule 12(c) motion, or at trial."  *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, --- F. Supp. 3d ----, No. 08-CV-04119-LHK, 2015 WL 5785549, at *6 (N.D. Cal. Oct. 5, 2015).

Following this reasoning, courts in this District and throughout the Ninth Circuit have held that a defendant is foreclosed from raising in a 12(b)(6) motion arguments it should have asserted in a prior 12(b)(6) motion to dismiss.  *See, e.g.*, *id.*; *Fed. Ag. Mortg. Corp. v. It's A Jungle Out There, Inc.*, No. C 03-3721 VRW, 2005 WL 3325051, at *5 (N.D. Cal. Dec. 7, 2005) ("Although the Ninth Circuit has not had occasion to apply this principle, the weight of authority outside this circuit holds that where the complaint is amended after the defendant has filed a Rule 12(b) motion, the defendant may not thereafter file a second Rule 12(b) motion asserting objections or defenses that could have been asserted in the first motion.").  On the other hand, other courts read Rules 12(g)(2) and 12(h)(2) as only applying to a successive motion to dismiss the same operative pleading, not a pleading that has since been amended.  *See, e.g.*, *United States v. Molen*, No. 2:10-cv-02591 MCE KJN PS, 2013 WL 3935994, at *3 (E.D. Cal. July 26, 2013).  And in any event, even with successive motions to dismiss the same pleading, "courts have discretion to hear a section motion under Rule 12(b)(6) if the motion is not interposed for delay and the final disposition of the case will thereby be expedited[.]"  *Aetna Life Ins. Co. v. Alla Med. Servs., Inc.*, 855 F.2d 1470, 1475-77 & n.2 (9th Cir. 1988).  There is no indication here that the purpose of

United States District Court
Northern District of California

1    Defendants' Section 2810.3 argument is delay, and if their arguments are meritorious, final

2    disposition of this case would be expedited by removing one avenue to liability and simplifying

3    the case.  Accordingly, while Defendants should have challenged Section 2810.3 liability much

4    earlier, the Court will nevertheless address their five arguments for dismissal of this claim now.[7]

5                        2.        Plaintiffs State a Section 2810.3 Claim

6            First, Defendants contend that the statute does not apply retroactively, and therefore the

7    Court cannot apply it here.  But Defendants made the same argument in connection with their

8    opposition to Plaintiffs' motion for leave to file the TAC, and there the Court noted that the

9    retroactivity argument was "beside the point, as Plaintiffs allege that Aranda worked for

10   Defendants until March 2015."  *Johnson*, 2015 WL 4913266, at *4.  The FAC includes the same

11   allegation and also expressly alleges that Aranda conducted removals for SCI in 2015.  (Dkt. No.

12   58 ¶ 7.)  Thus, the Court need not decide whether Section 2810.3 applies retroactively.

13           Second, Defendants argue that Plaintiffs failed to exhaust their administrative remedies as

14   required under subsection (d) of the statute.  Subsection (d) provides that "at least 30 days prior to

15   filing a civil action against a client employer for violations covered by this section, a worker or his

16   representative shall notify the client employer of violations under subdivision (b)."  Cal. Labor

17   Code § 2810.3(d).  Defendants note that the FAC does not allege compliance with that notice

18   requirement and urges dismissal on that ground.  And indeed, there are no FAC allegations about

19   notice-compliance.  It is not clear whether compliance with the 30-day advanced notice is a

20   pleading requirement.  Defendants cite *Stubbs v. Covenant Sec. Servs., Ltd.*, No. 15-CV-00888-

21   JCS, 2015 WL 5521984, at *7 (N.D. Cal. Sept. 16, 2015), in which the Court noted that the

22   plaintiffs had, in fact, alleged satisfaction of the notice requirements.  *Id.*  But this does not

23   necessarily mean that pleading such notice is required.  In any event, strict compliance with the

24

25   ───────────────

26   [7] The Court also addresses these arguments over Plaintiffs' objection that it should not consider
     them because they were raised for the first time in Defendants' reply.  (*See* Dkt. No. 65 at 4.)  The
     Court is cognizant that it is improper for a party to raise a new substantive defense for the first
27   time in a reply brief.  But that is exactly why the Court permitted Plaintiffs an opportunity to
     respond to the arguments by filing a supplemental submission.  Given that Plaintiffs had an
28   opportunity to respond both in writing and at oral argument, the prejudice arising from
     Defendants' addressing Section 2810.3 for the first time in reply has been cured.

1    notice requirement does not seem necessary under the circumstances presented here.  Plaintiffs did

2    not initiate a new civil action under Section 2810.3, which is the procedural posture that the statute

3    envisions.  Instead, Plaintiffs merely added a new theory of liability based on the same facts and

4    claims that had already been alleged in two earlier iterations of the pleadings.  As the Court

5    concluded in its Order granting leave to file the SAC, "Defendants were already on notice that

6    these claims existed" and the addition of Section 2810.3 did "not represent a major change in the

7    scope of the claims or in the tenor of the case."  *Johnson*, 2015 WL 4913266, at *5.  This notice

8    suffices, at least at the pleading stage, to proceed with a Section 2810.3 claim.

9         Third, Defendants maintain that they are not "client employers" within the meaning of

10   Section 2810.3.  As discussed above, the statute defines a "client employer" as an entity "that

11   obtains or is provided workers to perform labor within its usual course of business from a labor

12   contractor."  Cal. Lab. Code § 2810.3(a)(1)(A).  "Usual course of business" means the "regular

13   and customary work of a business, performed within or upon the premises or worksite of the client

14   employer."  *Id.* § 2810.3(a)(6).  Defendants urge that pick-ups, drop-offs, and transportation of

15   decedents is not part of their regular work, because "[t]he 'work' drivers actually perform is on the

16   road in transporting decedent bodies, not onsite of the 'client employer[,]'" and that Defendants'

17   businesses provide burial, crematory, and other mortuary services, not transportation services like

18   Plaintiffs.  (Dkt. No. 62 at 7.)  But drawing all inferences in Plaintiffs' favor, the FAC adequately

19   alleges that the drivers' job responsibilities are within the SCI entities' usual course of business,

20   especially given their emphasis on proper pick-up and drop-off procedures.  Defendants have not

21   identified any authority holding that the work of the subcontractors must be identical or must

22   overlap entirely with the client employer.  What is more, the FAC alleges that drivers spend up to

23   30 minutes at Defendants' premises when performing drop-offs, and perform up to eight calls per

24   day.  This is not an insignificant time at Defendants' worksites.  And Defendants have not cited

25   any authority that requires some threshold number of hours to give rise to Section 2810.3 liability.

26   Thus, these arguments fail to establish as a matter of law that the SCI entities are not client

27   employers for the purpose of Section 2810.3.

28        Relatedly, Defendants insist that they are exempt from Section 2810.3 under subsection

United States District Court
Northern District of California

14

(a)(1)(A)(ii), which exempts client employers that are supplied with five or fewer workers by a labor contractor at any given time.  *See* Cal. Lab. Code § 2810.3(a)(1)(A)(ii).  In the FAC, Plaintiffs allege that SCI "routinely engaged five or more STI Drivers weekly."  (Dkt. No. 58 ¶ 24.)  The statute does not define "given time" and Defendants have not identified any authority holding that "given time" means on a single day or holding that it cannot mean during a given week.  Under these circumstances, the FAC adequately pleads that the SCI entities are "client employers" for the purposes of Section 2810.3, although the record after discovery may reveal otherwise.

Fourth, in their reply Defendants contend that there is no private right of action under Section 2810.3.  "The existence of a private right of action depends on whether the Legislature has manifested intent to create such a right, which is revealed through the language of the relevant statute and its legislative history."  *Villalpando v. Exel Direct Inc.*, No. 12-cv-04137 JCS, 2014 WL 1338297, at *14 (N.D. Cal. Mar. 28, 2014) (citing *Lu v. Hawaiian Gardens Casino, Inc.*, 50 Cal.4th 592, 596-97 (2010)).  Reference to a remedy or means of enforcing the statute's substantive provisions—*i.e.*, by way of an action—is a strong indication that such a right of action exists.  *See id.*

Defendants argue that there is no subdivision expressly creating a private right of action to recover against a client employer and that the court can presume a private right of action was not intended due to the provision's grant of enforcement authority and jurisdiction to state labor agencies.  (Dkt. No. 62 at 8 (citing Section 2810.3 subdivisions (i) through (l) and *Lu*, 50 Cal. 4th at 596-97).)  But the statute specifically references a civil action by a worker on more than one occasion: subdivision (d) provides that "[a]t least 30 days prior to filing *a civil action against a client employer* for violations covered by this section, a *worker* or his or her representative shall notify the client employer of violations"; subdivision (e) proscribes retaliation against workers who "provid[e] notification of violations or fil[e] a claim or civil action."  These provisions would be meaningless if the statute did not contemplate a private right of action for workers.

Lastly, Defendants insist that they are exempt from Section 2810.3 pursuant to subdivision (p)(2), which exempts from liability a "client employer that is a motor carrier of property

15

subcontracting with, or otherwise engaging, another motor carrier of property to provide transportation services using its own employees and commercial motor vehicles, as defined in Section 34601 of the Vehicle Code." The Vehicle Code in turn, defines "motor carrier of property" as "any person who operates any commercial motor vehicle[,]" which includes a variety of trucks and trailers or vehicles transporting hazardous waste. Cal. Vehicle Code §§ 34500, 34601. Defendants do not cite any authority holding that businesses providing burial, crematory, and other mortuary services are "motor carriers of property" under these regulations. And indeed, to argue as much seems to flatly contradict their earlier argument that they do *not* provide transportation services like drivers do. (*See* Dkt. No. 62 at 7.) In any event, Defendants' passing reference to the FAC allegation that the SCI entities sometimes provide their own drivers who do the same work as Plaintiffs is not enough to establish, as a matter of law, that they are "motor carriers of property" subject to this exemption.

In short, each of Defendants' arguments against Section 2810.3 fails at this stage of the litigation. While a more developed record may reveal that Section 2810.3 is improper, drawing all inferences in Plaintiffs' favor, the FAC adequately states a claim against the SCI entities for Section 2810.3 liability to survive Defendants' motion to dismiss. The Court therefore declines to dismiss the Section 2810.3 claim against the SCI entities on this ground.

**B.      Joint Employer Status**

Defendants next contend that Plaintiffs have failed to allege that the Customer Defendants are liable to Plaintiffs as "joint employers" under the FLSA and California law. The joint employer doctrine recognizes that "even where business entities are separate, if they share control of the terms of conditions of an individual's employment, both companies can qualify as employers." *Guitierrez v. Carter Bros. Sec. Servs., LLC*, No. 2:14-cv-00351-MCE-CKD, 2014 WL 5487793, at *3 (E.D. Cal. Oct. 29, 2014) (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 769-60 (9th Cir. 1979)). "While [the] plaintiff is not required to conclusively establish that defendants were her joint employers at the pleading stage, [the] plaintiff must at least allege *some* facts in support of this legal conclusion." *Hibbs-Rines v. Seagate Techs., LLC*, No. C 08-05430 SI, 2009 WL 513496, at *5 (N.D. Cal. Mar. 2, 2009) (citation omitted).

16

1          1.       Joint Employer Under the FLSA

2                   a.       *Legal Standard*

3          A defendant must be an "employer" of the plaintiff to be liable under the FLSA.  *Bonnette*

4  *v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other*

5  *grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).  "Two or more

6  employers may be "joint employers" for the purposes of the FLSA."  *Maddock v. KB Homes, Inc.*,

7  631 F. Supp. 2d 1226, 1232 (C.D. Cal. 2007).  "All joint employers are individually responsible

8  for compliance with the FLSA."  *Id.*; *see also* 29 C.F.R. § 791.2(a).  Whether an entity is a "joint

9  employer" under the FLSA is a question of law.  *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir.

10  1997).

11         The Supreme Court has explained that the "economic reality" of an employment situation

12  determines whether an employer-employee relationship exists under the FLSA.  *Goldberg v.*

13  *Whitaker House Coop.*, 366 U.S. 28, 33 (1961).  As the Court explained in its Order reviewing the

14  TAC, the Ninth Circuit has adopted a four-part "economic reality" test to determine when the

15  employer-employee relationship exists.  *See Bonnette*, 704 F.2d at 1470.  These factors include

16  whether the employer:  "(1) had the power to hire and fire the employees, (2) supervised and

17  controlled employee work schedules or conditions of employment, (3) determined the rate and

18  method of payment, and (4) maintained employment records."  *Id.*; *see also Moreau v. Air France*,

19  356 F.3d 942, 946-47 (9th Cir. 2004) (confirming applicability of the *Bonnette* factors for the

20  economic reality test).  In *Torres-Lopez v. Mary*, the Ninth Circuit added to this analysis eight

21  secondary "non-regulatory" factors that support joint employer status, including whether:

22               (1) the work done by the employee was analogous to a specialty job
                 on the production line; (2) the responsibility under the contract was
23               standard for the industry and could be passed from one contractor to
                 another without material change and little negotiation; (3) the
24               purported joint employer owns or has an interest in the premises and
                 equipment used for the work; (4) the employees did not have a
25               business organization that could shift as a unit from one worksite to
                 another; (5) the services rendered were piecework and did not
26               require special skill, initiative or foresight; (6) the employee did not
                 have an opportunity for profit or loss depending upon the
27               employee's managerial skill; (7) there was permanence in the

28

United States District Court
Northern District of California

1    working relationship and (8) the service rendered was an integral part of the alleged joint employer's business.[8]

*Id.* at 640; *Moreau*, 356 F.3d at 947-48.  The first and eighth *Torres-Lopez* factors, however, do not have much bearing outside of the production-line employment context.  *Moreau*, 356 F.3d at 952.  The Ninth Circuit has since clarified that the *Bonnette* factors weigh most heavily in the analysis.  *See Moreau*, 356 F.3d at 946-47 (noting that the court "focused primarily on [the] four *Bonnette* factors"); *see also, e.g.*, *Rios v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL 2067847, at *2 (N.D. Cal. July 24, 2006) (noting that the *Bonnette* factors are most important) (citations omitted).

In addition to pleading facts in support of the *Bonnette* and *Torres-Lopez* factors, a plaintiff seeking to hold multiple entities liable as joint employers must plead specific facts that explain how the defendants are related and how the conduct underlying the claims is attributable to each defendant.  *See Freeney v. Bank of Am. Corp.*, No. CV 15-02376 MMM (PJWx), 2015 WL 4366439, at *18 (C.D. Cal. July 16, 2015); *Adedapoidle-Tyehimba*, 2013 WL 4082137, at *5.  Ultimately, all of these factors are meant to guide a court's analysis, but the ultimate determination must be based "upon the circumstances of the whole activity."  *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Bonnette*, 704 F.2d at 1470 ("The [ ] factors . . . provide a useful framework for analysis . . . but they are not etched in stone and will not be blindly applies.").  At the motion to dismiss stage, a plaintiff need only allege facts demonstrating some of the *Bonnette* or *Torres-Lopez* factors to survive.  *See, e.g.*, *Guitierrez*, 2014 WL 5487793, at *5-6.

        b.    *Application to the Customer Defendants*

            i.    *Bonnette* Factors

**Power to Hire and Fire**.  The first *Bonnette* factor is whether the alleged joint employer has the power to hire and fire the purported employees.  The Court concluded that the TAC failed to allege that the Customer Defendants had the power to hire or fire Serenity Transportation's drivers because, in short, it alleged that Serenity Transportation and Friedel advertised, interviewed, and hired drivers and also retained and exercised the right to terminate a driver's

---

[8] The *Torres-Lopez* factors derive from the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1872.  *See Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226,

1   employment, and while the TAC alleged that Customer Defendants could remove drivers from

2   their work rotations, there were no allegations that removal from a work rotation terminates the

3   driver's role as a driver for Serenity Transportation.  *Johnson*, 2015 WL 6664834, at *10.

4          However, Plaintiffs have added certain allegations to the FAC intended to emphasize that

5   removal of a driver from a work rotation can terminate the driver's role as a driver for Serenity

6   Transportation.  As for the SCI entities, the FAC alleges that Plaintiff Aranda made numerous 15-

7   hour long-distance round-trip calls for the SCI entities, and that other drivers make these trips as

8   well.  (Dkt. No. 58 ¶ 19.)  Plaintiffs further identify an admission in Defendants' motion to dismiss

9   the TAC in which they clarified that SCI is one of Serenity Transportation's "two largest accounts

10  and its clients."  (Dkt. No. 51 at 8.)  Plaintiffs urge that SCI's role as one of Serenity

11  Transportation's largest customers coupled with SCI's ability to remove drivers from its rotation is

12  enough to plausibly infer power to fire for the purposes of the first *Bonnette* factor.  (Dkt. No. 61

13  at 13-14.)  Plaintiffs rely on *Lemus v. Timberland Apts., LLC*, No. 3:10-CV-01071-PK, 2011 WL

14  7069078, at *10 (D. Or. Dec. 21, 2011), citing its language that "a more general right to remove

15  [subcontractor's] employees from the job site" is "a sanction somewhat equivalent to hiring here

16  where [contractor's] jobs constituted the vast majority of [subcontractor's] work."  While in

17  *Lemus*, the subcontractor also retained a contractual right to fire the contractor's employees for

18  policy violations not present here, the Court concluded that the contractor's right to remove the

19  employee, when that contractor represented the majority of the employer's work, was sufficient to

20  state a claim at the motion to dismiss stage.  Given the allegation that SCI is one of Serenity

21  Transportation's largest customers, and that SCI can remove a driver from its work rotation, the

22  Court cannot conclude as a matter of law that removal from SCI has no effect on a driver's

23  potential termination; instead, the FAC gives rise to a plausible inference to the contrary.

24          With respect to the County, the FAC alleges that potential new drivers are sent to the

25  County to conduct a Live Scan as part of the overall Serenity Transportation hiring process.  (*Id.*

26  ¶ 23.)  There is no express allegation, but the Court can reasonably infer that a driver must pass the

27  Live Scan to be hired.  The FAC also alleges that Plaintiff Johnson sometimes made as many as 6

28  calls for the County in a single day.  (*Id.* ¶ 32.)  The FAC also recounts an incident in which the

United States District Court
Northern District of California

19

County suspended a Serenity Transportation driver from its rotation for 30 days.  (*Id.* ¶ 23.)

Friedel considered terminating that driver, but decided not to when the County clarified that the

driver's infraction was only minor.  (*Id.*)  In their motion, Defendants appear to ignore this

allegation altogether.  Based on the County's involvement in the hiring process through Live Scan

and its alleged influence on Friedel's firing decisions, and drawing all inferences in Plaintiffs'

favor, the Court concludes that the FAC has adequately alleged that the County has at least some

power or influence over hiring and firing decisions.  The first *Bonnette* factor therefore weighs

slightly in favor of joint employer status for the SCI entities and the County.

 ***Control over the Employees' Work Schedules or Conditions.***  The second *Bonnette* factor

is whether the entity has control over the employees' work schedules or conditions.  Reviewing

the TAC, the Court discounted the general and conclusory allegations that all Customer

Defendants promulgated detailed policies governing drivers' work and exercised supervision and

control over them while at their worksite, but nevertheless concluded that the more specific

allegations about control provided "a scintilla of support" for a finding of joint employer status

against all Customer Defendants.  *Johnson*, 2015 WL 6664834, at *10.  The FAC provides even

more details, and thus supports this *Bonnette* factor even more.

 The FAC alleges that the SCI entities have drivers available to them 24 hours a day, and

require drivers to respond to calls within 60 to 75 minutes.  (Dkt. No. 58 ¶¶ 18, 31.)  The SCI

entities have enacted policies prohibiting drivers from transferring multiple decedents at the same

time and requiring drivers to use particular type of identification band, specific labeling

procedures, a protocol for witnessing removal of human remains, and step-by-step procedures for

removing infant and fetal remains.  (*Id.* ¶¶ 28, 31.)  In fact, each SCI location has step-by-step

specifications for drivers, including details about where they must park; what documents they

must complete upon arrival; when, where, and how to label and place the deceased; and how to

exit the facility.  (*Id.*)  The FAC alleges that drivers spend up to 30 minutes performing these

activities at the SCI locations.  (*Id.*)  SCI retains the right to enforce its work rules on drivers when

drivers were at their facilities.  (*Id.* ¶¶ 28, 32, 33.)  The SCI entities further retain the right to

require that drivers receive ongoing training, and the FAC alleges that SCI has actually trained

United States District Court
Northern District of California

United States District Court
Northern District of California

drivers regarding identification protocol, transfer of the deceased, and proper documentation of removal work.  (*Id.* ¶ 29.)  Further, SCI provides to drivers SCI business cards with a blank space for the drivers' names, which drivers use and hand out to families of the deceased.  (*Id.*)

The FAC is still absent allegations that the SCI entities control the drivers' routes and schedules.  Plaintiffs insist that the requirements about call-response time suffice to show such control.  (*See* Dkt. No. 61 at 15.)  Not so; this allegation allows the Court to plausibly infer some control over the drivers' work conditions, but does not indicate that the SCI entities decide or assign routes or determine which calls each Serenity Transportation driver is assigned.  However, taken together, the FAC allegations indicate that the SCI entities have some control over the drivers' work conditions and daily job functions for the time the drivers spend at the SCI facilities, which is not the "brief time" that Defendants urge in their motion (Dkt. No. 59 at 14), but rather up to 30 minutes for each call (Dkt. No. 58 ¶ 28).  *See Carrillo v. Schneider Logistics Trans-Loading & Distrib., Inc.*, No. 2:11-cv-8557-CAS (DTBx), 2014 WL 183956, at *8 (C.D. Cal. Jan. 14, 2014) (on motion for summary judgment, concluding that this *Bonnette* factor weighed in favor of joint employer status where evidence established that defendant was "closely monitoring and enforcing productivity standards" for workers and "imposed and enforced other operating procedures" governing their "daily job functions").

The same is true of the County.  The Court concluded that the TAC allegations that the County promulgated policies about the timeframe in which drivers must respond to different types of calls and the amount of times drivers must wait at the scene if the deceased was not ready to be transported sufficed to satisfy this *Bonnette* factor against the County.  *Johnson*, 2015 WL 6664834, at *11.  The FAC bolsters this conclusion, adding more details.  Specifically, when calls for pick-ups originate within 12 miles from the County's facility (but not necessarily from the driver), the County requires drivers to arrive at the scene within 45 minutes after the request for service.  (Dkt. No. 58 ¶ 34.)  The FAC also further details the County's policies, which include prohibitions on drivers labeling the deceased, making any stops once en route to County facilities, and carrying more than one body in a single trip, and instructions about what materials to bring to the scene.  (*Id.* ¶ 37.)  Like the TAC, these allegations are enough to satisfy this *Bonnette* factor at

21

1    the pleading stage.

2          In short, the second *Bonnette* factor provides some support for a finding of joint

3    employment status for the County and, to a slightly lesser degree, the SCI entities.

4          **Control over the Rate and Method of Employees' Payment.**   The third *Bonnette* factor is

5    whether the alleged employer determines the rate and method of the employees' payment.

6    Reviewing the TAC, the Court concluded that the conclusory allegation that all Defendants

7    participated in the compensation scheme, including by requiring Drivers to fill out proprietary

8    paperwork on which Driver time is recorded," was not enough.  *Johnson*, 2015 WL 6664834, at

9    *11.  In particular, the Court noted that the TAC impliedly alleged that drivers signed an

10   employment contract with Serenity Transportation, not the Customer Defendants, which indicated

11   that drivers receive a percentage of the fees for services that the Customer Defendants pay.  *Id.*

12   (record citations omitted).  The FAC does not add any new facts that indicate otherwise.

13   Accordingly, as before, the FAC does not adequately allege that the Customer Defendants exercise

14   any control over the rate and method of the drivers' payment.  This *Bonnette* factor therefore

15   weighs against a finding of joint employment.

16         **Maintenance of Employment Records for the Employees.**  The final *Bonnette* factor

17   considers whether the Customer Defendants maintain employment records for the employees.  The

18   Court concluded that the TAC failed to include facts sufficient to meet this *Bonnette* factor

19   because there were no allegations that any Customer Defendant maintained employment records

20   of the drivers, including records of their runs.  *See Johnson*, 2015 WL 6664834, at *12.

21         In the FAC, Plaintiffs allege that the SCI entities retain records of the drivers who make

22   calls for them, the time period in which drivers are dispatched on SCI's behalf, and the drivers'

23   identities, and also audit the drivers' motor vehicle licenses.  (*Id.* ¶ 30.)  While employment

24   records is a broad category that likely includes much more information, in this context recording

25   data about the time each driver spent on runs fits the bill, at least at this stage of the litigation.  The

26   same is true of the County, which is alleged to keep records of drivers' names, information, and

27   photo IDs, their service completion, and logbooks of the drivers' runs.  (*Id.* ¶¶ 22, 36.)

28         In short, while Defendants urge that the FAC "does not allege that any of the Customer

United States District Court
Northern District of California

22

United States District Court
Northern District of California

Defendants recorded the [Serenity Transportation] drivers' time[,]" (Dkt. No. l 59 at 15), such is not the case.  Defendants' reliance on *Carrillo* fares no better.  In *Carrillo*, the Court concluded that the employer's furnishing of employment records to the alleged joint employer was not enough to satisfy this *Bonnette* factor.  2014 WL 183956, at *10.  But in *Carrillo*, the alleged joint employer directed the employer to "maintain [employment] records and use them to make periodic reports" to the alleged joint employer, and the Court was unpersuaded by that argument.  *Id.*  In fact, the court concluded that the record before it indicated that the alleged joint employer simply imposed certain screening requirements on the workers, which was not enough to establish maintenance of records.  *Id.*  In contrast, here, the FAC alleges that the Customer Defendants maintain their *own* records of the drivers' runs.  Thus, *Carrillo* does not support Defendants' position.  Accordingly, for the purposes of surviving a motion to dismiss, Plaintiffs have adequately alleged that the fourth *Bonnette* factor weighs in favor of joint employer status against all Customer Defendants.

ii.    *Torres-Lopez* Factors

The Court now turns to the second through seventh *Torres-Lopez* factors.  *See Moreau*, 356 F.3d at 952.  Reviewing the TAC, the Court concluded that the third ("ever so slightly"), fifth, and sixth *Torres-Lopez* factors supported a finding of joint employment as for the County, and only the fifth and sixth as for the SCI and SCI California (and the other Customer Defendants in the TAC).  *Johnson*, 2015 WL 6664834, at *12.  The Court reaches almost the same conclusion here.

As for the second factor, there are no allegations that "responsibility under the contract [i]s standard for the industry and c[an] be passed from one contractor to another without material change and little negotiation[,]" so this factor weighs against a finding of joint employer status.  *Torres-Lopez*, 111 F.3d at 640.  As for the third factor, the FAC alleges that the drivers perform some of their work at SCI's facilities—up to 30 minutes per call—and use SCI paperwork.  (*Id.* ¶ 28.)  The same is true of the County, which is also alleged to provide some of the equipment, including body bags, plastic sheeting, and body shrouds, that drivers use while at their facility.  (*Id.* ¶ 39.)  These allegations provide some support, though minimal, since the drivers' primary job

23

is transporting the deceased in their vehicles, and there is no allegation that SCI, SCI California, or the County have any interest in the drivers' cars. There are no allegations pertaining to the fourth *Torres-Lopez* factor, but like the TAC, "the fifth and sixth weigh in favor of joint employer status inasmuch as the [FAC] alleges that the services rendered were piecework as drivers received a flat rate per run and required no special skill or license requirement and that the drivers [have] no opportunities for profit or loss depending on their managerial skill." *Johnson*, 2015 WL 6664834, at *12. The seventh factor remains a wash because, as before, "Plaintiffs allege that there [is] permanence in the working relationship, but at the same time allege that the Customer Defendants [can] remove a driver from their work route at any time and [a]re provided to the Customer Defendants as labor contractors on a per-call basis." *Id.* In short, the third—though to a limited extent—fifth, and sixth factors support a finding of joint employment for the Customer Defendants.

However, in the Order reviewing the TAC the Court noted that "besides a mechanical application of these factors, the facts of *Torres-Lopez* itself are also instructive." *Johnson*, 2015 WL 6664834, at *12. Unlike *Torres-Lopez*, in which the purported joint employer, and *not* the nominal employer, exercised control over the workers, the TAC alleged that Serenity Transportation and Friedel hire, train, supervise, and fire drivers and acted as labor contractor, not mere employment agent or broker. *Id.* The FAC remains distinguishable from *Torres-Lopez*: while it includes some facts suggesting the Customer Defendants' involvement in or influence over day to day job conditions and the like, it still alleges that the bulk of the hiring, training, supervision, and termination duties remain in the hands of Serenity Transportation and Friedel, the nominal employee. Thus, the *Torres-Lopez* factors on their own do not compel the Court to conclude that the Customer Defendants are both joint employers.

*   *   *

The *Bonnette* factors weigh the heaviest in the joint employment analysis under federal law. *See Moreau*, 356 F.3d at 946-47. The first, second, and fourth *Bonnette* factors weigh in favor of joint employment for the County. Likewise, the first, second—though only to a slight degree—and fourth weigh in favor of joint employment for the SCI entities. Three of the six

24

applicable *Torres-Lopez* factors provide support for such a conclusion.  Ultimately, the factors themselves are just a guide and what matters is the totality of the circumstances alleged.  *See Rutherford*, 331 U.S. at 730; *Bonnette*, 704 F.2d at 1470.  In light of the *Bonnette* and *Torres-Lopez* factors, and viewing the economic realities test as a whole while drawing all inferences in Plaintiffs' favor, the FAC alleges just enough to eke out a plausible inference of joint employment for the SCI entities and the County.

### 2. Joint Employer Under California Law

The Court must also consider whether Plaintiffs have alleged a basis for liability against the Customer Defendants under California law, which has its own test for determining joint employment.  Defendants argue that the FAC fails to state a claim that either the SCI entities or the County is a "joint employer" under California law (Dkt. No. 59 at 16), and Plaintiffs' opposition only argues that Plaintiffs have adequately pled joint employer liability against the SCI entities.  (Dkt. No. 61 at 21-24.)  The Court deems Plaintiffs' failure to respond to Defendants' arguments as a concession that the FAC in fact fails to state a claim of joint employer liability under California law against the County.  *See Ardente v. Shanley*, No. 07-4479 MHP, 2010 WL 546485, at *6 (N.D. Cal. Feb. 9, 2010) ("Plaintiff fails to respond to this argument and therefore concedes it through silence.").  Thus, the Court considers whether the FAC adequately alleges California joint employer status only against the SCI entities.

#### a. *Legal Standard*

In actions to recover unpaid minimum wages pursuant to Cal. Labor Code § 1194, as here, "the standards to determine whether Defendants are directly liable are set out in *Martinez v. Combs*, 49 Cal.4th 35 (2010), where the California Supreme Court held that the definition of 'employer' for minimum wage purposes is provided in the orders of California's Industrial Welfare Commission ("IWC")[.]"  *Ochoa v. McDonald's Corp.*, --- F. Supp. 3d ----, No. 14-cv-02098-JD, 2015 WL 5654853, at *2 (N.D. Cal. Sept. 25, 2015); *see Martinez*, 49 Cal. 4th at 52; *see, e.g.*, *Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1429 (2010); *Betancourt v. Advantage Human Resourcing, Inc.*, No. 14-cv-01788-JST, 2014 WL 4365074, at *2-3 (N.D. Cal. Sept. 3, 2014); *Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 394-95 (C.D. Cal. 2014);

1   *Taylor v. Waddell & Reed Inc.*, No. 09-cv-02909 AJB (WVG), 2013 WL 435907, at *3 (S.D. Cal.

2   Feb. 1, 2013) (citation omitted); *Arredondo v. Delano Farms Co.*, No. CV F 09-01247-LJO-DLB,

3   2012 WL 2358594, at *9 (E.D. Cal. June 20, 2012) (citation omitted).  The IWC Wage Order

4   provides three alternative definitions for the term "to employ."  *Martinez*, 49 Cal.4th at 64.  It

5   means: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or

6   permit to work, *or* (c) to engage, thereby creating a common law employment relationship."  *Id.* at

7   64.

8       Under *Martinez*, an entity employs workers if it "directly or indirectly, or through an agent

9   or any other person, employs or exercises control" over their wages, hours, or working conditions.

10  IWC Wage Order No. 9-1002 § 2(G).  The language is disjunctive, and control over only one such

11  factor will give rise to joint employer liability.  *See Martinez*, 49 Cal.4th at 59.  "While this

12  language is potentially quite broad in scope, California courts have circumscribed it by denying

13  employer liability for entities that may be able to influence the treatment of employees but lack the

14  authority to directly control their wages, hours or conditions."  *Ochoa*, 2015 WL 5654853, at *3.

15      An entity can be held liable as an employer for "suffering or permitting to work" only if it

16  "fail[s] to perform the duty of seeing to it that the prohibited condition does not exist."  *Martinez*,

17  49 Cal.4th at 69 (internal quotation marks omitted).  Put another way, the "basis of liability is the

18  defendant's knowledge of and *failure to prevent* the work from occurring."  *Id.* at 70 (emphasis in

19  original).  Merely receiving the benefit of the employees' work is not enough to establish liability

20  under the "suffer or permit to work" standard.  *Id.*

21      Lastly, under *Martinez*, "to engage" means to create a common law employment

22  relationship.  *Martinez*, 49 Cal.4th at 64.  Under the common law, "[t]he principal test of an

23  employment relationship is whether the person to whom service is rendered has the right to control

24  the manner and means of accomplishing the result desired."[9]  *Borello*, 48 Cal.3d at 350; *see also*

25  _____

26  [9] California's common law the test is so similar to federal law that at least one court in this District
    has declined to apply the California rules separately and instead applied the FLSA test even to
27  state law labor claims.  *See Rios v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL
    2067847, at *2 (N.D. Cal. July 24, 2006) (where plaintiff brought both FLSA and state law claims,
28  noting that "[b]ecause of the similarities underlying the FLSA and California laws at issue here,
    the court applies the FLSA's joint employer test to [plaintiff's] claims"); *see also Guitierrez*, 2014

United States District Court
Northern District of California

United States District Court
Northern District of California

*Futrell*, 190 Cal. App. 4th at 1434 (noting that the key factor is "control of details").  What matters is whether the hirer "retains all necessary control" over the operations, and the strongest factor is whether the hirer can discharge the worker without cause.  *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 532 (2014).

California courts also consider "several 'secondary' indicia of the nature of a service relationship."  *Borello*, 48 Cal. 3d at 350; *Futrell*, 190 Cal. App. 4th at 1434.  These factors include the right to terminate at will, along with:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Id.*; *see also Futrell*, 190 Cal. App. 4th at 1434.  The factors "[g]enerally . . . cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations."  *Borello*, 48 Cal.3d at 350 (citation omitted).

### b. *Application to SCI and SCI California*

Plaintiffs argue that the FAC allegations meet all three definitions of an employer under *Martinez*.

#### i. Exercise Control Over Wages, Hours, or Working Conditions

Plaintiffs contend that the SCI entities exercise control over "wages, hours, or working conditions" sufficient for a finding of joint employment, but their opposition only argues that they have adequately pleaded control over hours and working conditions.  (*See* Dkt. No. 61 at 21-22.)  And indeed, for the same reasons discussed in the FLSA context, the Court concludes that the SCI entities do not exercise control over the drivers' wages.  *See supra* Section B.1.b.i, Control over the Rate and Method of Employees' Payment.  Nor does the FAC plausibly allege that the SCI

WL 5487793, at \*5 (noting that the California common law "right-to-control" test is similar to federal law's economic reality test).

entities exercise control over drivers' hours.  To the contrary, the FAC alleges that Serenity Transportation and Friedel assign drivers to shifts and calls, which determines their hours.  While the SCI entities might require drivers for certain long-distance trips, there are no allegations that they decide which drivers are assigned those routes or to any others.

Thus, the question comes down to whether the FAC adequately alleges that the SCI entities exercise control over the drivers' working conditions based on their workplace policies.  Although the policies described in the FAC demonstrate control over certain of the drivers' daily activities while performing calls for the SCI entities, as the Court noted in reviewing whether this definition of employer was adequately alleged in the TAC, "mere imposition of requirements or oversight of workers' performance is not enough to make the overseeing entity a joint employer absent hiring and firing power."  *See Martinez*, 49 Cal.4th at 70; *Futrell*, 190 Cal. App. 4th at 1432-33; *Ochoa*, 2015 WL 5654853, at *5.  However, unlike the TAC, the FAC now includes factual allegations that give rise to a plausible inference that the SCI entities exercise some influence over the firing of drivers, for the same reasons discussed in the FLSA context.  *See supra* Section B.1.b.i, Power to Hire and Fire.  Specifically, based on the allegation that SCI is one of Serenity's largest customers, the Court can plausibly infer that the SCI entities' removal of drivers from their work route removes the driver from employment at Serenity Transportation.  Thus, the FAC adequately alleges that the SCI entities exercise control over the drivers' working conditions relevant to a finding of joint employer status under the first prong of *Martinez*.

###### ii.      Suffer or Permit to Work

The second *Martinez* prong assesses whether the entity "suffer[s] or permit[s]" the employees to work—that is, if it knows of and fails to prevent the unlawful work from occurring. *See Martinez*, 49 Cal.4th at 70.  In reviewing the TAC, the Court concluded that Plaintiffs failed to establish that the Customer Defendants "suffered or permitted" drivers to work because the TAC alleged that Serenity Transportation and Friedel have exclusive power to hire and fire the drivers and set their wages and hours, and so the Customer Defendants "did not suffer and permit drivers to work, even if they exercised control or influence over the actual employer."  *Johnson*, 2015 WL 6664853, at *17 (citations omitted).

Plaintiffs point to the FAC allegations that the SCI entities know that drivers work hours of overtime, for example, when they make long-distance runs of up to 15 hours, but SCI neither pays Plaintiffs overtime nor makes any effort to ensure that Serenity Transportation pays drivers overtime or pays them for meals or rest breaks on those trips.  (Dkt. No. 58 ¶ 32.)  While this allegation does not indicate that the SCI entities have hiring and firing power or ability to set wages, which are necessary to establish that an entity suffered or permitted work, *see, e.g.*, *Futrell*, 190 Cal. App. 4th at 1434; *Ochoa*, --- F. Supp. 3d -----, 2015 WL 5654853, at *7, for the same reasons discussed above, the FAC contains sufficient allegations to plausibly infer that the SCI entities had some influence over Serenity Transportation's firing decisions.

In their opposition, Plaintiffs cite *Arredondo* for the proposition that they have adequately alleged that the SCI entities suffered or permitted drivers to work.  (*See* Dkt. No. 61 at 22 (citing 2012 WL 2358594, at *9).)  But *Arredondo* does not help Plaintiffs.  There, the court concluded that there was a factual dispute that prevented summary judgment on the "suffer or permit to work" joint employment test because the alleged joint employer had knowledge that the workers were engaged in pre- and post-shift work because supervisors were present in the field, and had the power to prevent plaintiffs from working because it "*helped set the workers' wages*, had the ability to move workers around, decided when and where to start pre-[work] and [work] activities, and was responsible for deciding when to cancel work due to inclement weather."  2012 WL 2358594, at *21 (emphasis added).  Here, in contrast, the FAC does not allege that the SCI entities set the workers' wages, had any say in what calls workers were assigned, or decided when workers' shifts would begin or end.  While the FAC allegations here do not make as clear a case for the "suffer or permit to work" standard as in *Arredondo*, because the FAC does plausibly allege that the SCI entities had some influence on firing decisions, it adequately alleges that they are joint employers under this second prong of *Martinez*.

          iii.     To "Engage" and Create a Common Law Employment Relationship

As for the third prong, whether the SCI entities "engaged" drivers, the Court considers whether they created a common law employment relationship with the drivers.  *Martinez*, 49 Cal. 4th at 64.

1    The primary inquiry is whether the SCI entities had the right to exercise control over the

2    drivers.  The inquiry is similar to the FLSA analysis.  In reviewing the TAC, the Court noted that

3    allegations were "enough to plausibly allege that the Customer Defendants had some control over

4    *some* of the details of the drivers' work." *Johnson*, 2015 WL 6664853, at *18 (emphasis in

5    original).  The same is true of the FAC allegations about the SCI entities: Plaintiffs allege that the

6    SCI entities retain the right to control the drivers' work by enacting detailed labeling and step-by-

7    step decedent removal protocol, requiring drivers to undergo training and actually training drivers

8    on a variety of topics, detailing the time period in which drivers must respond to calls.  (Dkt. No.

9    58 ¶¶ 28-31.)

10   As for the secondary factors, the Court concluded that some of the secondary indicia of an

11   employment relationship were alleged, but not others.  *Johnson*, 2015 WL 6664853, at *18.

12   Ultimately, the Court concluded that pleading a "weak showing right to control coupled with some

13   secondary indicia of an employment relationship" was not enough to plausibly allege an

14   employment relationship under this prong of *Martinez*.  *Id.* at *19.  Turning to the secondary

15   factors alleged in the FAC, Plaintiffs sufficiently allege that the drivers' work—including

16   transportation and removal of human remains—is not a distinct occupation or business from the

17   SCI entities, but rather is integral to their work.  (*See* Dkt. No. 58 ¶ 28 (alleging that SCI labels

18   part of the drivers' work as "one of the most fundamental aspects of our business"); *id.* ¶ 43

19   (alleging that SCI also hires its own drivers as employees who performed the same work as the

20   Serenity Transportation drivers).)  They have alleged that no skill, special training, or specialized

21   license is required to do the work (*id.* ¶ 46), and that drivers are made available to the SCI entities

22   on an ongoing basis, which implies an indefinite working relationship (*id.* ¶ 45).  They have also

23   alleged that the SCI entities has some control over the drivers' working conditions, for the same

24   reasons described above in the FLSA context.

25   On the other hand, other secondary factors are not met in the FAC. For example, while the

26   FAC alleges that the drivers spend some time at SCI properties and facilities, up to 30 minutes per

27   call, as in the TAC "their primary place of work [i]s the road—*i.e.*, their cars—and there are no

28   allegations that" the SCI entities supply those cars to drivers.  The mere allegation that the SCI

United States District Court
Northern District of California

30

United States District Court
Northern District of California

entities require certain paperwork does not plausibly establish that the SCI entities supply the instrumentalities and tools needed for transportation of human remains.  While Plaintiffs allege generally that the work at the SCI entities' facilities is done with supervision, the specific allegation in the FAC is that Serenity Transportation and Friedel engage in day-to-day supervision of their work, not the SCI entities.  Finally, as in the TAC, there are no allegations regarding whether the drivers and the SCI entities believe that they are creating an employer-employee relationship.

Thus, the FAC is similar to the TAC inasmuch as it alleges only a right to control some of the drivers' working conditions and some secondary indicia of an employment relationship, only the FAC provides slightly more details indicative of control.  And indeed, plaintiffs "do not have to satisfy every factor in order to establish an employment relationship" at the pleading stage.  *See Betancourt*, 2014 WL 4365074, at *6 (citation omitted).  Drawing all inferences in Plaintiffs' favor, the policies controlling transportation and labeling protocol, training, and call-response times are sufficient to serve as a plausible basis for a common law employer-employee relationship between the SCI entities and drivers for the purposes of the Labor Code wage statutes.  While the common sense understanding of who "employed" drivers for the purposes of compelling payments of allegedly unpaid wages may appear to be Serenity Transportation and Friedel, not the SCI entities, Plaintiffs have alleged just enough to make plausible that the SCI entities were employers, as well.

*   *   *

In sum, the additional allegations the FAC set forth a plausible basis for joint employer liability under all three prongs of *Martinez*.  Plaintiffs therefore state a basis for joint employer liability under California law as is required to state a claim against the SCI entities under the state wage laws.

## CONCLUSION

For the reasons described above, the Court DENIES Defendants' motion to dismiss the claims against the SCI entities and the County.  The FAC sufficiently alleges Section 2810.3 as a basis for liability against the SCI entities.  The FAC also adequately alleges the Customer

1   Defendants' joint employer liability for the purposes of federal and California law.  The Court

2   therefore denies Defendants' motion to dismiss the Customer Defendants.  The Customer

3   Defendants shall file an answer to the FAC by January 31, 2016, and this action shall proceed

4   pursuant to the schedule set forth in the Pretrial Order.  (Dkt. No. 68.)

5           This Order disposes of Docket No. 59.

6           **IT IS SO ORDERED.**

7   Dated: January 22, 2016

8

9

10                                                    JACQUELINE SCOTT CORLEY
                                                      United States Magistrate Judge

United States District Court
Northern District of California

32