UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS JOHNSON, et al., | Case No. 15-cv-02004-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: MOTIONS FOR SUMMARY JUDGMENT** |
| SERENITY TRANSPORTATION, INC., et al., | Re: Dkt. Nos. 124, 126, 153 |
| Defendants. | |

Plaintiffs, removal technicians, allege that they and other Serenity Transportation, Inc. removal technicians were misclassified by Serenity as independent contractors instead of employees and thus denied the benefits of California and federal wage-and-hour laws. Apparently believing that Serenity may not be able to satisfy a judgment, they have also sued three entities for whom the Serenity removal technicians performed services on the theory that they are the removal technicians' joint employers and thus jointly and severally liable for Serenity's wage and hour violations. (Dkt. No. 121.[1]) Now pending before the Court are these entities' motions for partial summary judgment on whether they are subject to liability as Plaintiffs' joint employers along with Serenity. (Dkt. Nos. 124, 126.) Plaintiffs have also filed an administrative motion to file under seal certain documents submitted in support of their opposition to Defendants' motions. (Dkt. No. 153.) Having considered the parties' submissions, and having had the benefit of oral argument on January 19, 2016, the Court GRANTS IN PART SCI's motion, GRANTS the County's motion, and GRANTS Plaintiffs' sealing request.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**BACKGROUND**

**I.     Factual Summary**

    A.     <u>Serenity Transportation</u>

Plaintiffs Curt Johnson and Gary Johnson are removal technicians, also known as mortuary drivers, who are responsible for picking up and transporting dead bodies from the place of death—including residences, hospitals, convalescent homes, or accident and crime scenes—to designated locations—typically the morgue, a mortuary, or a funeral home storage facility. Generally, their responsibilities include remaining on call to receive assignments, wrapping the bodies in plastic sheets, transporting the bodies, and positioning the bodies at the destination. (Dkt. No. 154-2 ¶ 3; Dkt. No. 154-3 ¶ 3; Dkt. No. 154-4 ¶ 3.)

Plaintiffs worked as removal technicians for Serenity, a California mortuary transportation service owned by David Friedel.  Serenity refers to itself as a "referral service" that connects its clients with removal technicians.  Curt Johnson worked for Serenity from January 2012 to August 2013.  Gary Johnson worked for Serenity from February 2015 until April 2016.  The contracts between Serenity and its technicians are all substantially similar, and classify the removal technicians as "independent contractors."  Removal technicians lease their vehicles and gurneys from Serenity and complete four to eight removals per day for various clients.  Serenity removal technicians may attend a removal as either the lead—the primary removal technician—or the assist, who does not usually accompany the decedent into the client's facility.  Removal technicians serve as lead instead of assist, and vice versa, on about half of their calls.  They are paid on a flat fee basis per delivery with expense reimbursement for trips over 30 miles and additional reimbursement for excessive wait times.  Serenity removal technicians are assigned removal calls through Serenity's dispatch.

    B.     <u>SCI</u>

SCI and its affiliates own and operate funeral homes, cemeteries, crematories, and facilities known as "Personal Care Centers" ("Care Centers") where remains are prepared for final

United States District Court
Northern District of California

disposition, and holding facilities where remains are stored temporarily.[2]  At its Care Centers and

holding facilities SCI employs staff who—among other duties—drive and perform removal

services.  However, SCI has contracted with Serenity for removal technicians since 2011 because

it "wanted to have an option if [they] were unable to do the removal services with [their] own

staff."  (Dkt. No. 156-9 at 9.)  Serenity picked up decedents outside of business hours when SCI's

rotating after-hours on-call employees are unavailable or do not want to take the after-hours

assignment, or during regular business hours when SCI's employees are otherwise too busy.

Unlike SCI's staff, Serenity removal technicians only perform removal services and no other

tasks.

SCI has contracted with Serenity to provide removal services as needed since 2011.  The

contracts are non-exclusive—*i.e.*, SCI can use other third-party vendors to find removal

technicians—and designated the Serenity removal technicians independent contractors; however,

some SCI affiliates use only Serenity and no other third party vendors.  Serenity performs the

removal services in exchange for a flat fee.

Summaries of removal technicians' call sheets reflect that SCI calls accounted for less than

20% of the removals plaintiff Curt Johnson and Gary Johnson performed for Serenity in 2015 and

2016.

### C.    The County

The County, through the Office of the Medical Examiner Coroner ("Coroner"), is

responsible for determining the cause and manner of death for certain decedents in the County.   A

---

[2] SCI is a publicly-traded Texas corporation, which functions only as a holding company for its subsidiaries and does not itself own any mortuaries or funeral homes. (Dkt. No. 124-51 ¶¶ 2-3.) In their motion, SCI emphasizes that it was not a party to any contracts with Serenity, does not own, manage, or operate any mortuaries or funerary business, and does not hire, fire, or supervise employees of its affiliates, and that there is no evidence to show SCI is a joint employer. (*See* Dkt. No. 124-1 at 8-9.)  This information is not relevant at this time: the Court has held that it will decide whether SCI California is Plaintiff's joint employer assuming, for the purposes of the summary judgment motion, that SCI and SCI California are an integrated enterprise. (*See* Dkt. No. 140 at 1-2.)  The Court reasoned that "[i]f there is a triable issue of fact as to SCI California's liability as a joint employer, then SCI's liability as an integrated entity with SCI California can be litigated later.  If there is no triable issue as to SCI California, then there is none as to SCI either." (*Id.*)  Accordingly, in this Order the Court refers to SCI generally without any distinction between SCI, SCI California, or various SCI affiliates.

police department or hospital typically notifies the Coroner of a decedent, and the Coroner assigns an investigator to the case who determines whether the Coroner must determine the cause and manner of death pursuant to state statute. After the investigator obtains evidence at the scene of the death, he arranges for transportation to the Coroner's office. Unlike SCI, the County "does not have employees whose job duty it is to transport decedents to the Coroner's office." (Dkt. No. 131 ¶ 3.) Instead, the County contracts with Serenity to transport decedents to the Coroner's Office. Sometimes, however, County investigators assist removal technicians with removals. The County has contracted with Serenity to provide removal services since 2011. While the contract is non-exclusive, Serenity has been the County's exclusive removal services provider since 2011. Serenity performs removal services in exchange for a flat fee that varies according to job type and location.

Of the 1059 deliveries that Curt Johnson completed for Serenity in 2012, 299—28%— were for the County. During Gary Johnson's entire tenure with Serenity, he completed only one delivery for the County.

## II.     Procedural History

The Court's prior orders have extensively detailed the procedural history of this case, which the Court will not reiterate here. (*See* Dkt. Nos. 57, 69.) But the Court's order denying Defendants' motion to dismiss the Fourth Amended Complaint is relevant here and bears repeating. (Dkt. No. 69.) There, the Court concluded that the Fourth Amended Complaint adequately stated a claim against the SCI entities for Section 2810.3 liability. (*Id.* at 16.) The Court also held that Plaintiffs had "allege[d] just enough to eke out a plausible inference of joint employment for the SCI entities and the County" under federal law (Dkt. No. 69 at 25), and adequately alleged a plausible basis for the SCI entities' joint employer liability under California law (*id.* at 31). Plaintiffs then filed the now-operative Fifth Amended Complaint, which did not add any substantive allegations but substituted Gary as a named plaintiff and proposed class representative for Anthony Aranda. (*See* Dkt. No. 119 at 3; Dkt. No. 121.) Both SCI and the County now move for summary judgment on the grounds that they are not the removal technicians' joint employers under federal law or—with respect to SCI only—under California

law or for purposes of Section 2810.3 liability.  (Dkt. Nos. 124, 126.)

**DISCUSSION**

## I.      Evidentiary Objections

Both Plaintiffs and Defendants have objected to evidence submitted in connection with briefing the motions for partial summary judgment.  (*See* Dkt. Nos. 161, 167, 168, 169.)

SCI objects to the Court's consideration of the Serenity removal technicians' statements about the number of calls they completed per day on the grounds that their testimony "is directly contradicted by the evidence"; namely, the call sheets.  (*See* Dkt. No. 161 at 9-11; *see also* Dkt. No. 166 ¶¶ 9-15.)  Defendants cite no evidentiary rule to exclude the testimony.  The Court will consider the removal technicians' declarations over Defendants' objection.

SCI objects to Paragraph 3 of the declaration of Serenity removal technician Mario Almanza (Dkt. No. 156-65 ¶ 3) on the grounds that Almanza's statements about what Friedel told him—namely, that one of Serenity's mortuary clients was upset that he had fallen asleep on the job—are inadmissible hearsay.  (Dkt. No. 161 at 10.)  The Court overrules the objection, as Friedel's out-of-court statement is not hearsay but rather a statement of a party opponent under Federal Rule of Evidence 801(d)(2).

SCI objects to the Court's consideration of Paragraph 11 of the declaration of John Lundholm and Paragraph 15 of the declaration of Jeremy Jukich on the grounds that their statement that Friedel instructed them to pass out business cards on SCI calls are inadmissible hearsay.  (Dkt. No. 161 at 10; Dkt. No. 167 at 8.)  The Court will consider Paragraph 11, as Friedel's out-of-court statement is not hearsay under Rule 801(d)(2) but rather a statement by a party opponent.

SCI objects to the removal technicians' statements about what paperwork Serenity's other mortuary clients require for lack of foundation and lack of personal knowledge.  (Dkt. No. 161 at 10.)  There is evidence in the record that SCI was just one of Serenity's mortuary clients for which the technicians performed removal work, which is enough to demonstrate their familiarity with other mortuaries' practices.  The Court therefore considers the removal technicians' statements over Defendants' objection.

SCI also objects to Paragraph 17 of Curt's declaration on the grounds that his statements are "not specific to the SCI Defendants or the joint employer issue." (Dkt. No. 161 at 10.) In Paragraph 17, Curt describes taking direction and instructions directly from County investigators while performing removals. (Dkt. No. 156-7 ¶ 17.) The County's control and supervision over removal technicians is relevant to the joint employer issue, so the Court considers the statement only with respect to the County, not SCI.

The County objects to Paragraph 12 of Gary Johnson's declaration on the grounds that it is improper in form, lacks foundation and personal knowledge, and is inadmissible hearsay. (Dkt. No. 167 at 7.) The Court relies on Paragraph 12 solely for purposes of acknowledging Gary's statement that he remembered performing a removal for the County on one occasion. The County's objections are without merit as to this statement.

The County objects to Paragraph 3 of the declaration of Tony Goulart—in which he describes an incident where he was disciplined by the County for handing out personal business cards—on the grounds that he does not recall the name of the captain, the date, or any other details about the incident. (Dkt. No. 167 at 7.) The date and name of the officer are irrelevant; the salient point is the discipline itself. The County also objects to this paragraph as inadmissible hearsay. (*Id.*) The Court sustains the objection as to Mr. Goulart's explanation of what the officer told him at the meeting, but overrules the objection as to Mr. Goulart's overall explanation of the event— *i.e.*, that the meeting occurred, the reason for the meeting (his handing out business cards), and the ultimate result (his suspension from County and Serenity calls).

Plaintiffs object to Paragraph 3 of the declaration of Jeffrey Hubins submitted in support of the County's reply (Dkt. No. 167-1), which describes an administrative case against one Serenity removal technician, on the grounds that it contains improper argument and conclusions, hearsay, violates the best evidence rule, lacks foundation, contains improper opinion testimony, is irrelevant, and is more prejudicial than probative. (Dkt. No. 168.) The Court sustains the objection.

Plaintiffs object to Paragraph 3 of the declaration of David Friedel submitted in support of SCI's reply (Dkt. No. 164) on the grounds that it lacks foundation, constitutes improper opinion

testimony, and is speculative and not based on personal knowledge. (Dkt. No. 169 ¶ 1.) The Court sustains the objection to the extent that Friedel's explanation of the meaning of its SCI contracts is improper legal opinion.

Plaintiffs also object to Paragraphs 7 and 8 of the declaration of Candace Shirley submitted in support of SCI's reply (Dkt. No. 166) on the grounds that it lacks foundation and is not based on personal knowledge, constitutes improper opinion testimony, and is speculative. (Dkt. No. 169 ¶ 2.) The Court does not consider this evidence so the objection is moot. Plaintiffs further object to Paragraphs 6 and 9 through 16—both Paragraphs 16, as there are two—on the grounds that the testimony contains improper argument and conclusions and hearsay, violates the best evidence rule, lacks foundation, and contains improper opinion testimony. (*Id.*) The Court agrees and sustains the objection.

The Court overrules the remaining objections.

## II.     Joint Employer Status

The joint employer doctrine recognizes that "even where business entities are separate, if they share control of the terms of conditions of an individual's employment, both companies can qualify as employers." *Guitierrez v. Carter Bros. Sec. Servs., LLC*, No. 2:14-cv-00351-MCE-CKD, 2014 WL 5487793, at *3 (E.D. Cal. Oct. 29, 2014) (citing *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 769-60 (9th Cir. 1979)). Defendants seek partial summary judgment that they are not the removal technicians' joint employers under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, and California law.

### A.     Joint Employer under the FLSA

#### 1.     *Legal Standard*

A defendant must be an "employer" of the plaintiff to be liable under the FLSA. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985). Two or more employers may be 'joint employers' for the purposes of the FLSA. *Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1232 (C.D. Cal. 2007) (citation omitted). "All joint employers are individually responsible for compliance with the FLSA." *Bonnette*, 704 F.2d at 1469 (citation

omitted); *see also* 29 C.F.R. § 791.2(a). Whether an entity is a "joint employer" under the FLSA is a question of law. *Torres-Lopez v. May*, 111 F.3d 633, 638 (9th Cir. 1997) (citing *Bonnette*, 704 F.2d at 1469).

The "economic reality" of an employment situation determines whether an employer-employee relationship exists under the FLSA. *Goldberg v. Whitaker House Coop.*, 366 U.S. 28, 33 (1961). The Ninth Circuit has adopted a four-part "economic reality" test to determine when the employer-employee relationship exists. *See Bonnette*, 704 F.2d at 1470. These factors include whether the employer: "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* (citation omitted); *see also Moreau v. Air France*, 356 F.3d 942, 946-47 (9th Cir. 2004) (confirming applicability of the *Bonnette* factors for the economic reality test). In *Torres-Lopez v. May*, 111 F.3d 633 (9th Cir. 1997), the Ninth Circuit added to this analysis eight secondary "non-regulatory" factors that support joint employer status, including whether:

> (1) the work done by the employee was analogous to a specialty job on the production line; (2) the responsibility under the contract was standard for the industry and could be passed from one contractor to another without material change and little negotiation; (3) the purported joint employer owns or has an interest in the premises and equipment used for the work; (4) the employees did not have a business organization that could shift as a unit from one worksite to another; (5) the services rendered were piecework and did not require special skill, initiative or foresight; (6) the employee did not have an opportunity for profit or loss depending upon the employee's managerial skill; (7) there was permanence in the working relationship and (8) the service rendered was an integral part of the alleged joint employer's business.[3]

*Id.* at 640 (citation omitted); *Moreau*, 356 F.3d at 947-48.

All of these factors are meant to guide a court's analysis, but the ultimate determination must be based "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Bonnette*, 704 F.2d at 1470 ("The [ ] factors . . . provide a

---

[3] The *Torres-Lopez* factors derive from the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1872. *See Maddock v. KB Homes, Inc.*, 631 F. Supp. 2d 1226, 1232-33 (C.D. Cal. 2007) (citation omitted).

United States District Court
Northern District of California

useful framework for analysis . . . but they are not etched in stone and will not be blindly applied."). As a result, summary judgment may be proper even when some factors favor joint employment and others do not. *See Moreau*, 356 F.3d at 952.

### 2. SCI

#### a. *Bonnette* Factors

##### i. power to hire and fire

The first *Bonnette* factor, whether the alleged joint employer has the power to hire and fire the purported employees, weighs against joint employment. It is undisputed that SCI does not post available Serenity removal technician jobs, review resumes or applications, or interview candidates, and it is not involved in drafting, approving, or executing contracts between Serenity and the removal technicians. Instead, Serenity alone, largely via Friedel, takes responsibility for all of these actions. That "SCI's agreements with Serenity are non-exclusive; [and] SCI can choose to assign work to its own personnel, Serenity removal technicians, or non-Serenity removal technicians[,]" (Dkt. No. 156 at 19) does not create a genuine dispute as to whether SCI has the power to hire Serenity removal technicians. This evidence addresses whether a Serenity removal technicians will perform work for SCI, not whether the individual will be hired as a Serenity removal technician in the first instance. Thus, it is undisputed that Serenity alone hires the removal technicians. *See Montoya v. 3PD, Inc.*, No. CV-13-8068-PCT-SMM, 2014 WL 3385116, at *3 (D. Ariz. July 10, 2014) (finding no power to hire where the alleged joint employer did not meet the worker until after he was hired and did not review application materials, even if it did require the worker to pass a background check); *cf. Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 400 (N.D. Cal. 2012) (finding power to hire where the alleged joint employer interviewed several massage therapists before they were hired, and told several massage therapists that before they would be hired they would have to complete certain training by the employer).

Plaintiffs nonetheless insist that a trier of fact could find that SCI has the power to fire Serenity removal technicians. While it is undisputed that the SCI-Serenity contracts do not grant SCI authority to terminate a removal technician from Serenity altogether or to bar a technician from performing any removals for SCI, the record supports a finding that SCI has the authority to

9

remove a Serenity removal technicians from the SCI rotation; indeed, Friedel testified that several SCI mortuaries made such requests. (Dkt. No. 156-8 at 15-16; Dkt. No. 156-50.) This evidence, however, does not support a reasonable inference that SCI has the power to fire Serenity removal technicians. An entity's right to remove particular workers from its rotation is not the same as power to fire a worker from the labor contractor itself. *See, e.g.*, *Montoya*, 2014 WL 3385116, at *4 ("Although Home Depot may have requested that 3PD remove Montoya as a delivery driver of Home Depot goods, it remained 3PD's decision whether to continue its relationship with Montoya. Even if Home Depot indirectly contributed to the termination of 3PD's relationship with Montoya, it is not enough to suggest that as a matter of law Home Depot had the power to . . . fire Montoya."); *Adams v. US Airways, Inc.*, No. CIV 10-1088-PHX-DKD, 2013 WL 1345509, at *3 (D. Ariz. Mar. 29, 2013) (defendant's request that a worker stop providing services to its customer did not constitute ability to fire); *Valdez v. Cox Commc'ns Las Vegas, Inc.*, No. 2:09-CV-01797-PMP-RJJ, 2012 WL 1203726, at *2-3 (D. Nev. Apr. 11, 2012) (finding the defendant was not a joint employer where the worker did not establish that the defendant "ordered a contractor to terminate any particular employee or that a contractor did so in response to such a command").

Plaintiffs' attempt to distinguish these cases on the grounds that Friedel's emails support a finding that Friedel terminated Serenity workers at SCI's request is unavailing. At oral argument Plaintiffs identified Exhibit 53 to their opposition as an example. That email and others demonstrate that Serenity terminated a removal technician for violating an SCI policy by having two bodies in the vehicle at one time and consequently placing the wrong identification band on one of the deceased. Friedel warned that the removal technicians had been instructed to place the identification bands on at the time of removal and he threatened termination from Serenity if removal technicians fail to follow this policy. (*See* Dkt. Nos. 156-53, 156-54, 156-55.) But nothing in any of the emails indicates that SCI required Serenity to terminate the technician from Serenity, or retained authority to require Serenity to do so, or even asked that Serenity do so. And given the seriousness of the error, that Serenity terminated the removal technicians does not support an inference that SCI dictated such a consequence. Serenity's termination of a removal

10

technicians who fell asleep on the job during an SCI call (Dkt. No. 156-65 ¶ 3), also does not support a reasonable inference that SCI directed Serenity to fire that employee or even asked that Serenity do so.

Trying a different tack, Plaintiffs contend that SCI's role as one of Serenity's largest customers coupled with SCI's ability to remove removal technicians from its rotation is enough to establish a genuine dispute about SCI's power to fire Serenity technicians. An alleged joint employer's right to remove workers from a jobsite may be tantamount to the right to fire where the alleged joint employer's jobs constitute all or the vast majority of the contractor's work. *See, e.g.*, *Perez*, 2015 WL 3451268, at *6 (where workers performed all work for alleged joint employer pursuant to an exclusivity contract between the labor contractor and alleged joint employer, removal from the joint employer was equivalent to firing) (citation omitted); *Valdez*, 2012 WL 1203726, at *2 (finding that if defendant decided that a worker could not work on its assignments, that meant termination from the contractor because the contractor obtained 100% of its work for defendant); *Lemus v. Timberland Apts., LLC*, No. 3:10-CV-01071-PK, 2011 WL 7069078, at *10 (D. Or. Dec. 21, 2011), *report & recommendation adopted*, 2012 WL 174787 (D. Or. Jan. 20, 2012) (concluding that plaintiff had stated a claim for power to fire based on allegations that the defendant had the right to remove a worker from its worksite and the contractor performed a majority of its work for the defendant). Here, however, while SCI may be one of Serenity's largest customers, there is no evidence that SCI calls constituted all or even a majority of Serenity's removals. Instead, in 2015 SCI removals constituted less than 15 percent of all Serenity removals, and between 2012 and 2016 SCI removals accounted for between 8.6 and 13.8% of Serenity's total gross revenue. (Dkt. No. 124-8 ¶ 34.) In light of this evidence, coupled with the lack of any evidence that Serenity actually fired any removal technicians because SCI asked that they not perform Serenity removals for SCI, even drawing all inferences in Plaintiffs' favor, a Serenity removal technician's removal from SCI's rotation is not tantamount to termination from Serenity; such removal technician would still be able to respond to 85% of Serenity's calls and the

vast majority of its revenue-generating calls.[4]

Plaintiffs' reliance on *Carrillo v. Schneider Logistics Trans-Loading & Distribution, Inc.* ("*Carrillo/SLTD*"), No. 2:11-CV-8557-CAS, 2014 WL 183965 (C.D. Cal. Jan. 14, 2014), is unpersuasive. There the evidence supported a finding that the contract between the alleged joint employer and contractor gave the joint employer the authority to remove the contractor's employees from the joint employer's warehouse and from their assignment with the joint employer; that the joint employer exercised this authority on multiple occasions; and that the contractor thereafter terminated the employment of at least some of the removed employees following the joint employer's request that the employees be removed from the warehouse. *Id.* at *4. But unlike *Carrillo/SLTD*, here there is no evidence that Serenity fired a removal technician because SCI asked that the removal technician be removed from SCI's rotation; instead there is only evidence that Serenity heeded SCI's request to remove a removal technician from SCI's rotation temporarily (Dkt. No. 156-8 at 15-16; Dkt. No. 156-50; Dkt. No. 164 ¶ 4) and that, on other occasions, Friedel independently decided to terminate Serenity removal technicians based on mistakes made during SCI calls (Dkt. No. 156-51; Dkt. No. 156-52; Dkt. No. 156-54; Dkt. No. 156-65 ¶ 3.) This does not create a genuine dispute of material fact about SCI's power to fire Serenity removal technicians.

        ii.     control over the employees' work schedules or conditions

The second *Bonnette* factor is whether the alleged joint employer has control over the employees' work schedules or conditions. The evidence does not support a finding that SCI has control over the removal technicians' overall work schedules. While SCI requires Serenity to provide a certain number of removal technicians on a 24-hour basis, only Serenity, through Friedel, sets the removal technicians' schedules by determining which four or five days per week the removal technicians will be on 24-hour call and grants or denies removal technicians' requests

---

[4] The Court reaches the same conclusion with respect to Plaintiffs' related argument that the comparative revenue streams of SCI and Serenity—*i.e.*, SCI's large surplus compared to Serenity's alleged undercapitalized status—effectively gave SCI control over Serenity's hiring and firing of removal technicians. Assuming that Serenity is, in fact, undercapitalized, this argument is likewise not persuasive given that SCI represented a small portion of Serenity's overall revenue.

12

for time off.  Put another way, while SCI requires 24-hour coverage, Serenity can staff its removal technicians however it sees fit.  At oral argument, Plaintiffs conceded that they could not cite a case that holds that requiring a certain number of workers or requiring coverage for a certain amount of time indicates control.  Moreover, when removal technicians are on call, Serenity also retains exclusive authority to decide which removal technician to assign to which call and to determine which removal technician will serve as lead versus assist, if the call requires two people.  While there is evidence that SCI requested particular removal technicians on occasion, the record does not support a finding that any removal technicians ever responded to a call without an instruction from Serenity's dispatch, which indicates that SCI has no authority to assign removal technicians to calls.  In sum, there is no evidence that suggests SCI had any control over which removal technicians would be on call, when, or for how long.  Thus, SCI does not have control over removal technicians' work schedules.

However, the evidence supports a finding that SCI imposes a number of rules regarding the removal technicians' work conditions and daily job functions when they respond to SCI calls.  SCI promulgated policies for the removal technicians' work that detailed requirements for timing in responding to calls, including making certain representations to the decedent's family, a specific way of placing identification bands on the decedent, requiring the removal technicians to ensure there is a non-employee witness to the removal, limiting removal technicians to delivering only one decedent at a time, completing certain paperwork about the removal and the decedent's personal property, and depositing the body at the SCI Care Center in a particular way.  SCI reviews the removal technicians' paperwork and requires them to fix any errors that it finds.  There is also evidence that SCI's work rules were more extensive than the requirements other mortuaries imposed on Serenity removal technicians.  Although SCI did not invite or require removal technicians' attendance, Serenity technicians' attended live training sessions at SCI on several occasions, and SCI gave Serenity a training DVD to show the removal technicians.  SCI also provided Serenity a monthly performance review where it highlighted incidents of technician misconduct.

The question then is whether the paperwork requirements and supervision that SCI

imposes are sufficient to find "control" for the purposes of this *Bonnette* factor. Most of the procedures relate to identification of decedents, which SCI identified as the most important part of its business; the contracts between SCI and Serenity required Serenity to follow the procedures. SCI concedes that these are the same rules its own employees must follow when they perform removals. Nevertheless, SCI maintains that they are not evidence of control, relying on *Moreau*. There, the court noted that defendant Air France was "very specific about how it wanted its work performed, and it checked to ensure that its standards were met and that the service provider's overall performance adhered to Air France's specifications." 356 F.3d at 951. The Ninth Circuit acknowledged that "[t]his type of activity can, in some situations, constitute 'indirect' supervision of the employees' performance" but concluded that such was not the case there, where "much of the indirect supervision or control [it exercised] over the ground handling employees was purportedly to ensure compliance with various safety and security regulations, such as ensuring that food equipment was properly stowed or that the plane's load was adequately balanced." *Id.* Following *Moreau*, courts have recognized that "compliance with legal requirements is not indicative of control for purposes of establishing an employer-employee relationship." *Taylor v. Waddell & Reed Inc.*, No. 09CV2909 DMS (WVG), 2010 WL 3212136, at *3 (S.D. Cal. Aug. 12, 2010). However, courts have applied the *Moreau* principle "in a narrow and limited way"—that is, only when the regulation sets forth a particular method of action and the entity complies with that method. *See Waddell*, 2010 WL 3212136, at *3 (citations omitted); *see, e.g.*, *Zhao v. Bebe Stores, Inc.*, 247 F. Supp. 2d 1154, 1160-61 (C.D. Cal. 2003) (clothing store's use of a compliance monitor to ensure garment manufacturer's compliance with labor laws that the Department of Labor requires did not indicate control for determining joint employer relationship). In contrast, where a regulation requires an entity only generally to establish a system of supervision but does not dictate how the system must be organized or provide further guidance, the entity's conduct may still be evidence of control. *Waddell*, 2010 WL 3212136, at *3 (on motion to dismiss, concluding that alleged joint employer's specific controls over workers were indicia of control where FINRA regulation's "general" requirement to supervise activities of registered representatives "does not specify how such supervision must be carried out").

SCI argues that many of its identification-related work rules—like the ban on transporting more than one body and the tagging requirements—are designed for regulatory compliance and therefore not indicia of control.  (Dkt. No. 124-1 at 20.)  SCI cites 16 California Code of Regulations § 1223.1, which lists conditions under which funeral establishments may share preparation and storage rooms, requiring among other things that the establishments have in place "[a]n identification and labeling system . . . to effectively identify the human remains being prepared and/or stored in the facilities[.]"  16 Cal. Code Regs. § 1223.1(e).  But Section 1223.1 does not dictate how the identification system must be carried out.  And it does not touch on a number of SCI's other work rules, like response times for calls, dry runs, dress code, or instructions for interacting with decedent's families.  Thus, on summary judgment, where all inferences must be drawn in Plaintiffs' favor, the evidence supports a finding that SCI engages in some control of the Serenity removal technicians' work conditions.

The control supported by the record, however, is not sufficient for this *Bonnette* factor to weigh in favor of a joint employer finding.  For example, in *Bonnette* the court concluded that the control factor supported a joint employment finding based on a "showing that the defendants, though not responsible for the day-to-day supervision of the plaintiffs, made the final determination as to the number of hours the plaintiffs would work, what tasks they would perform, and how and when the defendants would intervene if conflicts arose.  704 F.2d at 1470.  In the context of delivery removal technicians, a district court concluded that the second "control" factor weighed in favor of a joint employment finding based on evidence that "the defendant's managers held weekly meetings with the plaintiffs, that these managers would comment on the plaintiffs' uniforms and check to see if they delivered packages, and that the defendant would assign the plaintiffs extra work, order them to drive different routes, and suggest how many hours per day it wanted the plaintiffs on the road."  *Maddock*, 631 F. Supp. 2d at 1236 (citing *Tumulty v. Fedex Ground Package Servs.,* No. C04-1425MJP, 2005 U.S. Dist. LEXIS 26215, at *11-12 (D. Wash. Mar. 4, 2005)).  Plaintiffs have not identified any case finding the level of control at issue here weighs in favor of joint employment. They rely heavily on *Carrillo v. Schneider Logistics Trans-Loading & Distrib.* ("*Carrillo/Walmart*"), No. 2:11-cv-8557-CAS (DTBx), 2014 WL 183956,

(C.D. Cal. Jan. 14, 2014), but there the evidence supported a finding that the defendant was "closely monitoring and enforcing productivity standards" for workers and "imposed and enforced other operating procedures" governing their "daily job functions[.]" *Id.* at *3 (record citation omitted). Further, there was evidence that the joint employer also decided each employee's workload, determined the number of pallets each worker had to load each hour, and directly assigned work to the employees, who reported directly to the joint employer for supervision. *Id.* at *3-4. Here, in contrast, while the evidence supports a finding that SCI imposed rules governing the removal technicians' job functions when performing removals for SCI, Serenity determined the removal technicians' workload, assigned them work, and was largely responsible for supervision.

Most significantly, however, even if SCI 's level of control through its procedural requirements rose to the level that weighs in favor of joint employment, that control only applies to approximately 20% of the removal technicians' work. There is no evidence that SCI required Serenity removal technicians to comply with its policies while performing calls for other Serenity clients. Plaintiff has not cited any case, and the Court has not located any, where a court concluded that the evidence supported a finding of sufficient control to weigh in favor of a joint employer relationship when the plaintiffs performed work for, and thus were under the control of, the alleged joint employer for less than half of their work day. Thus, although SCI imposes a number of requirements governing the removal technicians' daily job functions, drawing all inferences in Plaintiffs' favor the circumstances presented here do not establish a level of control that weighs in favor of a finding of joint employment.

iii.      control over the rate and method of employees' payment

The third *Bonnette* factor is whether the alleged employer determines the rate and method of the employees' pay. The SCI-Serenity contracts provide that SCI will pay Serenity a flat fee per removal. Serenity determines how much it will compensate its removal technicians, paying them a flat fee per removal with additional pay for excess mileage. (*See* Dkt. No. 156-7 ¶ 8 (technicians testify that Serenity paid them a flat rate for all Serenity calls); (Dkt. No. 124-8 ¶28; Dkt. No. 124-21 ¶ 13; Dkt. No. 124-24 at 43, 53; Dkt. No. 124-45 ¶ 14.) Friedel once notified

removal technicians that any reduction in the amount SCI pays to Serenity for removals may cause a reduction in the removal technicians per-removal pay (Dkt. No. 156-8 at 6; Dkt. No. 154-13 (noting that when customers failed to pay Serenity, Serenity could not pay its removal technicians in full)), but the undisputed evidence is that that decision rested solely within Serenity's discretion. (*See* Dkt. No. 124-24 at 53.) Plaintiffs have not adduced any evidence that supports their contention that SCI determines the rate of removal technicians' pay, and they conceded at oral argument that removal technicians' pay did not vary depending on the client.

While Plaintiffs maintain that SCI "is effectively setting the compensation paid to removal technicians for removals performed for SCI[,]" the cases they cite are inapposite. (Dkt. No. 156 at 23-24.) In *Carrillo/SLTD*, the court held that there was a genuine issue of fact as to whether the defendant determined the rate and method of payment because its management expressed a preference for incentive-based payment systems during the bidding process, and specifically requested that its contractors pay workers on such a basis. 2014 WL 183965, at *6. The same was true in *Carrillo/Walmart*, where there was evidence that Walmart pressured its labor contractor to pay workers on a per-container, rather than hourly, basis and required the sub-contractor to seek Walmart's approval before changing the total amount it paid its subcontractors. 2014 WL 183956, at *9. In *Arredondo v. Delano Farms Co.*, 922 F. Supp. 2d 1071, 1085-86 (E.D. Cal. 2013), the terms of the oral contract between the defendant and the labor contractor explicitly set the contractor's commission as a percentage of the overall wages paid to its workers and the defendant expressed interest in setting those wage rates "above the industry standard" to be competitive and improve its reputation. There is no such evidence in the record here and no evidence that SCI expressed any preference about how Serenity would pay the removal technicians. Instead, that each client paid Serenity a different amount and Serenity paid removal technicians the same amount per removal, supports an inference that SCI, like other clients, does not have control over removal technicians' pay. Thus, there is no genuine dispute that SCI does not exercise control over the rate or method of removal technicians' payment, which weighs against joint employment.

　　　　　　　　　　　　　　iv.　　maintenance of employment records for the employees

The final *Bonnette* factor considers whether SCI maintains employment records for the removal technicians. Plaintiffs contend that the detailed paperwork removal technicians leave with SCI—including SCI's "Witness of Removal," "Chain of Custody and Identification Confirmation," and "Personal Effects Inventory" forms—constitute "employment records" for the purposes of this factor because they could be used to identify which removal technician performed each removal. They also argue that SCI's log sheets reflect which removal technician performed each removal and relevant timing, vehicle, and location information, as do the copies of Serenity's invoices that removal technicians leave with SCI upon completion of a call. (*See* Dkt. No. 156 at 24.)

SCI avers that the purposes of all of this paperwork was "simply to keep track of the identity of the decedents delivered," as the California funeral code requires, "not to keep track of the delivery drivers." (Dkt. No. 124-1 at 24.) Maintaining records for purposes of ensuring regulatory compliance or monitoring safety does not constitute maintenance of employment records to satisfy this *Bonnette* factor. *See, e.g.*, *Zhao*, 247 F. Supp. 2d at 1161; *see also Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 692 (D. Md. 2010) (applying the Fourth Circuit's joint employment test, noting that retention of records for purposes of quality control is not evidence of joint employment).

Citing its fact section generally without identifying any particular emails, Plaintiffs urge that "SCI's communications with Friedel demonstrate that these records were used for monitoring and disciplining drivers." (Dkt. No. 156 at 24 (citations omitted).) It is not the Court's role to comb through the record to identify the evidence that supports Plaintiffs' position. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). But in any event, the record reflects that SCI referenced these documents at times to determine which removal technician performed the removal so that the removal technician could fix a paperwork error, which supports only one inference: that quality control was the main purpose of the records. Even the case upon which Plaintiffs rely notes that this factor only weighs in favor of joint employer status where the "quality control motive for such exact recordkeeping may be *secondary* to other purposes for which it was kept by the putative joint employer." *Perez v. Lantern Light Corp.*, No.

C12-01406 RSM, 2015 WL 3451268, at *11 (W.D. Wash. May 29, 2015) (emphasis added) (citation omitted). On a handful of occasions SCI obtained additional information on Serenity removal technicians to resolve a problem with a client that implicated a Serenity removal technicians—for example, a missing bracelet incident that led the removal technician to give SCI an affidavit (Dkt. Nos. 156-44, 156-45), and the time Serenity gave SCI a copy of a removal technician's drug test after a decedent's family suspected the removal technicians of being on drugs (Dkt. Nos. 156-47, 156-48.) Aside from these limited instances, SCI did not keep a file on each Serenity removal technician. These two instances of obtaining removal technician information to resolve conflicts with clients are not enough to draw a reasonable inference that SCI maintained employee records on the removal technicians.

Plaintiffs' reliance on *Perez* is misplaced for other reasons as well. There, the records included information about the workers' identification numbers, certification status, skill set, weekly work schedule, starting location, contact information, work orders, performance data, and performance assessments, and used the information to meet with the labor contractor weekly and decide which workers to place on "forced time off" status. 2015 WL 3451268, at *11. In other words, the records both included "information that is, for all intents and purposes, payroll information" and actually used it for personnel-related purposes. *Id.* Not so here. While SCI's logbook, removal paperwork, and invoices contained some information about the removal technicians that could be considered "payroll information"—such as their names and contact information and, effectively, a list of their calls—there is no evidence that it was used for any personnel-related purpose like in *Perez*. To the contrary, the testimony and declarations support only one reasonable inference: that SCI used the records primarily for purposes of quality control, not discipline.

Plaintiffs also cite *Carrillo/Walmart* to support its position that SCI maintained employment records for the removal technicians. But there, the alleged joint employer did "not dispute that it maintained an individual file for each . . . worker containing forms related to SLTD-mandated safety orientation[,]" and employees used SLTD's timekeeping system to clock in and out of work. 2015 WL 183965, at *6 (record citations omitted). In contrast, SCI did not require

19

removal technicians to attend training orientation (although some did) nor did removal technicians notify SCI when they clocked in and out of work, let alone use SCI's timekeeping system to do so. More importantly, aside from the few instances of removal technicians sending materials to SCI so SCI could resolve problems with customers, there is no evidence that SCI maintained individual files for each removal technicians. Instead, any information it had on the removal technicians was merely incidental to its quality control paperwork, as discussed above.

Accordingly, this factor weighs against joint employment.

### b. *Torres-Lopez* Factors

Turning to the *Torres*-Lopez non-regulatory factors, the first assesses whether the Serenity removal technicians performed a "specialty job on the [asserted employer's] production line." *Torres-Lopez*, 111 F.3d at 640. While the Ninth Circuit has expressed doubt as to whether this factor as any relevance outside the production-line employment context, *Moreau*, 356 F.3d at 952, construing the evidence in the light most favorable to Plaintiffs this factor weighs in favor of joint-employer status. Serenity removal technicians work transporting and labeling decedents is "one small step in the sequence of steps" SCI takes to provide its full range of funeral and cremation services to customers. *Torres-Lopez*, 111 F.3d at 643; *see Carrillo/Walmart*, 2014 WL 183956, at *12 (concluding that the plaintiffs' jobs unloading goods onto pallets, labeling them, and loading the pallets onto trucks was a discrete step in the defendant's operations which weighed in favor of joint employment).

As for the second factor, whether the responsibility under the contract was standard for the industry and could be passed from one contractor to another without material change and little negotiation, the SCI-Serenity contracts were boilerplate, SCI used other individuals besides Serenity removal technicians to perform removals, and the same rules applied to SCI employees and Serenity removal technicians when they performed the removal work. Thus, this factor weighs in favor of joint employment.

The third factor considers whether the workers use the premises and equipment of the alleged joint employer to perform the work. The idea behind this factor is that "a business that owns or controls the worksite will likely be able to prevent labor law violations, even if it

20

delegates hiring and supervisory responsibilities to labor contractors." *Carrillo/Walmart*, 2014 WL 183956, at *13 (citation omitted). Not so here. SCI owns its Care Centers and mortuaries where some of the removal technicians' work was done, but only a small portion of the removal technicians' work occurred there: less than 30 minutes per call if they were the lead removal technician, and no time if they functioned as assist, in which case they waited in the car and never entered the premises. (Dkt. No. 124-5 ¶ 12; Dkt. No. 124-8 ¶ 17; Dkt. No. 124-21 ¶ 9; Dkt. No. 124-45 ¶ 11; Dkt. No. 162 ¶¶ 3-4.) Plaintiffs did not offer any evidence identifying how much time removal technicians spent at SCI's Care Centers, but they did note that removal technicians spent 30 to 90 minutes at the death scene for pick-up. (Dkt. No. 156-68 ¶¶ 4, 10.) Plaintiff's evidence does not raise a genuine dispute that removal technicians spent a majority of their time on the road, at death scenes, or on-call waiting for new assignments rather than at SCI's Care Centers. (*See* Dkt. No. 156-68 ¶¶ 4, 10.) And while SCI provided sheets, identification bands, and paperwork to removal technicians, SCI did not provide cars or gurneys, without which there would be no removals at all. This evidence mirrors *Perez*, where the court noted that DirecTV's ownership over its offices was "less consequential" because the majority of the installers' work occurred at private homes. 2015 WL 3451268, at *14. Based on that and the fact that DirecTV provided some equipment to installers, the *Perez* court concluded that this factor was neutral. *Id.* So too here.

The fourth factor is whether the employees had "a business organization that could shift as a unit from one worksite to another." *Torres-Lopez*, 111 F.3d at 640. This factor weighs against joint employment where "a significant number of employees . . . perform services for companies other than [the putative joint employer.]" *Zhao*, 247 F. Supp. 2d at 1159-60. For example, where baggage handlers "worked for multiple carriers in a given work day[,]" this factor weighed against joint employment. *Moreau*, 356 F.3d at 951. In contrast, where workers are forced to work for a single company—only the putative joint employer—to the exclusion of all others, this factor weighs in favor of joint employment. *See, e.g.*, *Torres-Lopez*, 111 F3d at 640 (workers were forced to work at a single farm); *Perez*, 2015 WL 3451268, at *14 (workers were "contractually forbidden from using their training to perform services for any other competing cable or satellite

television vendors"). Here, it is undisputed that the Serenity removal technicians regularly performed work for other mortuary clients; indeed, the majority of their calls were for clients other than SCI. This factor weighs against joint employment.

The fifth factor supports joint employment because it is undisputed that the removal technicians are paid on a piece rate basis for their work, which requires no special training. *See Carrillo/Walmart*, 2014 WL 183956, at *14. The removal technicians' work did not require initiative, judgment, or foresight. SCI argues that removal technicians could refuse calls or volunteer for long-distance calls that paid more. (Dkt. No. 124-1 at 25.) There is a factual dispute about whether removal technicians could actually refuse calls without negative consequences, a dispute which must resolved in Plaintiffs' favor at this stage. But even if they could, the removal technicians' work is still largely manual or other unskilled labor—not the kind of work that requires initiative, judgment, or foresight.

The sixth factor assesses whether the employees have the opportunity for profit or loss depending on managerial skill. Plaintiffs do not address this factor. In any event, in *Carrillo/Walmart*, the case on which Plaintiffs heavily rely in this section, the court concluded that this factor was not relevant to the joint employer context, but only in determining whether a worker is properly classified as an independent contractor or an employee. 2014 WL 183956, at *14. This Court agrees.

The seventh *Torres-Lopez* factor inquires whether there is permanence in the working relationship. Here, while there is an ongoing contractual relationship between SCI and Serenity, there is no permanence linking SCI and the individual Serenity removal technicians. Removal technicians could be assigned to SCI or not. Serenity might remove a removal technician from SCI's rotation. Even for long-time Serenity removal technicians, their SCI removals accounted for only 5 to 12% of their total removals. (Dkt. No. 124-35 ¶¶ 8, 9; Dkt. No. 124-40; Dkt. No. 124-41.) This factor weighs against joint employment. *See Torres-Lopez*, 111 F.3d at 644 (no permanence of the working relationship where workers spent only 32 days of the year working for the alleged joint employer). In *Perez*, in contrast, the evidence supported a finding that "no change in structure, management or ownership at the level of the subcontracting company can

22

sever the working relationship between" DirecTV, the alleged joint employer, and the plaintiff cable installers. 2015 WL 3451268, at *16. Indeed, when DirecTV's subcontractor changed, all of the installers moved to Direct TV's new subcontractor so that they continued to perform work for DirecTV. *Id*.

Finally, the *Moreau* court also questioned whether the final *Torres-Lopez* factor—how integral the work was to the alleged employer's business—is applicable outside of the production line. 356 F.3d at 952 (citation omitted). Nonetheless, Plaintiffs' evidence is sufficient to support a finding that the Serenity removal technicians' services are "integral" to SCI's business model. SCI has its own employees who perform the removals. And SCI has called the identification procedures that the removal technicians follow to be one of the most basic and fundamental parts of the company's work. This factor weighs in favor of a joint employer finding.

However, as the Court noted in its orders addressing Defendants' motions to dismiss, "besides a mechanical application of these factors, the facts of *Torres-Lopez* itself are also instructive." (Dkt. No. 69 at 24 (citation omitted).) Unlike *Torres-Lopez*, in which the purported joint employer, and *not* the nominal employer, exercised control over the workers, here the evidence establishes that Serenity hires and fires removal technicians, controls their schedules, and acts as a labor contractor, not a mere employment agent or broker. This case is thus distinguishable from *Torres-Lopez*: while there is some evidence that creates a genuine issue of material fact about SCI's control over and supervision of day to day job conditions, the record establishes that the bulk of the control over the removal technicians rests with Serenity. For this reason, the supporting *Torres-Lopez* factors do not support the conclusion that SCI is the removal technicians' joint employer.

### c. Conclusion about Joint Employment

The *Bonnette* factors weigh the heaviest in the joint employment analysis under federal law. *See Moreau*, 356 F.3d at 946-47. None weigh in favor of joint employment. Drawing all reasonable inferences in Plaintiffs' favor, the facts do not supporting a finding that SCI (1) has the power to hire or fire Serenity removal technicians, (2) controls the Serenity removal technicians' works schedules or exercises sufficient control of their working condition to support a joint

23

employer relationship, (3) dictates the Serenity removal technicians' method or rate of pay, or (4) maintains employment records for Serenity removal technicians.

While four *Torres-Lopez* factors—the first, second, fifth and eighth—weigh in favor of joint employment, they are not sufficient to support a finding by a reasonable trier of fact of joint employment given that none of the *Bonnette* factors weigh in favor of joint employment. Indeed, Plaintiffs have not cited, and the Court has not found, any case which allows the joint employment question to proceed to trial when none of the *Bonnette* factors is satisfied.

A further problem with Plaintiffs' argument is that removal technicians spend only a portion of their work day performing services for SCI. The cases on which Plaintiffs rely, in contrast, involve workers who toiled at a single location or worked for a single alleged joint employer. *See Perez*, 2015 WL 3451268, at *1-2 (cable installers were sub-contracted to work for DirecTV); *Carrillo/SLTD*, 2014 WL 183965, at *1-2 (workers performed merchandize loading and unloading services at the Mira Loma warehouse). Plaintiffs have not identified any case that based a joint employment finding on analogous circumstances—that is, in relevant part, where the entity exercises some control over day-to-day job functions for only a small portion of the work performed and owns the premises on which the workers spend only a fraction of their days and only some of their equipment—and the Court has found none. While such fact is not dispositive of the inquiry, it weighs heavily against a joint employer finding. In any event, viewing the evidence in the light most favorable to Plaintiffs, the overall circumstances support only one finding: the economic reality was that Serenity was Plaintiffs' employer and SCI was not. Consequently, Plaintiffs cannot proceed against SCI under the FLSA on the theory that SCI was their joint employer.

### 3. *The County*

#### a. *Bonnette* Factors

##### i. power to hire and fire

Serenity alone is responsible for posting available Serenity removal technician jobs, reviewing resumes and applications, and interviewing candidates, and the County is not involved in drafting, approving, or executing contracts between Serenity and the removal technicians.

24

However, unlike SCI, the County is somewhat involved in the hiring process. Specifically, Plaintiffs contend that the County's requirements that Serenity removal technicians pass their fingerprinting and background check procedure—which may involve the County making a subjective determination about whether a removal technician with certain convictions passes muster—before being hired demonstrates power to hire. For example, in *Carrillo/SLTD*, the court found that a genuine dispute remained about the defendant's power to hire workers where it imposed screening requirements on workers and approved overall staffing levels at its warehouses. 2014 WL 183965, at *7. Here, there is a lesser showing than *Carrillo/SLTD* because there is no evidence that the County imposed any staffing level requirements. Moreover, while Friedel testified that failing the County's background check was an indicator to Serenity that it should not hire the removal technician, that decision rested with Serenity alone. Put another way, Serenity might have relied on the background check results, but that does not mean that the County controlled Serenity's decision. Further, there is no evidence that Serenity ever excluded a removal technician for failing to pass the background check or the County's subjective assessment of an applicant's criminal record.

*Montoya* illustrates why the County's screening requirements do not tip the balance in favor of joint employment. There, the district court concluded that requiring a worker to pass a criminal background check and to meet certain federal regulatory requirements does not establish power to hire, and instead are merely "rational steps for [the entity] to take to ensure the safety of its products and its consumers." *Montoya v. 3PD, Inc.*, No. CV-13-8068-PCT-SMM, 2014 WL 3385116, at *3 (D. Ariz. July 10, 2014) (citation omitted); *see also Moreau*, 356 F.3d at 951 (finding no power to hire where the airline's "indirect" supervision over ground handling employees was related to safety and security concerns, and the airline would be remiss not to protect passengers' safety). So too here, where there is evidence that the County must comply with certain state removal requirements and the removal technicians have access to sealed crime scenes with ongoing investigations. Like *Montoya*, requiring removal technicians to pass a background check is a rational step for the County to take to ensure the integrity of its crime scenes and secured facilities. There is a factual dispute about whether failing the County's

background check precludes a removal technician from performing removals for the County or from working for any Serenity client. But it is undisputed that any decision to have the County's background check apply to work for other clients rests with Serenity, not the County.

Thus, viewing the facts in the light most favorable to Plaintiffs, the County's limited involvement in the hiring process does not establish that the County had the power to hire removal technicians for the purposes of this *Bonnette* factor.

The evidence likewise demonstrates that the County does not have the power to fire Serenity removal technicians. The County's contracts with Serenity give it the right to bar removal technicians from working for the County, and the County actually did so on several occasions—for example, when a removal technicians handed out a personal business card at a crime scene and when another divulged confidential information about a crime scene. County officers met with Serenity removal technicians on occasion to discuss misconduct, but the evidence does not support a finding that these conversations ever resulted in the County terminating a removal technician from Serenity or directing Serenity to terminate the removal technician, which weighs against finding power to fire. *See Montoya*, 2014 WL 3385116, at *4; *Adams*, 2013 WL 1345509, at *3. While there is evidence that Serenity once heeded the County's recommendation *not* to terminate a technician, there is no evidence that the County ever instructed Serenity to terminate a removal technician and that Serenity, following that instruction, actually did. *See Valdez*, 2012 WL 1203726, at *2-3. Moreover, removal from the County's rotation is not tantamount to termination from work as a Serenity removal technician altogether given that Serenity's work for the County has constituted only between 5.6% and 10% of Serenity's gross total revenue—far from a majority of Serenity's work. Indeed, Gary completed only one call for the County during his entire tenure at Serenity, and while County calls constituted nearly one-third of Curt's calls in 2012, that is far from what is required to make the leap from removal from a client to termination from the employer. *See Valdez*, 2012 WL 1203726, at *2; *Lemus*, 2011 WL 7069078, at *10.

Plaintiffs again cite *Perez*, 2015 WL 3451268, at *7, to support their contention that even indirect influence on hiring and firing satisfies this factor. But the indirect influence on hiring and

firing that DirecTV exerted in *Perez* was much greater than the County's here. In that case, with respect to hiring, DirecTV "established and enforced eligibility requirements" for cable installers, required that they pass a number of screenings and mandated that an applicant would not be eligible for employment *at AIS* before passing, and required installers to obtain two certifications at institutions that provided training specific to DirecTV. 2015 WL 3451268, at *6. This level of involvement in hiring is greater than the County's, which only required that removal technicians pass a background check to work for the County, not for Serenity itself, though there is evidence that Serenity chose to use the check as a more general screening for its removal technicians. DirecTV's control over firing is also greater than the County's. The cable installers there worked exclusively for DirecTV pursuant to their employment contracts, so when DirecTV refused to give an installer work due to poor performance or otherwise, that was sanction equivalent to firing. *Id.* at *6. Not so here where less than 30% of Curt's work was for the County, and where Gary performed just a single job for the County during an entire year. In short, in *Perez* the "undisputed facts indicate[d] that DirecTV, rather than AIS, set the standards for employment and had indirect power to enforce them." *Id.* at *7. Such is not the case here.

Although the County has limited involvement in the hiring process through its Live Scan fingerprinting and background check requirement, ultimately Serenity alone, and not the County, has the power to hire and fire removal technicians. This factor weighs against joint employment.

       ii.   control over the employees' work schedules or conditions

The County does not control removal technicians' work schedules, but it does exercise some control over their day-to-day working conditions. The analysis about control over work schedules is the same as it was for SCI: while the County requires Serenity to provide removal technicians on a 24-hour basis, only Serenity sets the removal technicians' schedules by determining which four or five days per week the removal technicians will be on 24-hour call and grants or denies removal technicians' requests for time off. When removal technicians are on call, Serenity retains exclusive authority to decide which removal technician to assign to which call and to determine which removal technician will serve as lead versus assist, if the call requires two people. While there is evidence that the County contacted particular removal technicians on

occasion to see if they were available for a call, no removal technician ever responded to a call without an instruction from Serenity's dispatch.  Further, while the County has certain requirements for call response and standby times, this does not constitute control over work schedules; those removal technicians are already "on call" based on Serenity's staffing decisions.

However, like SCI, the County imposes substantial rules regarding the removal technicians' work conditions and daily job functions when responding to County calls.   Before responding to any calls, the removal technicians must obtain a County identification badge and key card and complete a supplies checklist.  The County imposes requirements for dress code, timing in responding to calls, conduct at death scenes, prohibitions on labeling bodies, directs removal technicians to use certain County-provided materials, and restrictions on transporting more than one body at a time.  The County requires removal technicians to heed the instructions of the on-scene County investigator and sometimes required removal technicians to take particular routes.  As for actual removals, the County determines the number of removal technicians needed to respond to each call.  While the County has never trained Serenity removal technicians or provided them with training materials and directs any complaints about their misconduct or poor performance to Serenity, its detailed work rules, and especially the requirement that removal technicians follow the specific instructions of the on-scene investigator, demonstrate that the County has some control over the removal technicians' daily job functions through these rules.

The County argues that its work rules should not serve as indicia of control for the purposes of this *Bonnette* factor because they were promulgated and enforced pursuant to the County's obligations to comply with provisions of the California Government Code.  The County cites Government Code Section 25303; this statute vests the board of supervisors with authority to oversee the county sheriff, but notes that such supervision shall not interfere with "the constitutionally and statutorily designated investigative and prosecutorial functions of the sheriff . . . of a county."  Cal. Gov't Code § 25303.  The County also cites Section 27491, which provides that it "shall be the duty of the coroner to inquire into and determine the circumstances, manner, and cause of" enumerated manners of death.  The statute requires the coroner to sign the death certificate in these scenarios, requires those present at the scene of death to immediately notify the

coroner, and grants the coroner discretion to determine the extent of inquiry required under particular circumstances. Cal. Gov't Code § 27491. To be sure, the removal services are part of the County's statutory mandate to inquire into the manner of death. But these laws vest broad discretion in the County rather than setting forth a particular method of action, compliance with which courts tend to exempt from the *Bonnette* control analysis. *See Moreau*, 356 F.3d at 951; *Waddell*, 2010 WL 3212136, at *3; *Zhao*, 247 F. Supp. 2d at 1160-61.

The County also urges that "[s]pecifying work to be performed and following up to ensure adequate performance is not an indication of joint employment[,]" citing *Moreau*, 356 F.3d at 951, and *Montoya*, 2014 WL 3385116, at *4-5. (Dkt. No. 127 at 24.) Those cases are distinguishable from the County's level of supervision. [5] In *Moreau*, the defendant did not communicate directly with the workers, but instead supervised them "indirectly" through the labor contractor. *Id.* at 950-51. Similarly, in *Montoya* the workers were delivery drivers who did not communicate directly with the alleged joint employer, but received instructions through the labor contractor. 2014 WL 3385116, at *5. Here, in contrast, although much of the County's supervision came through Serenity, some was direct: for every removal, the County required the removal technicians to take instructions from the on-scene investigator.

But, even in light of the County's requirement that removal technicians follow investigators' instructions, there is still less control than is typical for a joint employer. There is no evidence that the County held any meetings with removal technicians, let alone weekly meetings; that County supervisors provided regular feedback about their work; or that the County ever assigned their work. *Cf. Tumulty*, 2005 U.S. Dist. LEXIS 26215, at *11, 19. And while the County required removal technicians to report to the on-scene investigator, unlike *Carrillo/SLTD*, 2014 WL 183965, at *5, the County did not determine removal technicians' workload or decide

---

[5] Here, as in other places, Plaintiffs have relegated to lengthy, single-spaced footnotes their responses to the County's arguments and their contentions about why the cases on which Defendants rely are distinguishable. (*See, e.g.*, Dkt. No. 154 at 23 n. 12 & 13, 24 n.15, 28 n.21 & 22.) It seems as if Plaintiffs have done so to find a backdoor around the Local Rules' page-length requirement, which limits an opposition to 25 pages of double-spaced text. *See* N.D. Cal. Civ. L.R. 7-3(a), 7-4(b). Despite the impropriety, the Court addresses Plaintiffs' responses, when necessary, in the body of this Order.

the number of calls to which a removal technician would respond, nor did the removal technicians work exclusively for the County. While the County's level of control over removal technicians inches closer to joint employment, it still falls short of the control that courts have found justifies a finding of joint employment. This is especially true with respect to Gary, who performed only one call for the County during a 12-month period.

          iii.  control over the rate and method of employees' payment

   As to the third *Bonnette* factor, the County does not have control over the rate or method of removal technicians' pay. The County-Serenity contracts provide that the County will pay Serenity a flat fee for removals, and the fee varied according to the type and location of the removal. The contracts also noted that Serenity would receive additional compensation when a particular call requires additional wait time. Either way, the County pays Serenity, not the removal technicians themselves. There is testimony that Serenity pays the removal technicians a percentage of the fee that the County pays Serenity but Serenity, not the County, determines the rate and method of the employees' pay.

   As with SCI, Plaintiffs' insistence that the County exercises indirect control over the removal technicians' compensation misses the mark. First, Plaintiffs note that the County changed removal technicians' timekeeping methods after it accused the removal technicians of reporting too much standby time. But this single instance of discussing the amount the County would pay *Serenity* does not amount to control over the rate and method of *removal technicians'* pay. Instead, as explained above in the context of SCI, in the *Carrillo* cases and *Arredondo* the joint employers weighed in on the removal technicians' actual payment structures—that is, they requested incentive- and commission-based compensation and actually discussed the removal technicians' pay rates. *Carrillo/SLTD*, 2014 WL 183965, at *6; *Carrillo/Walmart*, 2014 WL 183956, at *9; *Arredondo*, 922 F. Supp. 2d at 1085. Plaintiffs have not identified any such evidence here. Nor have Plaintiffs identified evidence that suggests that if the County does not pay Serenity, Serenity does not pay removal technicians at all. Thus, even drawing all inferences in Plaintiff's favor, the record does not support a finding that the County exercised control over the method and rate of removal technicians' pay.

30

iv.     maintenance of employment records for the employees

Nor does the County maintain employment records on the removal technicians in support of the final *Bonnette* factor.  Plaintiffs urge that the County's logbooks; roster of Serenity technicians; paperwork showing all individuals holding identification badges with keycard access that includes names, dates of birth, social security numbers, genders, and address information; a database including the name and contract information for technicians; records reflecting the tools and materials the removal technicians used; and Serenity's invoices, which include pick-up and drop-off times, constitute employment records to satisfy this factor.

As for the logbooks, there is undisputed testimony that the County keeps these records to track decedents, not to monitor the removal technicians or their time, which does not support joint employment.  *See, e.g.*, *Zhao*, 247 F. Supp. 2d at 1161; *Jacobson*, 740 F. Supp. 2d at 692.  As for the roster of Serenity removal technicians, there is evidence that Serenity sent the County its roster of removal technicians, but Plaintiffs have not cited any case that holds that a mere list of names constitutes an employment or personnel record.

With respect to the Serenity invoices, "[t]here is persuasive authority suggesting that daily time sheets and daily driver logs do not constitute employment records as typically considered" inasmuch as they are meant to keep track of the work accomplished.  *Montoya*, 2014 WL 3385116, at *7 (citation omitted).  So it is here.  There is no testimony that the County used the Serenity invoices for anything other than determining payment.  Plaintiffs urge that the County's database of removal technicians with key cards is an employment record.  They argue that the County only included removal technicians, and no other contractors in that database.  The County insists that other contractors were included, too, but this is a distinction without a difference: while the information on the identification badge list is arguably information that would populate a personnel file, there is no evidence that the County used this information for purposes other than recordkeeping.  There is no evidence that the County used the records to monitor drop-off times or record incidents of removal technician misconduct, or evidence that the County kept notes on the removal technicians' performance as part of these records.  *Cf. Perez*, 2015 WL 3451268, at *12.  Instead, this is another important safety and quality control move for the County when it gives

individuals access to its secure facilities and crime scenes. Nor does the County's maintenance of records from its LiveScan background checks support a joint employment finding. *See Carrillo/Walmart*, 2014 WL 183956, at *10 (concluding that the screening requirements the defendant imposed on all workers in its warehouse did not support this factor).

Again, Plaintiffs urge that *Carrillo/SLTD* supports their claims. There, the defendant did "not dispute that it maintained an individual file for each . . . worker . . . containing forms related to SLTD-mandated safety orientation[,]" and that workers used the defendant's own timekeeping system. 2014 WL 183965, at *6. Here, in contrast, there is no evidence that the County had Serenity removal technicians attend any trainings, let alone kept employment files with forms from that training or that the removal technicians ever used County-specific timekeeping programs. Accordingly, this factor weighs against joint employment.

b. *Torres-Lopez* Factors

The *Torres-Lopez* analysis is largely the same for the County as it was with SCI. The first factor supports joint employment, as the Serenity removal technicians s' work was only one step in the range of the medical-examiner/coroner and investigative services the County provides. The second weighs in favor of joint employment.

The third—whether the alleged joint employer owns or has an interest in the premises and equipment—is neutral. The County owns its facilities, but removal technicians did not spend much of their workday there. From the County's calculations, when Curt was lead technician he spent less than 15 minutes at the County's facility per call, and did not even enter when he was the assist. (Dkt. No. 132 ¶ 14.) Plaintiffs did not determine the amount of time removal technicians spent at the County's facility in particular or even on County calls, but they contend that Serenity removal technicians routinely spent 30 to 90 minutes at the scene of SCI pick-ups and transporting SCI decedents. (Dkt. No. 156-68 ¶¶ 4, 10.) Assuming that they spent the same amount of time at death scenes and transporting decedents for County calls, this is still a small portion of their hours-long shifts. The County provided some of the removal technicians' equipment, including body bags, shrouds, and sheets, but the technicians provided the rest of the required gear, including cars and gurneys.

As with SCI, the fourth factor—whether the employees shifted as a unit from one worksite to another—weighs against joint employment because removal technicians performed only a fraction of their removals for the County. The fifth supports joint employment because the removal technicians are paid on a piece rate basis for their work, which requires no special training. The sixth weighs against joint employment, as removal technicians do not have the opportunity for profit or loss depending on managerial skill, as does the seventh, as there is no permanence in the working relationship between particular removal technicians and the County. To the extent the eighth applies, it weighs in favor of joint employment. Although the County does not have its own employees who perform removals, it has acknowledged that to complete its duty to determine the manner and cause of death the County needs to transport bodies to the Coroner's office, which suggests that the removal technicians' work is an integral part of its operations.

However, for the same reasons discussed above—namely, that Serenity does not act as a mere employment agent or broker and actually exercises substantial control over the removal technicians —*Torres-Lopez* is distinguishable. Thus, even resolving all disputes of fact in Plaintiffs' favor, the few *Torres-Lopez* factors that support joint employment do not allow the conclusion that the County is a joint employer.

### c.     Conclusion about Joint Employment

Ultimately, the Court reaches the same conclusion about the County's status as SCI's: viewing the totality of the circumstances in the light most favorable to Plaintiffs and drawing all inferences in their favor, the County is not the removal technicians' joint employer. Although the County exercised some control over the removal technicians' daily job functions when they were performing work for the County, this level of control is less than the amount that courts have found justifies joint employment given Serenity's involved role as the removal technicians' employer. Moreover, removal technicians performed only a fraction of their work for the County, so even the control it did exercise has less bearing on the analysis. Adopting Plaintiffs' position would lead to an absurd result: finding the County liable as Gary's joint employer even though he performed just one removal for the County during a year-long period. This cannot be the result

33

Congress intended when it enacted the FLSA, and Plaintiffs have not identified any case where a court concluded that an entity with so tenuous a connection to a worker was his joint employer. This Court declines to be the first to do so. The economic reality is that the County is not Plaintiffs' joint employer.

### B. Joint Employer under California Law

#### 1. *Legal Standard*

In actions to recover unpaid minimum wages pursuant to Cal. Labor Code § 1194, as here, "the standards to determine whether Defendants are directly liable are set out in *Martinez v. Combs*, 49 Cal. 4th 35 (2010), where the California Supreme Court held that the definition of 'employer' for minimum wage purposes is provided in the orders of California's Industrial Welfare Commission ("IWC")[.]" *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015) (footnote omitted); *accord Salazar v. McDonald's Corp.*, No. 14-cv-02096-RS, 2016 WL 4394165, at *5 (N.D. Cal. Aug. 16, 2016). The IWC Wage Order provides three alternative definitions for the term "to employ." *Martinez*, 49 Cal. 4th at 64. It means: "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common-law employment relationship." *Id.* at 64 (citation omitted).

Under *Martinez*, an entity employs workers if it "directly or indirectly, or through an agent or any other person, employs or exercises control" over their wages, hours, or working conditions. IWC Wage Order No. 9-1002 § 2(G). The language is disjunctive, and control over only one such factor will give rise to joint employer liability. *See Martinez*, 49 Cal. 4th at 59. An entity can be held liable as an employer for "suffering or permitting to work" if it "fail[s] to perform the duty of seeing to it that the prohibited condition does not exist." *Martinez*, 49 Cal. 4th at 69 (internal quotation marks omitted). Put another way, the "basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Id.* at 70 (citation omitted) (emphasis in original). Merely receiving the benefit of the employees' work is not enough to establish liability under the "suffer or permit to work" standard. *Id.* Lastly, "to engage" means to create a common-law employment relationship. *Martinez*, 49 Cal. 4th at 64. Under the common law, "[t]he

principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."[6] *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal.3d 341, 350 (1989); *see also Futrell v. Payday Cal., Inc.*, 190 Cal. App. 4th 1419, 1434 (2010) (noting that the key factor is "control of details"). What matters is whether the hirer "retains all necessary control" over the operations, and the strongest factor is whether the hirer can discharge the worker without cause. *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 532 (2014).

California courts also consider "several 'secondary' indicia of the nature of a service relationship." *Borello*, 48 Cal. 3d at 350; *Futrell*, 190 Cal. App. 4th at 1434. These factors include the right to terminate at will, along with:

> (a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee

*Borello*, 48 Cal. 3d at 350; *see also Futrell*, 190 Cal. App. 4th at 1434. The factors "[g]enerally . . . cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Borello*, 48 Cal.3d at 350 (citation omitted).

### 2. *SCI is not a Joint Employer under California Law*

At oral argument, Plaintiffs conceded that, while California law spells out the standards differently, the analysis involves consideration of the same evidence and the ultimate result is the same as under the FLSA. Nevertheless, the Court will address each *Martinez* prong here.

---

[6] California's common law test is so similar to federal law that at least one court in this District has declined to apply the California rules separately and instead applied the FLSA test even to state law labor claims. *See Rios v. Airborne Express, Inc.*, No. C-05-2092 VRW, 2006 WL 2067847, at *2 (N.D. Cal. July 24, 2006) (where plaintiff brought both FLSA and state law claims, noting that "[b]ecause of the similarities underlying the FLSA and California laws at issue here, the court applies the FLSA's joint employer test to [plaintiff's] claims"); *see also Guitierrez*, 2014 WL 5487793, at *4-5 (noting that the California common law "right-to-control" test is similar to federal law's economic reality test).

35

a.      Control over Wages, Hours, or Working Conditions

"'[C]ontrol over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." *Futrell*, 190 Cal. App. 4th at 1432. Plaintiffs insist that "SCI directly influenced technicians' pay" by setting the amount it paid Serenity, which in turn paid the removal technicians. (Dkt. No. 156 at 27.) But there is no genuine dispute that SCI did not have the power to negotiate or set the technicians' pay rate, for the same reasons discussed above in the FLSA context. Moreover, the California Supreme Court rejected Plaintiffs' very argument that control over wages arises where the entity's contractual relationship with the labor contractor influences the amount the labor contractor pays the workers. *See Martinez*, 49 Cal. 4th at 71 (rejecting argument that a "contractual relationship" permitted an entity to exert "indirect control" over employees' wages). Nor is there any evidence in the record to support a finding that SCI had control over removal technicians' hours; it did not, for the reasons listed under the *Bonnette* factors.

Thus, the question comes down to whether the record supports a finding that SCI exercised control over the removal technicians' working conditions to justify joint employment. As discussed above, SCI exercised some control over the removal technicians' working conditions during the limited amount of time that removal technicians spent responding to SCI calls through its promulgation of work rules governing the technicians' daily job functions. Even assuming this this control is enough to support joint employment—which, given that removal technicians performed only a fraction of their work for SCI, is doubtful—it still does not support joint employment. The *Martinez* court held that mere imposition of requirements or oversight of workers' performance is not enough to make the overseeing entity a joint employer absent hiring and firing power. *See Martinez*, 49 Cal. 4th at 70; *Futrell*, 190 Cal. App. 4th at 1432-33. For the reasons discussed in the FLSA context, there is no genuine dispute that Serenity, not SCI, had exclusive authority to hire and fire removal technicians. Accordingly, the record does not raise a triable issue of fact as to whether SCI retained or exercised direct or indirect control over Plaintiffs' wages, hours, or working conditions.

### b.    Suffer or Permit to Work

Nor did SCI "suffer or permit" removal technicians to work under the second *Martinez* prong.  In *Martinez*, the court reasoned that the defendant entity lacked "the power to *prevent* [the] plaintiff from working[,]" because the nominal employer "had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work."  49 Cal. 4th at 70 (emphasis added).  So too here.  There is no genuine dispute that Serenity, not SCI, bears each of those responsibilities.  Thus, SCI did not "suffer or permit" the removal technicians to work.  *See id.*; *see also Futrell*, 190 Cal. App. 4th at 1434 (finding the defendant did not suffer or permit the plaintiff to work "because there is no evidence showing [the defendant] had the power to either cause him to work or prevent him from working") (citation omitted).

Plaintiffs argue that SCI contracted for the labor of the removal technicians, knew when the technicians arrived at their facilities to complete removals, and thus could have prevented the labor code violations "by ensuring that the flat rate paid for removal technicians included overtime[.]"  (Dkt. No. 156 at 28.)  But this argument rests on the faulty assumption that SCI had control over removal technicians' pay; the record belies that assertion.

Plaintiffs rely on *Arredondo*, 2012 WL 2358594, at *9, as they did in their opposition to Defendants' motion to dismiss the Fourth Amended Complaint.  In that context, the Court noted that "*Arredondo* does not help Plaintiffs" because the alleged joint employer there helped set the workers' wages, among other facts not present here.  (*See* Dkt. No. 69 at 29.)  Nevertheless, the Court held that the FAC plausibly alleged that SCI "suffered or permitted" removal technicians to work because of allegations that SCI influenced hiring and firing decisions.  (*Id.*)  The record now establishes that SCI did not control hiring and firing.  Thus, there is no genuine dispute that SCI did not "suffer or permit" removal technicians to work.

### c.    To "Engage" and Create a Common Law Employment Relationship

As for the third prong, whether SCI "engaged" removal technicians, the Court considers whether they created a common law employment relationship with the technicians based on the *Borello* factors.  *Martinez*, 49 Cal. 4th at 64.  This inquiry is similar to the FLSA analysis, as the preliminary inquiry is the right to control.

The record reflects that SCI exercised control over the removal technicians' daily job functions through its work rules. But the California Supreme Court has noted that "the strongest evidence of the right to control" for the purposes of this analysis is the power to fire. *Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal. 4th 522, 531 (2014) (citations omitted). As the Court has emphasized throughout this Order, there is no genuine dispute that SCI had no such power.

As for the secondary factors, Serenity removal technicians' work was part of SCI's regular business and the work was unskilled, which supports employment. Removal technicians were paid per job rather than by time, which weighs in the opposite direction. SCI provided only some of the instrumentalities and place of work; the most important—the vehicles and gurneys—technicians supplied themselves, and they spent only minimal time at SCI's facilities. This factor weighs only slightly in favor of an employment relationship. Serenity's relationship with SCI was indefinite, but each removal technicians only worked for SCI when Serenity assigned him; this factor is neutral. Ultimately, the weight of just a few secondary factors coupled with a weak showing of control does not support joint employment.

And indeed, applying the *Borello* factors, courts have based employment relationships on much higher levels of control and stronger secondary factor showings than are present here. For example, the Ninth Circuit found a common law employment relationship where an entity controlled drivers' per-delivery rates; set their schedules, including deciding the days the drivers worked and determining their days off; set the drivers' routes; controlled the drivers' equipment, including their trucks, tools, and mobile phones; required that drivers wear particular uniforms; held mandatory meetings with the drivers every morning; had the drivers regularly report to the entity about their progress; and contacted the drivers directly if they were running late. *Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1102 (9th Cir. 2014) (discussing the *Borello* factors in the context of determining whether FedEx drivers were employees or independent contractors). Other cases reflect that mere control over daily job functions through work rules is not enough absent power over other aspects of the job, like hours, hiring, and firing. *See, e.g.*, *Alexander v. FedEx Ground Package Sys.*, 765 F.3d 981, 989-90 (9th Cir. 2014) (applying California law, finding that FedEx drivers were employees, not independent contractors, where, among other things, FedEx

38

controlled how and when drivers delivered packages and their work hours); *Garcia v. Seacon Logix, Inc.*, 238 Cal. App. 4th 1476, 1485 (2015) (finding that truck drivers were employees where the defendant owned the trucks the drivers used, set their work schedules, required that the drivers call the entity if they were going to be late or absent, and prohibited drivers from working for any other company).

The cases Plaintiffs cite do not persuade the Court otherwise. For example, Plaintiffs rely on *Air Couriers International v. Employment Development Department*, 150 Cal. App. 4th 923, 931 (2007), contending that there, as here, an employment relationship arose out of the entity's control over the workers. (*See* Dkt. No. 156 at 29.) But there was greater control in *Air Couriers* than is present here. There, (1) the alleged employer assigned drivers to each delivery, whereas here Serenity was responsible for that task; and (2) the drivers worked regular schedules for the entity, unlike the relationship here, where removal technicians performed only sporadic removals for SCI and performed a majority of removals for other Serenity clients. Moreover, the secondary factors found more support there than they do here: in contrast to SCI, where the removal technicians' work was just one aspect of SCI's business, in *Air Couriers* the drivers performed the entirety of the company's basic function: delivering packages. *Cf.* 150 Cal. App. 4th at 939. Likewise, the *Air Couriers* drivers were paid regularly rather than per job. *Id.* Not so here. Plaintiffs' reliance on *Alexander* is equally misplaced, as there the court's conclusion that FedEx drivers were employees rather than independent contractors of FedEx rested, at least in part, on evidence that FedEx set the drivers' work hours. Further, Plaintiffs do not cite any case that found a common law employment relationship based on circumstances analogous to those present here, where workers performed only a fraction of their jobs for the alleged joint employer. Thus, the third *Martinez* prong does not weigh in favor of joint employment under state law.

### 3. *The County*

The Court had already concluded that Plaintiffs' Fourth Amended Complaint failed to state a claim that the County was the removal technicians' joint employer under California law. (*See* Dkt. No. 69 at 25.) Thus, the claim that the County is a joint employer under California law is no longer at issue in this action.

* * *

The Court must grant summary judgment in favor of SCI as viewing the record in the light most favorable to Plaintiffs no *Martinez* prong weighs in favor of joint employment.

## C. Liability under California Labor Code Section 2810.3

Lastly, SCI seeks summary judgment that it is not liable for alleged wage violations under California Labor Code Section 2810.3.[7] (Dkt. No. 124-1 at 26.) Section 2810.3 provides that a "**client employer** shall share with a labor contractor all civil legal responsibility and civil liability for all workers supplied by that labor contractor for . . . the payment of wages." Cal. Labor Code § 2810.3(b) (emphasis added). The parties dispute whether SCI is a "client employer" to which Section 2810.3 applies. The statute defines "client employer" as "a business entity, regardless of its form, that obtains or is provided workers to perform labor within **its usual course of business** from a **labor contractor**." Cal. Labor Code § 2810.3(a)(1)(A) (emphasis added). "'Usual course of business' means the regular and customary work of a business, performed within or upon the premises or worksite of the client employer." Cal. Labor Code § 2810.3(a)(6). And "labor contractor" means an entity that supplies a client employer with workers to perform labor within the client employer's usual course of business. Cal. Labor Code § 2810.3(a)(3). A "client employer" does not include an entity "with five or fewer workers supplied by a labor contractor or labor contractors to the client employer at any given time." *Id.* § 2810.3(a)(1)(B)(ii). Thus, SCI can be liable for Serenity's wage violations if Serenity and any other labor contractor together provided five or more workers to SCI at "any given time" to perform the "regular and customary work" of SCI within or upon SCI's premises or worksite. Because Section 2810.3 became effective on January 1, 2015, there is essentially no available case law addressing its scope.

### 1. *Legislative History*

Given the dearth of case law interpreting Section 2810.3's reach, the Court will consider the law's legislative history.[8] Discussing the bill that would later become Section 2810.3, the

---

[7] Plaintiffs bring the Section 2810.3 claim only against SCI, Serenity, and Friedel, not against the County. (Dkt. No. 58 at 21-25, 27-28.)

[8] Both Plaintiffs and SCI submitted requests for judicial notice asking the Court to consider certain aspects of Section 2810.3's legislative history. (Dkt. No. 124-53 (SCI's RJN); Dkt. No. 157

Senate Labor and Industrial Relations Committee referenced workers in garment manufacturing, farm labor, construction, janitorial services, as well as security guards and warehouse contractors, nurses, accountants, computer programmers, "to warehouse work in transportation and material moving, housekeeping, landscaping, and manufacturing." (Dkt. No. 124-54 at 2-4.) But the Committee did not state that the bill would exclusively apply to those industries or that the list was exhaustive. (*See id.*) To the contrary, it noted the general trend towards the business model of using subcontracted workers, or "labor suppliers," across industries. (*Id.* at 3-4.) The Committee noted that proponents of the bill urged it to pass so that "companies [would be] accountable for serious violations of workers' rights committed by their own labor suppliers to workers *on their premises.*" (Dkt. No. 124-54 at 6.)

The Senate Judiciary Committee discussed the growing use of temp firms to staff workers in the industries referenced above, along with the fast food, food service, port trucking, and home care industries, which it identified as "sectors characterized by extensive contracting[.]" (Dkt. No. 125-55 at 2.) It later mentioned that the bill is meant to address "blue-collar worksites [that] have been increasingly more reliant on using temporary workers," (*id.* at 5); however, its analysis nowhere states that the bill is only meant to apply to certain industries. (*See generally id.*)

As the bill neared passage into law, the state Senate enacted certain amendments, including the exemptions for business entities that use less than five workers supplied by a labor contractor at a given time and certain motor carriers and slight changes to other definitions. (Dkt. No. 124-56.) These amendments did not include any definitions of "premises or worksite" or "at any given time" or any suggestion that the law should be limited to particular types of workers. The Legislative Counsel's Digest of the bill echoes the same, noting that there are limited, enumerated exceptions to the definitions of "client employer" and "labor contractor" but otherwise not limiting the law's application to particular industries or in any other way. (Dkt. No. 124-57.) At bottom,

_____

(Plaintiffs' RJN).) The Court GRANTS these requests. There is overlap in the documents for which the parties seek judicial notice: both ask the Court to notice the Senate Labor and Industrial Relations Committee's discussion of the bill that later became Section 2810.3 and the Senate Judiciary Committee's analysis. (*Compare* Dkt. No. 124-54 *and* Dkt. No. 124-55, *with* Dkt. No. 157-1, *and* Dkt. No. 157-2.) As the content is identical, the Court cites only to SCI's versions of these documents in this Order.

41

the various legislative committees that examined the bill expressed concern generally about client employers evading liability for wage-and-hour and working condition violations for subcontracted workers given the increased prevalence of this type of working arrangement in California.

2.  *Whether SCI is a "Client Employer"*

a.  Regular and Customary Work on the Employer's Premises or Worksite

SCI contends that it is not a client employer as a matter of law because the Serenity removal technicians do not perform "the regular and customary work" of SCI "within or upon the premises or worksite" of SCI. It argues that "premises" and "worksite" must mean the same thing and both refer to an entity's fixed location, like an office or a particular farm or a construction location and therefore cannot refer to the ever-changing locations where Serenity removal technicians retrieve decedents. To that end, SCI notes that most technicians made only 1-2 deliveries per day to SCI and they typically spent only 15 to 20 minutes, and an average 18.1 minutes, on the premises of an SCI care center when making a delivery as primary and no time at all actually on SCI's premises when they served as assist. Because removal technicians spent minimal time on SCI's premises, it argues that technicians did not perform the "regular and customary" work of SCI on its premises or worksite and therefore SCI was not a client employer covered by the statute.

SCI's attempt to conflate the words "premises" and "worksite" conflicts with the canon of statutory interpretation that a court give significance to every word in a statute to avoid "a construction that would make some words surplusage[,]" and to view words "in context, keeping in mind the nature and obvious purpose of the statute." *See Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 651-52 (9th Cir. 2016) (citation omitted). Here, SCI required removal technicians to perform work at places other than its actual premises because it required technicians to perform work at pick-up locations, which can be viewed as SCI's worksites. Specifically, according to Plaintiffs' evidence, in addition to time spent at an SCI Care Center itself, removal technicians spent between 30 minutes and an hour and a half at the site of the removal on SCI calls, often spending two to three hours on SCI calls from initial dispatch until

becoming available for another call, and sometimes spending even more time. And while removal technicians spent more time on standby awaiting calls and driving between locations than at SCI's care centers or pick-up locations, the statute does not expressly provide that the "premises" or "worksite" of a client employer must be a location where workers spent some threshold amount of time. Nor has SCI identified any authority that holds this amount of time is insufficient to trigger Section 2810.3 liability, any case law interpreting an analogous statute that supports its position, or any authority that requires some threshold number of hours to give rise to Section 2810.3 liability.[9] Thus, there is a genuine dispute as whether Serenity removal technicians performed SCI's regular and customary work at SCI's premises or worksites.

b.    Five or More Workers "At Any Given Time"

A "client employer" does not include a business entity "with five or fewer workers supplied by a labor contractor or labor contractors to the client employer at any given time[,]" Cal. Labor Code § 2810.3(a)(1)(B)(ii), but the statute does not define what "any given time" means. Plaintiffs offer evidence that for each week during the months of January, May and September 2015, six or more Serenity removal technicians performed removals for an SCI affiliate. (Dkt. No. 156-68 ¶¶ 3, 5.) The statute, however, states that it does not apply to entities who utilize five or fewer workers supplied by a labor contractor "at any given time," not for "any given week."

Plaintiffs have also submitted evidence that for 17 days in January 2015, 13 days in May 2015, and 13 days in September 2015, six or more Serenity removal technicians performed removals for a Serenity affiliate. (*Id.* ¶ 5.) But, again, the statute does not state "on any given day," but rather "at any given time." When the California legislature has intended to more broadly apply a "number of employees" limitation to a statute it has used different language. *See, e.g.*, Cal. Gov't Code § 12926(d) (defining "employer" under the Fair Employment and Housing Act as

[9] The only cases SCI cites in support of its position are cases finding less than ten percent to be "statistically insignificant" in a number of irrelevant scenarios. *See, e.g.*, *Kerins v. Hartley*, 27 Cal. App. 4th 1062, 1069 n.3 & 1075 (1994) (in case involving emotional distress damages for fear of exposure to AIDS, finding a one-in-three-hundred-thousand risk of developing AIDS to be statistically insignificant). Not only are these cases inapposite, but SCI's argument is a non-starter because it only considers the time Serenity removal technicians spent at SCI Care Centers, not the time they spent performing work for SCI at other worksites.

43

"any person *regularly* employing five or more persons") (emphasis added); *Robinson v. Fair Emp't & Housing Comm'n*, 2 Cal. 4th 226, 238 (1992) (noting that the administrative interpretation of "regularly employing" is "an 'average' or 'normal' complement of five or more persons in his employ on a regular basis") (citation omitted).

Nevertheless, SCI did not squarely raise this issue in its moving papers and instead focused on it at oral argument. Accordingly, the Court will give the parties the opportunity to present additional argument and evidence on whether a reasonable trier of fact could find that Serenity supplied SCI with six or more workers "at any given time." In analyzing how the statute should be interpreted, the parties should address how it would apply as a practical matter. For example, if Serenity supplied six different removal technicians for only 15 days during a month, how is SCI's responsibility for overtime to be calculated? The parties may also wish to address whether, as a matter of statutory construction, a court can aggregate the workers at affiliated SCI entities.

Unless the parties stipulate otherwise, SCI shall file its further submission on or before April 28, 2017, and Plaintiffs' response shall be filed on or before May 12, 2017. The Court will take this one additional issue under submission at that time.

### III.     Plaintiffs' Motion to File Under Seal

Also pending before the Court is Plaintiffs' administrative motion to file under seal documents submitted in support of its oppositions to the motions to dismiss. (Dkt. No. 153.)

There is a presumption of public access to judicial records and documents. *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978*)*. A party must demonstrate "compelling reasons" to seal judicial records attached to a dispositive motion. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006). Examples of compelling reasons include "the use of court records for improper purposes," such as "to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* "[S]ources of business information that might harm a litigant's competitive strategy may also give rise to a compelling reason to seal," *Nixon*, 435 U.S. at 597, as may pricing, profit, and customer usage information kept confidential by a company that could be used to the company's competitive disadvantage, *see Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214 (Fed. Cir. 2013). The "compelling reasons"

standard is a strict one, and "[s]imply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents, does not satisfy the burden." *Kamakana*, 447 F.3d at 1184. The court must "balance the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* at 1179; *see also Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1162 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2374 (2012).

In addition, parties moving to seal documents must comply with the procedures set forth in Civil Local Rule 79-5. The rule permits sealing only where the parties have "establishe[d] that the document or portions thereof is privileged or protectable as a trade secret or otherwise entitled to protection under the law." Civ. L.R. 79-5(b). It requires the parties to "narrowly tailor" their requests only to the sealable material. *Id.* at 79-5(d). Thus, although sometimes it may be appropriate to seal a document in its entirety, whenever possible a party must redact. *See Kamakana*, 447 F.3d at 1183 (noting a preference for redactions so long as they "have the virtue of being limited and clear"); *Murphy v. Kavo Am. Corp.*, 11-cv-00410-YGR, 2012 WL 1497489, at *2-3 (N.D. Cal. Apr. 27, 2012) (denying motion to seal exhibits but directing parties to redact confidential information). Whatever the basis, the court "must articulate [the] reasoning or findings underlying its decision to seal." *Apple Inc.*, 658 F.3d at 1162.

Here, Plaintiffs move to file under seal one exhibit submitted in support of its opposition to the County's motion and the portion of their opposition discussing that document, as well as one document submitted in support of their opposition to SCI's motion. (Dkt. No. 153 at 2.) Specifically, Plaintiffs seek to seal Exhibit 9 to the declaration of Jessica Riggin, filed in connection with the County's motion, which is excerpts from the Friedel deposition, and pages of its opposition discussing that testimony. (*Id.*) The redacted portions of these documents discuss the revenue sources and amounts of Friedel and Serenity. Serenity designated the testimony Confidential—Attorneys' Eyes Only pursuant to the parties' Protective Order. Although Serenity has not filed a Rule 79-5(e) declaration, given that the Court did not discuss, let alone rely on, the

confidentially-designated content in reaching its conclusion on summary judgment, Plaintiffs have met their burden of setting forth compelling reasons to seal these documents.

The Court reaches the same conclusion with respect to Plaintiffs' request to seal Exhibit 11 to the declaration of Valerie Brender, filed in connection with SCI's motion, which is a Serenity invoice. The invoice was initially produced unredacted but at a deposition SCI verbally requested that the names of the decedents be kept confidential. SCI is not a party to any protective order in this case. The decedents' identities are irrelevant to the joint employer issue and the Court did not rely on them in resolving the summary judgment motions. The decedents and their families are entitled to privacy. Moreover, Plaintiffs' proposed redactions are narrowly tailored to limit only the confidential information. Accordingly, although SCI was not a party to a protective order and failed to file a Rule 79-5 declaration in support of the sealing request, the Court GRANTS Plaintiffs' request to file the Serenity invoice with the decedents' names redacted.

### CONCLUSION

Viewing the undisputed evidence in the light most favorable to Plaintiffs, while SCI and the County exercised some control over Serenity removal technicians' daily job functions through their work rules, they did not retain or exert control over their hiring, firing, wages, or hours. Under the circumstances presented here, there is no genuine dispute that SCI and the County are not the removal technicians' employers for the purposes of the FLSA. Plaintiffs cannot pursue liability as to the County as a joint employer under California law, so the Court GRANTS the County's motion for summary judgment. As there is no remaining theory of liability as to the County, the Court dismisses the County from this action.

The Court GRANTS IN PART SCI's motion for partial summary judgment. Plaintiffs cannot proceed against SCI on a theory of joint employer liability. However, the Court defers decision as to whether, as a matter of law, SCI is not subject to liability under Section 2810.3 until the parties submit further briefing and evidence regarding the "five or fewer workers supplied by a labor contractor or labor contractors to the client employer at any given time" exemption from the statute.

In addition, for the reasons described above, the Court GRANTS Plaintiffs' administrative

motion to file under seal.

This Order disposes of Docket Nos. 126 and 153. Docket No. 124 remains pending in part.

**IT IS SO ORDERED.**

Dated: April 14, 2017

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge