UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS JOHNSON, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>SERENITY TRANSPORTATION, INC., et al.,<br><br>   Defendants. | Case No. 15-cv-02004-JSC<br><br>**ORDER GRANTING PLAINTIFFS' MOTION TO INVALIDATE RELEASES AND ISSUE CORRECTIVE NOTICE**<br><br>Re: Dkt. Nos. 104, 186 |

Plaintiff mortuary drivers allege they were misclassified by Serenity Transportation, Inc. as independent contractors and thus denied the benefits of California and federal wage-and hour laws. Plaintiffs also sued SCI and the County of Santa Clara under a joint employer theory, arguing these entities are jointly and severally liable for Serenity's wage and hour violations. Now pending before the Court is Plaintiffs' motion to invalidate releases signed by former and current Serenity drivers and to issue corrective notice to the Fair Labor Standards Act class. (Dkt. Nos. 104, 186.) Because the Court finds that Serenity discouraged drivers from participating in this lawsuit, and that the releases contain misleading and inaccurate information, the Court grants Plaintiffs' motion.

**BACKGROUND**

Plaintiffs filed their motion for conditional certification of their Fair Labor Standards Act (FLSA) claim on March 16, 2016. (Dkt. No. 75.) The Court granted Plaintiffs' motion a month later and the parties submitted a notice to the class which the Court approved with modification. (Dkt. Nos. 84, 86-87.) Notice was issued to 74 putative class members who had until July 30, 2016 to opt in to the FLSA action. (Dkt. No. 104-6.) There are currently 28 drivers who have joined the collective action, including the two named plaintiffs. (Dkt. Nos. 72-74, 80, 89-92, 96-

103, 192 at 7 & n.2.)

Approximately 30 days into the collective action opt-in period, Serenity began contacting putative class and collective action members in an attempt to secure their exclusion from this litigation. (Dkt. No. 104-1 ¶ 2.) Among other things, Serenity sent its drivers a letter concerning the lawsuit and a "Settlement and Release Agreement" ("Release"). (Dkt. Nos. 104-2, 103-3.) Plaintiffs' counsel first learned of Serenity's efforts shortly after they commenced, and at their request Serenity provided them with copies of the exclusion documents. (*Id*.)

### A. Serenity's Written Communications to the Drivers

Serenity's Chief Operating Officer David Friedel[1] attests that on June 15 and 17, 2017 he emailed current and former Serenity drivers informing them that they would receive a personal letter from him in a few days. (Dkt. No. 190-2 ¶ 4.) The email also noted that some drivers already had a copy of the letter. (*Id*. ¶ 5.) He attached a copy of the Fourth Amended Complaint to the email, although there are no such emails in the record before the Court. (*Id*. ¶¶ 4, 5.) Friedel posted the collective action notice and the operative complaint at Serenity's office next to the drivers' mailboxes on May 10, 2016. (*Id*. ¶ 3.)

#### 1. The Letter

Defendants' four-page letter states that "a settlement offer has been structured which is intended to provide you with compensation in return for a complete release of all potential claims related to this lawsuit." (Dkt. No. 104-2 at 2.) It asserts that Defendants have complied with all state and federal wage and hour laws, and informs the reader that a copy of the Fourth Amended Complaint can be obtained near the mailbox and references the conditional certification notice that all drivers should have already received. (*Id*.) The letter describes litigation as an "uncertain process for all those involved, and this lawsuit is no exception" and that it is an "adversarial process." (*Id*. at 3.)

---

[1] Friedel attests that he has been Serenity's Chief Operating Officer ("COO") since its inception (Dkt. No. 190-2 ¶ 2); however, he signed the letter as Serenity's "CEO." (Dkt. No. 104-2 at 5.) Moreover, Serenity submits the declaration of Josh Ponce who attests that has been Serenity's COO since January 2016. (Dkt. No. 190-6 ¶ 1.) Regardless of title, it is apparent that Friedel runs Serenity.

2

The letter explains that because of the "time, expense, and uncertainties of litigation," Serenity has "decided to offer monetary compensation to you to resolve these potential issues with you." (*Id.*)  Serenity describes the offer as "fair and reasonable" based on a "review of duration of your time" with Serenity and explains that "[b]y signing the release and accepting the offer [the driver is] giving up [the driver's] rights as a potential class member for those claims asserted or related to the issues raised in the lawsuit." (*Id.* at 4.)  The letter advises the driver that Plaintiffs intend to pursue the class action on behalf of drivers who worked for Serenity since May 16, 2013. (*Id.* at 3.)  The letter also confirms that the driver's decision as to whether to accept the offer will not impact the driver's work with Defendants.  (*Id*. at 5.)  Under the heading "**Further Consultation,"** the letter suggests that the driver consult with an attorney of his choosing and then immediately gives the contact information for Defendants' counsel and then the contact information for Plaintiffs' counsel, followed by a sentence again encouraging the driver to consult with an attorney and welcoming the driver to talk with Defendants' counsel.  (*Id.* at 4-5.)  It gives the driver until June 30, 2016 to respond to Serenity's offer.  (*Id*. at 5.)

### 2. The Release

The Release accompanying the letter states in relevant part:

> In exchange for the consideration of Payment as detailed in this Agreement, Driver, for himself/herself and on behalf of his/her successors and assigns, does hereby release, acquit and agree to settlement of any and all claims, actions, causes of action, demands, rights, damages, costs and expenses whatsoever, known and unknown, foreseen and unforeseen (collectively, "Claims"), that Driver may have against the Defendants…..arising out of or in any manner related to the Ongoing Litigation, including claims for failure to pay wages (overtime and minimum), for failure to reimburse business related expenses, for unfair competition, for all statutory and/or civil penalties including those pursuant to the California Labor Private Attorney General Act and California Labor Code, attorney fees and wage statement deficiencies.

(Dkt. No. 104-3 ¶ (H)).  The Release also states that the payment is for "any and all claims that Driver has, had or could have had arising out of the Ongoing Litigation or in any way related thereto."  (*Id*. ¶ G.)  Section (J) states, in part, that the driver agrees "to Opt-Out of the Ongoing Litigation and not participate in future[.]"  (*Id*. ¶ J.)

**B.     Serenity's Other Conduct**

Two Serenity drivers attest that at a meeting with drivers in around March 2016, Friedel discouraged the drivers from participating in the lawsuit. Specifically, Gary Johnson testifies that at that meeting Friedel warned the drivers that if they participated in the lawsuit "he would have to take us off of rotation and terminate our contract because our participation in the lawsuit would be a conflict of interest." (Dkt. Nos. 104-8 ¶ 5.)  "Because of these type of statements," Johnson did not feel at liberty to participate in the lawsuit until he left Serenity. (*Id*. ¶ 6.)  Johnson opted into the lawsuit on June 20, 2016 and the next day received a text from Friedel stating: "Guess apparently I treated you so badly that you had to screw me again." (Dkt. No. 104-8 at 5.)

Robert Felix often heard Friedel speak about the lawsuit. (Dkt. No. 181-1 ¶¶ 3, 4.)  He also heard Friedel state at a driver meeting in or around March/April 2016 that anyone who joined the lawsuit would no longer work at Serenity because it would be a "conflict of interest." (*Id*. ¶ 4; Dkt. No. 192-2 at 3.)  Felix understood from this meeting that if he joined the lawsuit he would be fired. (*Id*.)  In June, Friedel called Felix into his office and said the Plaintiffs are going to lose because he is not going to pay a dime and that anyone who joined the lawsuit was against him. (*Id*. ¶ 5.)  Friedel then asked Felix to sign the Release. (*Id*.)  Felix said he did not want to sign, and when pressured, Felix told Friedel he would think about it. (*Id*.)

Thereafter, Friedel brought up the Release almost every time he saw Felix. (*Id*. ¶ 6; Dkt. No. 192-2 at 8.)  He told Felix that if he did not sign the Release Felix was not going to have a good work environment. (*Id*.)  The pressure became overwhelming and Felix did not want to lose his job, so he signed the Release in exchange for $60 determined by Friedel. (*Id*. ¶¶ 6, 7.)  Felix told Friedel he thought the amount should be higher, but Friedel said it was a take it or leave it amount. (*Id*. ¶ 7.)  Friedel has continued to discuss the lawsuit after Felix signed the Release, saying he is going to bankrupt Serenity and start a new company so that the drivers do not recover anything from the lawsuit. (*Id*. ¶ 9.)  Felix wishes to join the lawsuit but is concerned that Friedel will retaliate against him for trying to participate in the case. (*Id*. ¶ 10.)  Felix was terminated from his job with Serenity in June 2017. (Dkt. No. 192-6 ¶ 2.)

Serenity had its Chief Operating Officer Josh Ponce approach Daniel Gillette at his new

workplace, SCI, after he had already left Serenity's employ. (Dkt. Nos. 104-9 ¶ 4, 190-6 ¶ 1, 192-3 at 4:8-18.) Ponce gave Gillette the Release and a $100 check and informed Gillette that Friedel wanted to pay Gillette money for "unpaid hours for meetings." (Dkt. Nos. 104-9 ¶ 4-5, 192-3 at 5:15-16.) Gillette was frustrated someone from Serenity showed up at his workplace. (Dkt. Nos. 104-9 ¶ 6, 192-3 at 7:5-8.) He worried there would be complications at his current job at SCI, which had a contract with Serenity, if he did not sign the Release. (Dkt. No. 104-9 ¶ 6.) Gillette signed the Release but was not given any information about the lawsuit and did not know what the Release meant. (Dkt. Nos. 104-9 ¶ 5, 192-3 at 5:19-20.) Gillette would not have signed the Release had someone not showed up at his current job. (Dkt. No. 104-9 ¶ 6.) Gillette later received a blank release and a copy of the form letter from Friedel in the mail. (*Id*. ¶ 5, 7.) Gillette felt misled about the intent of the Release and felt pressure to sign it. (Dkt. Nos. 104-9 ¶ 7, 192-3 at 5:10-12.) He consented to join the lawsuit on July 11, 2016, and wishes to participate in the case. (*Id*. ¶ 8.)

### E. Driver Participation

Every Serenity driver who was working for Serenity during the opt-in period signed Serenity's Release and did not opt in to the lawsuit. (Dkt. Nos. 104-11, 104-12, 104-13, 192 at 6.) The executed Releases in the record reflect varying amounts of payment as compensation. Two Releases reflect a payment of $1.00 (Dkt. No. 104-3), two reflect a payment of $10.00 (Dkt. No. 104-4), one records a payment of $20 (Dkt. No. 104-5), one for $60 (Dkt. No. 181-1) another a payment of $100.00 (Dkt. No. 104-9), and another payment of $220 (Dkt. No. 191 at 9). There is testimony as to an additional seven Releases for $60 or less. (Dkt. No. 104-1 ¶ 7.)

For former drivers, that is, drivers who received the FLSA notice after no longer working for Serenity, the opt-in rate is 51% or 28 of 55 former drivers. (Dkt. No. 104-13, 192 at 7 & n.2.) Of these, nine opted in before the notice was sent, 10 opted in between the date of the notice and the date of Serenity's letter, and 9 opted in after they were sent Serenity's letter. (Dkt. No. 190-2 ¶ 14.)

### PROCEDURAL HISTORY

Plaintiffs filed a motion to invalidate the Releases and for a corrective FLSA notice to be

5

sent to the conditionally certified class. (Dkt. No. 104.) The parties subsequently attended a settlement conference, and following that, agreed to focus on discovery and motions regarding whether the non-Serenity defendants are liable as "joint employers." Thereafter the parties stipulated to Plaintiffs filing a Fifth Amended Complaint. (Dkt. Nos. 108, 120.) On summary judgment, the Court held that the remaining non-Serenity defendants were not "joint employers" as a matter of law, although it left SCI in the case pursuant to California Labor Code section 2810.3. (Dkt. Nos. 172, 175.) Plaintiffs subsequently filed a supplemental brief in support of their motion to invalidate (Dkt. No. 186) and Serenity filed an opposition (Dkt. No. 190) to which Plaintiffs replied. (Dkt No. 192.) Plaintiffs' motion is now under submission.

## LEGAL STANDARD

"Before a class is certified in a class action, counsel for both plaintiffs and defendants may communicate with the putative class, *ex parte,* about the lawsuit." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). "Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100. "The prophylactic power accorded to the court presiding over a putative class action under Rule 23(d) is broad; the purpose of Rule 23(d)'s conferral of authority is not only to protect class members in particular but to safeguard generally the administering of justice and the integrity of the class certification process." *Retiree Support Grp. of Contra Costa Cty. v. Contra Costa Cty.*, No. 12-CV-00944-JST, 2016 WL 4080294, at *5 (N.D. Cal. July 29, 2016) (citing *O'Connor v. Uber Technologies, Inc.,* No. C-13-3826 EMC, 2014 WL 1760314, at *3 (N.D. Cal. May 2, 2014)).

"Courts applying the *Gulf Oil* standard have found that *ex parte* communications soliciting opt-outs, or even simply discouraging participation in a case, undermine the purposes of Rule 23 and require curative action by the court." *Guifu Li v. A Perfect Day Franchise, Inc.*, 270 F.R.D. 509, 517 (N.D. Cal. 2010); *see also Hoffman La Roche v. Sperling*, 493 U.S. 165, 173 (1989) (extending the reasoning of *Gulf Oil* to collective actions). In the context of class action litigation, whether pre- or post-certification, unsupervised communications between an employer and its workers present an acute risk of coercion and abuse. *See Guifu Li*, 270 F.R.D. at 517.

6

Communications between parties and class members may be restricted when there is "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101. "Courts in this district have limited communications, as well as invalidated agreements that resulted from those communications, when they omitted critical information or were otherwise misleading or coercive." *Slavkov v. Fast Water Heaters Partners I, LP*, 2015 WL 6674575, at *2 (N.D. Cal. Nov. 2, 2015) (citing cases). Any order restricting the parties' speech must be "carefully drawn" and limit speech "as little as possible*." Gulf* Oil, 452 U.S. at 102.

## DISCUSSION

Serenity engaged in ex parte communications that discouraged drivers from participating in the lawsuit and provided the drivers with a misleading and inaccurate release; thus, invalidation of the Releases and curative notice is warranted.

### A. Serenity's Oral Communications

The Court credits the testimony of drivers Johnson and Felix that at a drivers meeting in or around March 2016, Friedel told the drivers that anyone who joined the lawsuit would have a conflict of interest and therefore could not work at Serenity.

First, the drivers' testimony is consistent with the fact that not a single current driver opted in to the lawsuit yet 51% of former drivers did so. The discrepancy is reasonably explained by Friedel's threat via his "conflict of interest" comment (whether explicit or implicit) to fire current drivers. Similarly, that every single current driver signed the Release for nominal sums, as low as $10, is also consistent with Friedel having discouraged driver participation in the lawsuit. *See Guifu Li,* 270 F.R.D at 518 (finding that the "Defendants' filing of 38 signed opt-out forms indicates that these meetings secured signed forms from a substantial number of the current workers" and thus supported the court's finding that the meetings were coercive).

Second, Friedel's text message to Johnson supports the finding that Friedel discouraged drivers from participating. It is undisputed that the day after Johnson opted in Friedel texted Johnson that he had "screwed him" again. Defendants' insistence that this was the lone instance in which Friedel discouraged a driver from participating is not plausible; Friedel's text is

consistent with Johnson and Felix's testimony that Friedel had earlier threatened the drivers about participating in the lawsuit. It is also consistent with Felix's testimony that Friedel told him that the drivers would get nothing because he would put the company into bankruptcy.

Third, Felix's testimony that Friedel hounded him for weeks about signing the release—testimony that Friedel does not dispute—supports a finding that Friedel engaged in a campaign to discourage drivers from participating in this action. While Felix still worked for Serenity, Friedel repeatedly asked him whether he would sign the release until he wore Felix down. Similarly, the undisputed fact that Serenity sent its COO Ponce to Gillette's new work place—the work place of an important Serenity client—to get him to sign a release is further evidence that Serenity actively discouraged drivers from joining this action. *See Ojeda-Sanchez v. Bland Farms,* 600 F.Supp.2d 1373, 1379-81 (S.D. Ga. 2009) (finding an employer's in-person solicitations coercive).

Fourth, Friedel does not deny that he told the drivers that they would have a conflict of interest if they joined the lawsuit; indeed, he admits that he held a meeting with the drivers at which he discussed the lawsuit. (Dkt. No. 190-2 ¶ 10.) He claims instead that he never forbid any driver from discussing the case with Plaintiffs' counsel (something Plaintiffs do not contend), and that he "never threatened anybody during that meeting or at any other time that they would lose their job, be retaliated against, or suffer any other form of discipline as a result of joining the lawsuit." (*Id.*) However, telling your drivers that they have a conflict of interest if they join the lawsuit is an implicit threat that will discourage participation. Further, Friedel does not deny that he sent Johnson the "you screwed me again" text message, that he repeatedly hounded Felix for the release, or that he had Ponce personally solicit former driver Gillette at his workplace.

In any event, Friedel's denial is in a declaration that is riddled with falsehoods and inconsistencies. For example, to bolster his claim that he did not threaten the drivers' jobs, he declares that Michael Hartwig and Ace Valentine were still driving for Serenity at the time they opted into the lawsuit. (*Id.* at ¶ 15.) False. Hartwig left Serenity in the fall of 2014 (Dkt. No. 192-5 ¶ 2) and Valentine left Serenity in July 2014 (Dkt. No. 192-4 ¶ 2). Friedel similarly claims in the declaration to have been Serenity's COO since its inception (Dkt. No. 190-2 ¶ 2), yet he signed the letter to the drivers as Serenity's CEO (Dkt. No. 104-2 at 5), and Ponce declares that he has

8

1   been Serenity's COO since January 2016.  (Dkt. No. 190-6 ¶ 1.)  Finally, Friedel attests that in

2   June 2016 he emailed the letter along with a copy of the Fourth Amended Complaint to the drivers

3   (Dkt. No. 190-2 ¶  ), yet just the month before Serenity claimed to not have the emails of several

4   drivers. (Dkt. No. 104-7.)  Friedel appears to have taken little care with his declaration; it is not

5   credible.

6         Defendants' other declarations do not persuade the Court otherwise.  While Ponce, the

7   COO, claims to have been at a meeting where Friedel discussed the lawsuit, he, too, does not deny

8   that Friedel said that drivers who join the lawsuit would have a conflict of interest.  And, of

9   course, Ponce was personally involved in soliciting Gillette at his workplace.  Della King, who

10  performs payroll and accounting services for Serenity, says she never heard Friedel threaten a

11  driver's job in connection with the lawsuit; however, she was not at the drivers' meeting at which

12  Johnson and Felix attest Friedel said the drivers would have a conflict of interest if they joined the

13  litigation.  Lonnie Ritter, who works for Serenity in accounting and data entry, shares an office

14  with Della King.  She says she never heard Friedel threaten to fire a driver for refusing to sign the

15  Release.  (Dkt. No. 190-3.)  However, she, too, was not at the drivers' meeting.

16        Serenity's protest that only a few drivers have submitted declarations in support of

17  Plaintiffs' motion misses the point.  Plaintiffs bring this motion precisely because Serenity

18  discouraged drivers from participating in this lawsuit.  *See Wang v. Chinese Daily News, Inc.*, 236

19  F.R.D. 485, 489 (C.D. Cal. 206) (holding that the lack of declarations provided by current

20  employees in support of plaintiffs' motion to invalidate was not surprising due to coercive

21  workplace environment and a 90 percent rate out-opt rate, whereas former employees opted out at

22  a rate of approximately 25 percent), *aff'd by*, 623 F.3d 743, 761 (9th Cir. 2010), *rev'd on other*

23  *grounds,* 131 S.Ct. 2541 (2011).  To accept Serenity's argument would reward employers for

24  engaging in such conduct since the more successful they are at discouraging drivers from

25  participating the more likely they are to prevent any judicial curative action.

26        Because the Court finds that Serenity actively discouraged its current drivers from

27  participating in this lawsuit, their releases must be invalidated and curative notice issued.  *See*

28  *Guifu Li*, 270 F.R.D. at 517-519 (invalidating opt-out forms when defendant employer presented

the forms in mandatory one-on-one meetings during work hours*); see also Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. Apr. 15, 2014) (invalidating releases when plaintiffs received a letter stating defendants' business would close and everyone would lose their jobs if plaintiffs participated in the lawsuit).

### B. Serenity's Written Communications

In addition to Serenity's active discouragement, Friedel's letter and the Release include misinformation and omissions that require that all of the Releases, including those executed by former drivers, be invalidated.

First, the Release encompassed all claims in the lawsuit, including the FSLA claims. Neither the Release nor the letter told the drivers that the settlement of FLSA claims requires court approval. This omission was improper. *See Slavkov v. Fast Water Heaters Partners I, LP*, 2015 WL 6674575 *5-6 (N.D. Cal. Nov. 2, 2015). At oral argument Serenity explained that it did not believe judicial approval was required because the drivers had not opted in. This argument is not factually or legally sound. Most, if not all, of the Releases in the record were obtained before the end of the opt-in period. Further, failing to opt in to an FLSA collective action does not extinguish an employee's FLSA claim; it merely means that the employee is not pursuing the claim in the pending litigation. Neither the Release nor Friedel's letter "make any mention of the possibility of judicial approval — instead, the unmistakable perception is that accepting the Defendants' settlement offer will release *all* claims raised by Plaintiffs." *Slavkov*, 2015 WL 6674575 at *6. "[T]his is no minor omission." *Id.*

Second, the Release incorrectly states on whose behalf the claims in this litigation were being brought. The Release advised the drivers that Plaintiffs are seeking to pursue claims for drivers who worked from May 16, 2013 to the present. Not so. The Unfair Competition Law (UCL) claim reaches drivers who worked from May 2011 to the present. Serenity's oral argument explanation that it used the date from the collective action notice is meritless; that notice was for the FLSA claims only while Serenity sought and obtained a release of any and all claims related to this litigation, including the UCL claims.

Third, the Release tells the driver that by signing the Release he agrees to opt out of the

10

1  "the Ongoing Litigation and not participate in future[.]"  This language, to a lay person,
2  improperly suggests that by signing the Release the driver is precluded from participating as a
3  witness or otherwise participating in the litigation, not just that he will not be a class member.  *See*
4  *Slavkov*, 2015 WL 6674575 at * 4 (invalidating releases because plumbing and water heater
5  installers were unlikely to have legal expertise thus release's language that workers "agree not to
6  participate" in the litigation was misleading because it restricted anyone who signed the agreement
7  from talking to the plaintiffs' counsel).

8        Fourth, Serenity did not provide the Fourth Amended Complaint, or any version of the
9  complaint, to the drivers when it presented them with the Release.  Instead, Friedel claims that he
10 emailed the Fourth Amended Complaint to the drivers a few days before they received the release
11 in the mail.  As explained above, however, this testimony is not credible, at least not as to each
12 and every driver, as at the same time Friedel claims to have emailed the drivers, Serenity failed to
13 provide Plaintiffs with requested emails for some drivers. Either Friedel did not email those
14 drivers for whom Serenity did not provide emails or Serenity withheld email addresses from
15 Plaintiffs for drivers with whom Serenity communicated about the case by email; either scenario is
16 problematic.  Posting the complaint next to the drivers' workplace mailboxes is insufficient as it
17 does not provide notice to the former drivers.  *See County of Santa Clara v. Astra USA, Inc.*, 2010
18 WL 2724512 * 4-5 (N.D. Cal. July 8, 2010) (invalidating releases obtained by letter to putative
19 class that did not attach plaintiffs' complaint, explain plaintiffs' claims or the status of the case, or
20 include contact information for plaintiffs' counsel).

21       Finally, the Court is troubled by the letter's suggestion that the drivers contact Defendants'
22 counsel.  The letter appropriately suggests that the driver consult with an attorney of the driver's
23 choosing and then immediately below that suggestion lists Defendants' counsel's contact
24 information and after that, on the next page, Plaintiffs' counsel. That information is immediately
25 followed by: "Again, you are encouraged to consult an attorney, and are welcome to talk with
26 Defendants' attorney."  These words and format are telling the driver, in effect, that he could talk
27 with Defendants' attorney about whether to sign the Release even though Defendants' counsel
28 cannot ethically advise a driver on whether to sign the Release.  It is one thing to identify

11

Defendants' counsel, it is another to suggest that a driver contact Defendants' counsel.

These misstatements and omissions require invalidating the Release as to all drivers and sending curative notice to all drivers notifying them that their releases are invalid and reinstating the FLSA opt in period for a period of 60 days from the sending of new notice.[2]

Defendants' heavy reliance on *Aguilar v. Zep Inc.*, CV 13-00563 WHO, 2014 WL 1900460 (N.D. Ca. May 12, 2014), is unavailing for several reasons. First, and most significantly, in *Aguilar* there was no evidence or even allegation of any threatening communications; instead, the defendant mailed a letter to the worker offering him $8000 to settle his claims. *Id.* at *1. Second, the release did not bar the worker from participating in the litigation in the future, as does the Release here. (*Compare* Dkt. No. 104-3 at 3 *with* 13-00563 WHO Dkt. No. 113-3 at 3.) Third, the district court's opinion does not discuss, let alone hold, that FLSA claims can be released without court approval. Finally, while the letter sent to the worker said he should feel free to contact the defendants' counsel and also stated that the worker might want to contact the plaintiffs' counsel, it then listed both counsel's contact information side-by-side which was not done here. (13-00536 WHO Dkt. No 113-2.) There was also no indication in *Aguilar* that the district court had previously declined to include the defendants' counsel's contact information in a collective action notice as is the case here.

**C. Future Communications**

Plaintiffs also ask the Court to prohibit Serenity from communicating with the drivers about this litigation until the resolution of this lawsuit. This is a drastic remedy that the Court is not prepared to enter since it would, in effect, eliminate the opportunity for a driver to settle with Defendants outside of this litigation, an opportunity that some drivers may legitimately want to pursue. Further, under *Gulf Oil*, a limitation on communications with the class must be "carefully

---

[2] The Court recognizes that Defendants have submitted a declaration from Serenity driver Paul Gemignani who attests that he did not want to participate in the lawsuit and thus rejected Defendants' settlement offer of $100 and instead wrote in $1.00. (Dkt. No. 190-5.) Gemignani, who was a current Serenity driver at the time he signed the Release, was subject to the same threats and misstatements as the other drivers; thus his Release must be invalidated as well. If he freely and voluntarily does not wish to participate he can fail to opt in during the renewed period, opt out of any class action, or sign a new release.

12

drawn" to "limit[ ] speech as little as possible, consistent with the rights of the parties under the circumstances." 452 U.S. at 102. Nonetheless, given Serenity's past conduct, the Court is not convinced that similar coercive conduct will not occur again. Thus, the Court will order that Serenity not have any contact with the drivers about the lawsuit during the renewed opt-in period. Following the termination of the opt-in period Serenity may discuss the lawsuit with current and former drivers; however, the Court will order that before Serenity obtains a signed release from any driver it must notify Plaintiffs' counsel so that counsel can contact the driver and determine if the driver would like any advice before signing.

## CONCLUSION

For the reasons described above, Plaintiffs' motion to invalidate the Releases and issue curative notice is GRANTED. The Court will issue a curative FLSA notice and toll the statute of limitations from the date of the initial notice until the date of the curative notice and give the Serenity drivers another 60 days to opt in to the FLSA action. Plaintiffs shall draft a proposed notice and submit it to Defendants for their review. After the parties have met and conferred, Plaintiffs shall file their proposed notice and Defendants shall file their competing suggestions, if any. The proposed notices shall be filed on or before October 11, 2017.

This Order disposes of Docket Nos. 104 and 186.

**IT IS SO ORDERED.**

Dated: September 25, 2017

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

13