UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CURTIS JOHNSON, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>SERENITY TRANSPORTATION, INC., et al.,<br><br>       Defendants. | Case No. 15-cv-02004-JSC<br><br>**ORDER RE PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 225 |

Plaintiffs are mortuary drivers who filed suit against their employer, Serenity Transportation, Inc. ("Serenity Transportation"), its owner David Friedel ("Friedel") (together, the "Serenity Defendants"), as well as Service Corporation International ("SCI"), and SCI California Funeral Services, Inc. ("SCI California") (together, "the SCI Defendants"). Plaintiffs allege they have been misclassified as independent contractors and denied the benefits of California and federal wage-and-hour laws. Now pending before the Court is Plaintiffs' motion for class certification. (Dkt. No. 225.)[1] Having considered the parties' submissions, and having had the benefit of oral argument on June 12, 2018, the Court GRANTS in part and DENIES in part Plaintiffs' motion.

## FACTUAL BACKGROUND

### A.    The Parties

Serenity transports deceased persons for various clients including mortuaries. (Dkt. No. 225-4 at 9:17-22.) David Friedel is Serenity's CEO and sole owner; he is responsible for

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

overseeing all of Serenity's business, including its finances, marketing, and operations. (Dkt. Nos. 124-8 ¶¶ 1, 3; 233-1 ¶ 1; 225-4 at 3:23-25.) In 2016, Serenity had approximately 80 regular clients and 25 one-time clients. (Dkt. No. 233-1 ¶ 2.)

SCI Cal, an affiliate of SCI, owns and operates personal care centers and funeral homes. Personal care centers provide support services for funeral homes such as "body preparation, dressing, cosmetizing, embalming and transportation to the funeral homes for services." (Dkt. No. 124-21 ¶ 2.) At times the SCI Cal personal care center staff are unavailable to pick up a decedent. (*Id.* ¶ 4.) Therefore, on March 1, 2011, SCI California entered into a contract with Serenity for Serenity to provide transportation services when needed. (Dkt. No. 124-8 ¶ 18.) A new contract was executed on January 1, 2013. (*Id.*) All SCI affiliates ceased doing business with Serenity on October 30, 2017 and have not entered into any new contract with Serenity since that date. (Dkt. No. 233-6 ¶ 2.) In 2016, less than 15% of Serenity's gross revenue was derived from business with SCI affiliates. (Dkt. No. 233-1 ¶ 2.)

Plaintiff Curtis Johnson drove for Serenity from January 1, 2012 to August 27, 2013. (Dkt. No. 255-6 at 4:1-3.) Plaintiff Gary Johnson drove for Serenity from February 2015 until April 8, 2016. (Dkt. No. 234-2 ¶ 4.) Eighty-five persons drove for Serenity during the class period. (Dkt. Nos. 225-1 ¶ 37; 225-37.)

**B.     Serenity's Driver Contracts**

Prior to 2011, Serenity classified its drivers as employees who were paid on an hourly basis, received eight hours of pay regardless of the number of calls performed for each 24-hour shift, and were paid overtime. (Dkt. No. 75-8 ¶ 5.) In 2011, David Friedel terminated all of the Serenity drivers and gave them the option to return as independent contractors. (Dkt. No. 225-4 at 17:22-18:2.) Between January and June 2011, Serenity executed independent contractor agreements with several drivers. (Dkt. No. 234-2 ¶¶ 2, 3.) Drivers had to sign the independent contractor agreement (the "IC Agreement") in order to work for Serenity. (Dkt. No. 225-15 at 5:24-6:4.) Some drivers were informed the IC Agreement was nonnegotiable. (Dkt. No. 225-10 at 4:18-5:5.)

Serenity clients have delivery requirements that drivers are required to understand and

agree to. (Dkt. No. 225-18 at 2.) Drivers are free to refuse a dispatch without penalty but remain in the same "rotational position" for subsequent dispatches. (*Id*. at 3.)

As for meal and rest breaks, Mr. Curt Johnson's January 2012 to December 2013 contract is silent:

> Contractor will advise Serenity Transportation Inc. of the hours, days of the week and dates when it wishes to have Mortuary Support Services referred to it by Serenity Transportation Inc. and Serenity Transportation Inc. will not refer Mortuary Support Services to Contractor at other times. Serenity Transportation Inc. may "request" specific times and days, only to affect coverage for its clients. If Contractor determines that, it will not be available for referrals during the time and/or days and dates it has designated, it shall so advise Serenity Transportation, which will refer Mortuary Support Services to other Contractors during Contractor's period of unavailability.

(Dkt. No. 225-18 at 4.) However, the IC Agreement signed by Gary Johnson in February 2015 states:

> Contractor may take meal breaks, personal time off or refuse calls at their own discretion, however Serenity Transportation ,Inc. should be notified of the length of time Contractor will be unavailable. If Contractor determines that, it will not be available for referrals during the time and/or days and dates it has designated, it may so advise Serenity Transportation with 24 hours' notice, during which time STI will refer Mortuary Support Services to other Contractors during Contractor's period of unavailability.

(Dkt. No. 124-15.)[2]

Drivers must agree to Serenity's payment schedule. (*Id*.) No changes are made "except upon written notice by Serenity Transportation." (*Id*.) Drivers receive a "portion of the fee paid by Serenity Transportation customers" for each service performed for the customers at a minimum of $50 per man. (*Id*. at 5.) Drivers are responsible for their own expenses and supply their own equipment including van-type vehicles, gurneys, and other specialized equipment. (*Id*.) Drivers are also required to obtain a business license and liability insurance for the minimum amount of one million dollars. (*Id*. at 4.) Drivers have the option to terminate the agreement "in the event of a reduction in the amount to be paid to Contractor as its share of the fee paid by the Customer." (*Id*. at 3.)

---

[2] The 2012 Agreement and 2015 Agreement contain other minor differences in language, but these differences do not have a material effect upon the Court's analysis for class certification; therefore the remaining differences are not discussed in this Order.

The delivery services are performed within certain geographical areas including Alameda, Contra Costa, San Mateo, Santa Clara, San Francisco, Marin, San Joaquin, Sacramento, Napa, Sonoma, and Stanislaus counties. (*Id*.) Drivers are not dispatched to locales outside of these geographic areas. (*Id*.) Drivers, at their own discretion, may provide services to their own customers "without geographic limitation." (*Id*. at 4.) Drivers may hire their own contractors but are responsible for insuring the contractors are trained and have the proper equipment. (*Id*.) Drivers must be "appropriately groomed and conservatively clothed." (*Id*. at 6.)

Serenity may terminate the agreement "at any time for any reason or for no reason upon seven (7) days prior written notice to the Contractor." (*Id*. at 9.) Drivers may terminate the agreement "for material breach at any time upon fifteen (15) days prior written notice to Serenity Corporation." (*Id*.) Serenity may randomly drug test drivers "with or without suspicion, equal to at least 25% of the contractors over the term of the contract or annually, whichever is shorter." (*Id*.) Drivers are tested if involved in any accident. (*Id*.) Any driver who violates the "Drug and Substance Abuse Policy" or refuses to be tested is "permanently removed from any contract." (*Id*.) Drivers agree not to "solicit or induce any Customer of Serenity Transportation Inc. to become a Customer of Contractor" during the term of the agreement and for a one-year period following termination of the agreement by either party. (*Id*. at 10.) Drivers are also prohibited from working for or disclosing any information to "any agency which is in the same line of business as Serenity Transportation." (*Id*.)

## C. Client Policy Standards

Mr. Friedel instructs drivers to follow Serenity's policies in a document entitled "Client Policy Standards" which is provided to each driver upon hiring. (Dkt. Nos. 124-8 ¶ 6; 124-9 ("STI Client Policy Standards 1); 225-2 ¶ 7; 225-7 at 4:24-5:24.) The Standards prohibit drivers from contacting funeral homes "under any circumstances." (Dkt. No. 124-9 at 2.) They are required to wear a two-piece dress suit and black shoes. (*Id*.) Hair must be kept in "a conservative style." (*Id*.) Drivers have 75 minutes to arrive at their calls and must memorize the related codes for call start time, on scene, transporting, dropping at mortuary, and available for another call. (*Id*. at 3.) Vehicles may not have any smoke odors or dirty ashtrays, and Serenity

4

may inspect the vehicles.  (*Id*.)  Drivers are also prohibited from having any food or open drink containers in their vehicle.  (*Id*.)  Personal time off is permitted "with sufficient notice."  (*Id*.)  Substance abuse and DUI convictions are "grounds for immediate contract termination."  (*Id*. at 3-4.)  "Continuous violations of customer standards" may also result in "contract termination" or drivers being "pulled off rotation."  (*Id*. at 4.)

The deceased must have "an identification band that is waterproof and capable of fastening in such a way that it cannot be removed or taken off unless it is cut with a pair of scissors." (*Id*. at 5.)  Identifying information must be reflected on the band such as the deceased's name, date of removal, and date of death.  (*Id*.)  Certain removal procedures specific to particular locations must be followed.  These locations include "convalescent facility pick-ups," airport pickups, hospital removals, residence removals or house calls, coroner office removals, mortuary transfers, and mortuary drops.  (*Id*. at 8-18.)  "Absolutely no deviation" from the procedures are permitted.  (*Id*. at 15, 18, 21.)

**D.     Serenity's Operations**

After the reclassification of Serenity's drivers from employees to independent contractors, drivers performed the same work they did as employees but were required to (1) obtain a business license, (2) purchase liability insurance and auto insurance, (3) lease vehicles owned by Serenity or provide their own van-like vehicle, and (4) pay for fuel, maintenance, and required supplies including gurneys and sheets.  (Dkt. Nos. 225-4 at 18:6-7; 225-4 at 8:19-22, 10:8:17, 11:5-9, 13:24-14:4, 14:21-15:16; 225-5 at 16:15-17:19, 55:8-13; 225-18 at 5.)  Serenity provides the dispatch radio system, the forms and instructions from individual funeral homes (the "Mortuary Service Book"), and keys to access the funeral homes (the "mortuary keys").  (Dkt. Nos. 225-5 at 20:1-16; 225-36.)  New drivers receive a one-week training at Serenity's facility as well as training in the field via "ride-alongs" and assists with other drivers.  (Dkt. No. 124-8 ¶ 6.)

Mr. Friedel issues the driver schedule every 90 days and reserves the right to change the schedule with 24-hour notice to drivers, and to call other drivers if the scheduled driver is unavailable to perform the removal.  (Dkt. Nos. 224-4 at 36:9-17, 40:17-41:25; 225-31.)  Drivers are required to comply with the schedule made by Mr. Friedel.  (Dkt. No. 225-6 at 12:10-11.)

Drivers can only swap shifts with another driver who is not already scheduled to work that shift. (Dkt. No. 225-3.)

While drivers have the option to refuse calls, some drivers have been verbally reprimanded for doing so. (Dkt. No. 225-15 at 10:3-11.) These drivers feel they do not have the option to turn down calls because they are continuously called by Serenity's dispatch staff, and sometimes Mr. Friedel, and informed that no other drivers can take the call. (Dkt. No. 225-12 at 8:20-9:4.) Sometimes drivers receive a call from dispatch, respond with a pass, but dispatch continues to send the call. (*Id*. at 9:4-6.) Drivers accept calls the "majority of the time" because they receive "threatening phone calls" from Mr. Friedel; anytime a driver refuses a call they expect a call from Mr. Friedel. (Dkt. No. 225-10 at 6:21-7:7.)

Drivers are scheduled for 24-hour shifts from 9am to 9am the following day, five days per week, and are paid on a flat, per call rate. (Dkt Nos. 225-6 at 12:10-11; 225-17; 225-39 ¶ 10.) Drivers average three to five calls per shift, with some drivers completing as many as 6-10 calls per shift. (Dkt. Nos. 225-39 ¶ 11; 225-41.) Calls typically take 45 minutes to four hours to complete, but can take longer. (Dkt. No. 225-4 at 46:19-47:3.) Drivers sometimes travel long distances to locations such as Los Angeles, Fresno, San Diego, and Bakersfield. (Dkt. Nos. 225-6 at 16:8-14; 225-8 at 7:8-8:11.) Drivers are required to respond to calls on the radio system within five minutes and be on-site at the location in 45-75 minutes. (Dkt. Nos. 225-27 at 2; 225-33.)

Drivers, at their discretion, can arrange their own mealtimes by notifying Serenity of their unavailability. (Dkt. No. 225-5 at 51:19-21.) Serenity does not advise drivers whether they should take a meal period, Serenity has no written meal or rest period policies, and there is no policy or practice of paying drivers a premium for missed meal periods. (Dkt. No. 225-5 at 52:22-53:20.)

Serenity clients never directly contact Serenity drivers to pick up or deliver a decedent; instead, clients call Serenity who in turn dispatches drivers. (Dkt. No. 124-8 ¶ 16.) Serenity drivers are provided with a radio system through which Serenity contacts drivers. (Dkt. No. 225-5 at 18:3-24.) Serenity also communicates with drivers via email, text, and their cell phones. (*Id*.) Drivers complete invoice forms for the removals they perform which reflect the codes the drivers

are required to report to Serenity, including on-scene time, transport time, and availability for another call, etc. (Dkt. No. 124-8 ¶ 17.) If a client makes a complaint about a Serenity driver, it is "common procedure" for Mr. Friedel to demand a written report from the driver. (Dkt. No. 225-5 at 27:19-22.)

Serenity clients do not directly compensate drivers; instead, clients pay Serenity a flat fee for pick-up and delivery services based on the prices set forth in the parties' contract. (Dkt. No. 124-8 ¶ 28.) Drivers are not allowed to discuss prices with clients. (Dkt. No. 225-5 at 43:4-9.) Drivers receive between approximately $50 to $80 for each local removal, and more for long distance trips. (Dkt. No. 225-17.) Between January 2011 and December 2016, drivers were also reimbursed for each mile driven in excess of 30 miles and since January 2017 each mile driven in excess of 20 miles. (Dkt. No. 234-2 ¶ 3.) Over the years the reimbursement amount has ranged from $0.65 to $1.50 per mile. (*Id.*)

Drivers submit their invoices along with a billing sheet every Wednesday and Sunday. (Dkt. No. 225-5 at 44:19-45:1.) Using the invoices, Serenity pays its drivers twice per month. (*Id.* at 45: 2-14.) Drivers receive a check based on the number of calls completed; drivers do not receive a wage statement reflecting total hours and/or overtime worked. (Dkt. No. 225-5 at 51:1-52:7.) Drivers do not receive extra compensation for work over eight hours per day or 40 hours per week. (*Id.*)

**PROCEDURAL HISTORY**

Plaintiffs initiated this action in Alameda County Superior Court on June 12, 2014 alleging that Serenity Transportation and Mr. Friedel violated certain provisions of the California Labor Code. (Dkt. No. 1.) While the case was pending in state court, Plaintiffs amended the complaint to add two defendants and a claim under the FLSA. SCI thereafter removed the case to federal court. Plaintiffs then filed a Second Amended Complaint ("SAC") adding Plaintiff Aranda and naming Lifemark Group Inc. ("Lifemark"), SCI California, and the County of Santa Clara (the "County") as additional defendants. Following the filing of Plaintiffs' Fourth Amended Complaint, the Court denied Defendants' motion to dismiss. (Dkt. No. 59 and 69.) The parties later stipulated to allow Plaintiffs to file a Fifth Amended complaint ("FAC") to substitute Gary

1    Johnson for Anthony Aranda as a proposed class representative.  (Dkt. Nos. 119 and 120.)

2         The operative FAC includes ten causes of action under federal and California labor law

3    including: (1) unpaid overtime in violation of the FLSA, (2) failure to pay minimum wage in

4    violation of California Labor Code §§ 1194, 1197, 2753, 2810.3 and IWC Wage Order No. 9, (3)

5    failure to pay overtime in violation of the California Labor Code §§ 510, 1194, 2753, 2810.3 and

6    IWC Wage Order No. 9, (4) failure to reimburse business expenses in violation of California

7    Labor Code §§ 2802, 2753, (5) failure to provide meal periods in violation of California Labor

8    Code §§ 226.7, 512, 2810.3, 2753 and IWC Wage Order No. 9, (6) failure to permit rest breaks in

9    violation of California Labor Code §§ 226.7, 2753, 2810.3 and IWC Wage Order No. 9, (7) failure

10   to furnish accurate wage statements in violation of California Labor Code §§ 226, 226.3, 1174,

11   2753, (8) waiting time penalties for violations of California Labor Code §§ 201, 202, 203, and

12   2753, (9) unfair business practices in violation of California Business and Professions Code §

13   17200, and (10) civil penalties under the Private Attorney General Act ("PAGA"), California

14   Labor Code § 2699, et seq.  (Dkt. No. 121.)  The gravamen of Plaintiffs' claims is that Serenity

15   misclassified drivers as independent contractors instead of employees, and therefore Defendants

16   have denied them the benefits of federal and California wage-and-hour laws.  (*Id.*)

17        Plaintiffs moved for conditional certification of their FLSA claim which the Court granted.

18   (Dkt. No. 84.)  The parties then submitted to a stipulated 216(b) notice that the Court approved

19   and notice was issued to the putative class members.  (Dkt. Nos. 86 and 87.)  Plaintiffs later

20   moved to invalidate releases Defendants had obtained from certain FLSA class members and for a

21   corrective notice.  (Dkt. No. 104.)  The Court granted Plaintiffs' motion and issued a final

22   corrective notice that was mailed to all former and current Serenity drivers.  (Dkt Nos. 198 and

23   206.)

24        The parties have filed a series of motions for summary judgment.  The Court granted the

25   County's motion and dismissed the County from the action.  (Dkt. No. 172.)  The Court granted

26   SCI's partial motion on the theory of joint employer liability but denied SCI's motion as to

27   Plaintiffs' Labor Code Section 2810.3 claim.  (Dkt. Nos. 172 and 175.)

28        Six additional motions for summary judgment are currently pending.  Plaintiffs filed two

motions (Dkt Nos. 259 and 260), SCI filed one motion (Dkt. No. 201), SCI and SCI California filed one motion (Dkt. No. 249), David Friedel filed one motion (Dkt. No. 256), and Serenity filed one motion (Dkt. No. 262).  The Court heard oral argument on June 12, 2018 for Plaintiffs' motion for class certification as well as the two SCI and SCI California motions for summary judgment.   The remaining four motions for summary judgment shall be heard on September 6, 2018.  (Dkt. No. 266.)

Fact discovery closed on May 10, 2018.  (Dkt. No. 222.)  Trial is set for December 3, 2018.  (*Id.*)

## LEGAL STANDARD

"Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court."  *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017).  To succeed on their motion for class certification, Plaintiffs must satisfy the threshold requirements of Federal Rule of Civil Procedure 23(a) as well as the requirements for certification under one of the subsections of Rule 23(b).  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).  Rule 23(a) provides that a case is appropriate for certification as a class action if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "[A] party must not only be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."  *Comcast v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks and citation omitted).

## DISCUSSION

Plaintiffs seek to certify the following class as to the Serenity Defendants: "All persons

who have worked as independent contractor-classified Serenity Drivers and/or Technicians in the State of California between January 1, 2011 through the date of class certification" (the "class"); and the following subclass as to the SCI Defendants: "all persons from the class who were made available to SCI/SCI Cal between January 1, 2015 through class certification" (the "subclass"). (Dkt. No. 225 at 2:11-16.)

The Court will first address certification as to the Serenity class, and then as to the SCI subclass.

## I.   CLASS CERTIFICATION AS TO THE SERENITY DEFENDANTS

### A.   Plaintiffs Have Satisfied Rule 23(a)

The Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

#### 1.   *Numerosity*

A putative class satisfies the numerosity requirement "if the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Impracticability is not impossibility, and instead refers only to the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (citation omitted). "While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 526 (N.D. Cal. Nov. 27, 2012).

Plaintiffs estimate that the class contains approximately 85 drivers, making it impractical to bring all class members before the court on an individual basis. Serenity does not dispute this contention. (*See* Dkt. No. 234 at 14:23-25.) Accordingly, Plaintiffs have established the class is sufficiently numerous.

#### 2.   *Typicality*

Rule 23(a)(3) also requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality refers to the nature of the claim or defense of the class representative and not on facts surrounding the claim or defense." *Hunt v. Check Recovery Sys., Inc.*, 241 F.R.D. 505, 510 (N.D. Cal. Mar. 21, 2007) (citing *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted). The typicality requirement ensures that "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).

Plaintiffs' claims are typical of the class because they arise out of Serenity's policy of uniformly treating the class members as independent contractors and having them sign nearly identical independent contractor agreements. *See, e.g.*, *Ellsworth v. U.S. Bank, N.A.*, No. C 12-02506-LB, 2014 WL 2734953, at *15 (N.D. Cal. June 13, 2014) (concluding the plaintiffs' claims are typical because "[t]he allegations here are that Plaintiffs had identical form contracts, and the policies were applied uniformly"); *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *5 (N.D. Cal. Sept. 5, 2008) (finding typicality where the plaintiffs "presented evidence that Cardinal had a corporate practice of classifying delivery drivers as independent contractors and that this practice was common to the overwhelming majority of Cardinal delivery drivers").

Serenity's arguments to the contrary are unpersuasive. First, it contends "there is ample evidence from the other drivers refuting the class representatives' assertions." (Dkt. No. 243 at 16:5-6.) Factual disputes as to whether certain drivers took meal and rest breaks, had their expenses reimbursed, or were paid a minimum wage goes to the merits of the claims, not whether the named Plaintiffs' claims are typical of the class. Second, Serenity states—without citation to any evidence—that some drivers within the proposed class definition are managers. (Dkt. No. 234

at 16:8-10.)  However, Serenity has not argued that the named Plaintiffs were managers exempt from wage and hour laws nor has Serenity provided any evidence to support the conclusion that the manager exemptions under the California Labor Code apply to the alleged manager class members, as discussed below.  Thus, there is nothing atypical about the named Plaintiffs' claims or defenses. Accordingly, the typicality requirement is met.

### 3.  *Adequacy of Representation*

Rule 23(a)(4) imposes a requirement related to typicality: that the class representative will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Court must ask: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the actions vigorously on behalf of the class?"  *Evon*, 688 F.3d at 1031 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)); *see also Brown v. Ticor Title Ins.*, 982 F.2d 386, 290 (9th Cir. 1992) (noting that adequacy of representation "depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive") (citations omitted); Fed. R. Civ. P. 23(g)(1)(B) (stating that "class counsel must fairly and adequately represent the interests of the class").

Defendants do not challenge the adequacy of representation.  Given Plaintiffs (1) do not have any conflicts of interest with other class members, (2) Plaintiffs' counsel is highly experienced in complex class action wage and hour litigation; and (3) Plaintiffs' counsel has already devoted 2,800 hours to protect the interests of the class, the adequacy of representation requirement is satisfied.  (*See* Dkt. Nos. 225-3 ¶¶ 4, 5; 225-38 ¶¶ 2-7.)

### 4.  *Commonality*

"[C]ommonality requires that the class members' claims 'depend on a common contention such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke.'"  *Mazza*, 666 F.3d at 588-89 (quoting *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011)).  "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation."  *Id.* (internal quotation marks and citation omitted).  The commonality

1    requirement is construed permissively and is "less rigorous than the companion requirements of

2    Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. To that end, the commonality requirement can be

3    satisfied "by even a single question." *Trahan v. U.S. Bank Nat'l Ass'n*, No. C 09-03111 JSW,

4    2015 WL 74139, at *5 (N.D. Cal. Jan. 6, 2015). Ultimately, commonality "requires the plaintiff to

5    demonstrate the class members have suffered the same injury." *Evon*, 688 F.3d at 1029 (quoting

6    *Dukes*, 131 S. Ct. at 2551).

7         Here, Plaintiffs satisfy the commonality requirement because whether Serenity

8    misclassified its drivers as independent contractors rather than employees under California law is a

9    common question underlying every cause of action that is capable of common resolution for the

10   class. *See, e.g.*, *Bowerman v. Field Asset Servs., Inc.*, No. 13-cv-00057-WHO, 2015 WL 1321883,

11   at *14 (N.D. Cal. Mar. 24, 2015) ("*Bowerman I*") ("[W]hether putative class members were

12   misclassified under California law as independent contractors instead of employees . . . is a

13   common question that is capable of a common resolution for the class.") (citations omitted);

14   *Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 606 (N.D. Cal. Nov. 20, 2014) (holding that the

15   "threshold issue" of whether plaintiffs were employees or independent contractors was sufficient

16   to establish commonality); *Norris-Wilson v. Delta-T Group, Inc.*, 27 F.R.D. 596, 604 (S.D. Cal.

17   Sept. 30 2010) (finding a common question where "all members of the putative class were hired

18   by [defendant] and classified as independent contractors pursuant to the same [agreement]" and

19   "the merits of that classification turn on the same set of circumstances"); *Smith*, 2008 WL

20   4156364, at *5 (finding a common question "whether [ ] putative class members were improperly

21   classified as independent contractors in violation of California law").

22        Defendants' arguments to the contrary are unpersuasive. First, they argue there is no

23   company-wide policy requiring drivers to refrain from personal activities or not take meal and rest

24   breaks, and that it has provided evidence that drivers were able to eat, rest, and opt-out of dispatch

25   assignments. None of this evidence, however, suggests that the question of the proper

26   classification of the drivers is not a common question; this evidence is more relevant to whether

27   common questions predominate on, for example, the meal and rest break claims.

28        Second, Serenity argues that not all the drivers suffered losses under California Labor

13

Code Section 2802 involving reimbursement of expenses because not all drivers incurred vehicle expenses or paid for items that warrant reimbursement. However, whether certain drivers incurred more expenses than others does not make whether Serenity properly classified them as independent contractors an individual question.

Third, Serenity again argues that many of the proposed class members worked as managers and are therefore exempt from certain causes of action. Again, this argument is unsupported by citation to any evidence and, in any event, it has nothing to do with whether the named plaintiffs were properly classified and therefore whether non-manager employees were properly classified.

### 5. *Ascertainability*

Finally, Serenity argues that Plaintiffs' meal, rest breaks, expenses, and overtime claims are not ascertainable because these claims require the review of individual records. This argument is not about ascertainability, but rather predominance of common questions. Regardless, "the language of Rule 23 does not impose a freestanding administrative feasibility prerequisite to class certification." *Briseno*, 844 F.3d at 1126. Thus, Plaintiffs are not required to "demonstrate that there is an administratively feasible way to determine who is in the class in order for the class to be certified." *Id.*

In sum, the four Rule 23(a) requirements are satisfied.

## II.     Rule 23(b)

### A.     *Predominance of Common Questions*

To meet the predominance requirement of Rule 23(b)(3), "the common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation marks and alterations omitted). The predominance inquiry "presumes that there is commonality and entails a more rigorous analysis[.]" *Hanlon*, 150 F.3d at 1022.

"Considering whether 'questions of law or fact common to the class predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). "[T]he Court identifies the substantive issues related to plaintiff's claims . . . then considers the proof necessary to establish each element of the claim

or defense; and considers how these issues would be tried." *Gaudin v. Saxon Mortg. Servs., Inc.*, 297 F.R.D. 417, 426 (N.D. Cal. Aug. 5, 2013) (citation omitted).

### 1. *Employee-Independent Contractor Misclassification Claim*

Two tests are relevant to the analysis of whether Serenity drivers are properly classified: (1) the California common law test under *Borello*, and (2) the "ABC Test" under IWC wage orders.

### a. The *Borello* Test

Plaintiffs' employment status is governed by the multi-factor test set forth in *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal.3d 341 (1989). *See Alexander v. FedEx Ground Package System, Inc.*, 765 F.3d 981, 988 (9th Cir. 2014); *see also Linton v. DeSoto Cab Co.*, 15 Cal.App.5th 1208, 1219 (2017) (holding that the *Borello* test applies to wage and expense-related employee issues, not just workers compensation). As the drivers performed delivery services for Serenity, Serenity will bear the burden of proving that the drivers were independent contractors rather than employees. *See Ruiz v. Affinity Logistics, Corp.*, 754 F.3d 1093, 1100 (9th Cir. 2014); *Linton*, 15 Cal.App.5th at 1221. "'The principle test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.'" *Alexander*, 765 F.3d at 988 (quoting *Borello*, 48 Cal.3d at 350); *see also Ayala v. Antelope Valley Newspapers, Inc.*, 59 Cal.4th 522, 532 (2014) ("the hirer's right to control the work is the foremost consideration in assessing whether a common law employer-employee relationship exists"). Courts also consider the following secondary factors:

> a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

*Alexander*, 765 F.3d at 989 (quoting *Borello*, 48 Cal.3d at 351); *see also Linton*, 15 Cal.App.5th at 1219 (holding that the *Borello* secondary factors derived from the Restatement of Agency apply).

"For purposes of class certification, the issue is whether these factors may be applied on a classwide basis, generating a classwide answer on the issue of employee status, or whether the determination requires too much individualized analysis." *Narayan v. EGL, Inc.*, 285 F.R.D. 473, 478 (N.D. Cal. Sept. 7, 2012); *see also Ayala*, 59 Cal.4th at 533 ("A court evaluating predominance 'must determine whether the elements necessary to establish liability [here, employee status] are susceptible to common proof or, if not, whether there are ways to manage effectively proof of any element that may require individualized evidence.'") (citation omitted).

### i.    Right to Control

"Certification of class claims based on the misclassification of common law employees as independent contractors generally does not depend upon deciding the actual scope of a hirer's right of control over its hirees." *Ayala*, 59 Cal.4th at 537. "The relevant question is whether the scope of the right of control, whatever it might be, is susceptible to classwide proof." *Id*. The question is "not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." *Id*. at 533 (emphasis in original). As the job description for all drivers is uniformly set forth in the Independent Contractor Agreement and all drivers sign essentially the same Agreement, "the degree of control [the contracts] spell[ ] out is uniform across the class." *Ayala*, 59 Cal.4th at 534; *see also Villalpando*, 303 F.R.D. at 608 ("[U]niform contracts are a significant focus of the 'right to control' inquiry."). "At the certification stage, the importance of a form contract is not in what it says, but that the degree of control it spells out is uniform across the class." *Ayala*, 59 Cal.4th at 534.

Here, the Independent Contractor Agreement that all drivers sign and Serenity policies that all drivers are required to follow control most aspects of the drivers' work. Serenity uniformly controls how deliveries are made. Each driver must purchase a "van-like" vehicle or lease one from Serenity. Serenity retains the right to inspect the vehicles. Serenity requires that the vehicles be free of any smoke odors. Serenity also prohibits drinking or eating in the vehicles. And all drivers must arrive within a certain amount of time of receiving a dispatch.

Serenity also uniformly has the right to control the drivers' appearance. Drivers must wear a black suit, light shirt, black shoes, and be "conservatively groomed." Drivers who do not wear

the uniform can be temporarily removed from the schedule.

All Serenity drivers also participate in a one-week training program conducted on the Serenity premises and in the field via ride alongs and assisting other drivers. Each driver is required to abide by Serenity's policies, which contain specific instructions on how to interact with individuals at hospitals and funeral homes. The policies also describe the procedures drivers are required to follow at each kind of location: hospital, mortuary, funeral home, residential homes, etc.

Serenity also has significant, uniform control over when drivers work. Mr. Friedel creates the schedule himself. Drivers can request a certain schedule but there is no guarantee they will receive that schedule. Mr. Friedel issues the schedule every 90 days. Any driver who wants to change shifts must find someone to cover for them and this change must be approved by Serenity. Mr. Friedel and Serenity not only uniformly control which days drivers are required to work, but also for how long and the exact hours – all drivers are required to work for 24 hours beginning at 9am until the following morning at 9am. If drivers want a break they must request the time off, even if it is a few hours. These scheduling practices are uniformly applied across the class.

Serenity also uniformly controls pay. Serenity determines how much to charge clients and how much to pay drivers per delivery. Drivers are required to accept this payment schedule. Changes are only made upon written notice by Serenity. Each driver is expressly prohibited from talking to clients about pay.

Accordingly, Serenity's right to control the manner and means of the drivers' work may be proved on a class-wide basis.

ii.     Secondary Factors

The secondary *Borello* factors can also be resolved through common proof. First, the right to terminate can be determined on a classwide basis, as the uniform Independent Contractor Agreement includes termination provisions. Second, no special skill is required to drive other than a driver's license and Serenity does not require its drivers to have prior mortuary delivery service experience. Similarly, common proof is available as to who provided the instrumentalities, tools, and place of work, since drivers were contractually obligated to use certain Serenity equipment—

17

1  such as the dispatch radio system—and to obtain other equipment for themselves—including a

2  "van-like" vehicle, insurance, a gurney and other specialized delivery products.  Whether drivers

3  are engaged in a distinct occupation or business from Serenity can also be resolved on a class basis

4  because Serenity's entire business is the mortuary transportation services that drivers provide –

5  there is no evidence that any drivers hired subcontractors or performed the services differently

6  from other drivers.  Finally, the method of payment is also a common issue as the drivers were

7  uniformly paid per delivery; there is no evidence that some drivers received different amounts of

8  pay for the same job or a different method of pay.

9         Accordingly, common questions predominate the right to control and secondary *Borello*

10  factors analysis.

11                           b.       The ABC Test

12         The California Supreme Court recently adopted the "ABC Text" for determining a

13  workers' proper classification for purposes of the wage orders.  *Dynamex Operations West, Inc. v.*

14  *Superior Court*, 4 Cal.5th 903, at *7 (April 30, 2018).  Under this test, unless Serenity establishes:

15  "(A) that the worker is free from the control and direction of the hiring entity in connection with

16  the performance of the work, both under the contract for the performance of the work and in fact,

17  (B) that the worker performs work that is outside the usual course of the hiring entity's business,

18  and (C) that the worker is customarily engaged in an independently established trade, occupation,

19  or business, the worker should be considered an employee and the hiring business an employer

20  under the suffer or permit to work standard in wage orders," the worker should be classified as an

21  employee.  *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903, at *7 (April 30,

22  2018).  Common questions predominate under this test as well.

23         First, as discussed above, Serenity exercises uniform control over the manner and means

24  of the drivers' work.  Further, whether Plaintiffs provide services within Serenity's usual course of

25  business is subject to common proof because Serenity defines itself as a mortuary transportation

26  service and all drivers perform the same work: mortuary delivery services. There is no evidence

27  that Serenity provides other services or that drivers are engaged in other kinds of work.  Third,

28  because drivers perform the same work, the question of whether drivers are customarily engaged

18

in an independently established trade, occupation, or business can also be resolved on a class-wide basis.

In sum, common questions predominate the misclassification issue under the *Borello*, and, the extent applicable, ABC test.

## 2. *Minimum Wage and Overtime*

Plaintiffs allege Serenity violated minimum wage and overtime regulations because drivers are compensated on a piece-rate per delivery basis but not for their entire 24-hour on-call shift time. "California courts considering whether on-call time constitutes hours worked have primarily focused on the extent of the employer's control." *Mendiola v. CPS Sec. Sols., Inc.,* 60 Cal. 4th 833, 840 (2015). Various factors are relevant to an employer's control during on-call time: "(1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time." *Id*. at 841 (citing *Owens v. Local No. 169*, 971 F.2d 347, 351 (9th Cir. 1992)). "Courts have also taken into account whether the '[o]n-call waiting time ... is spent primarily for the benefit of the employer and its business.'" *Id.* (internal citation omitted).

Common questions predominate the issue of whether the drivers should be compensated for their on-call time. Serenity imposes a uniform geographical requirement that drivers must remain within approximately 75 minutes from any removal location for the entire duration of their shift. Drivers are uniformly obliged to respond to a dispatch call within five minutes. To change shifts each driver must find another driver to swap with. If a driver wants to take time off during a shift he can only request relief from a dispatcher and wait to see if another driver is available. If relieved while on shift, all drivers must specify how long they plan to be offline and remain no more than 75 minutes away from any removal site. Further, there is uniformly no on-premise living requirement. As Serenity concedes, these requirements apply to all drivers. (Dkt. No. 269 at 18-21.) Thus, common questions predominate the issue of whether the drivers' on-call time is

compensable.  *See, e.g., Mendiola*, 60 Cal. 4th at 838 (noting that the class had been certified in the trial court).

Defendants respond by citing summary judgment cases to argue, in effect, that the drivers could do "everyday life things" during their on-call time and therefore it is not compensable.  *See, e.g., Berry v. County of* Sonoma, 763 F.Supp. 1055 (N.D. Cal. 1991); *Henry v. Med-Staff, Inc.*, 2007 U.S. Dist. LEXIS (C.D. Cal. July 5, 2007).  But the question is not whether Plaintiffs will ultimately prevail; the question is whether Serenity imposed uniform on-call obligations on its drivers such the question of whether on-call time is compensable can be decided as to all drivers in one trial.  In *Chavez*, 2015 U.S. Dist. LEXIS 188220, in contrast, the trial court held that the employer's policy as to on-call time was not generally followed and thus individual questions predominated.

If the on-call time is compensable, common questions predominate Plaintiffs' minimum wage and overtime claims; that is, the question of whether Plaintiffs received less than the minimum wage when they were paid per delivery and whether they were entitled to overtime wages when they worked in excess of eight hours.  Each driver is required to work 24-hour shifts from 9am to 9am.  Serenity uniformly paid drivers on a piece rate basis for each removal over a 24-hour on-call shift.  No driver received extra pay for working beyond eight hours a day or 40 hours per week.  Assuming that the on-call time is compensable, whether this uniform practice violated minimum wage and overtime protections can be decided on a class-wide basis; the individual calculation of damages for each driver does not defeat class certification.

If on-call time is *not* compensable, however, then Plaintiffs' underlying minimum wage and overtime claims are not suitable for class certification because the actual number of hours worked by each driver other than on-call time must be determined on an individual basis by reviewing each driver's dispatch records, deciding when that driver's on-call time ended at any particular time during any particular shift, and then determining whether that particular driver worked in excess of eight hours or whether the per delivery fee was less than the minimum wage that driver was entitled to for the number of hours the driver worked.  Thus, if the trier of fact finds the on-call time not compensable, the putative class will still have their overtime and

20

minimum wage claims based on their time spent working and not on call, but such claims must be brought and adjudicated individually.

### 3. *Meal and Rest Breaks*

California law prohibits an employer from employing "any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes." IWC Wage Order No. 9, §11(A); Cal. Labor Code §512. Similarly, employers "shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof." IWC Wage Order No. 9, §12(A).

"An employer has an obligation to relieve its employee of all duty, permit the employee to take an uninterrupted 30-minute break, and to not impede or discourage the employee from doing so." *Id*. "Similarly, an employer has an obligation to provide a rest break, and if the employer fails to do so, the employer cannot claim the employee waived the break." *Id*. "[W]hen an employer has not authorized and not provided legally required meal and/or rest breaks, the employer has violated the law and the fact that an employee *may* have actually taken a break or was able to eat food during the work day does not show that individual issues will predominate in the litigation." *Bradley v. Networkers Int'l, LLC*, 211 Cal.App.4th 1129, 1151 (2012) (emphasis in original).

Whether Plaintiffs' meal and rest break claims are certifiable also turns on whether on-call time is compensable. If on-call time is compensable, then the meal and rest break claims can be adjudicated on a class-wide basis because the common question is whether Serenity should have authorized a certain number of meal and rest breaks over the course of the drivers' 24-hour shift. Serenity admits that it does not have a common meal or rest break policy. Mr. Friedel testified that he does not encourage or discourage drivers from taking meal or rest breaks. Further, while drivers are instructed to take meal breaks at their discretion, Mr. Friedel admits there is no policy requiring drivers to take meal breaks and drivers are not compensated for missed meal breaks. Because Serenity did not authorize meal and rest breaks Plaintiffs had no opportunity to decline to

take them.  *See Brinker Restaurant Corp. v. Superior Court,* 53 Cal.4th 1004, 1033 (2012); s*ee also Benton v. Telecom Network Specialists, Inc.*, 220 Cal.App.4th 701, 725-726 (2013) (concluding the trial court "improperly focused on whether individualized inquiry would be required to determine which technicians had missed their meal and rest periods" rather than "focusing on whether plaintiffs' theory of liability—that [Defendant] violated wage and hour requirements by failing to adopt a meal and rest period policy—was susceptible to common proof").

        Serenity misstates the law when it argues that absent evidence showing Serenity had a policy of prohibiting drivers from taking meal or rest breaks, class certification should be denied. (Dkt. No. 234 at 28:22-24.)  As discussed above, Serenity had an affirmative duty to authorize and provide rest and meal breaks and its concession that there was no policy is sufficient for class certification purposes. As the *Bradley* court stated in certifying the meal and rest break claim there:

> On plaintiffs' class certification motion, it was undisputed that (1) Networkers did not have a policy permitting or authorizing meal or rest breaks for the proposed class members; (2) Networkers did not know whether these workers took the required breaks; and (3) Networkers did not maintain any records reflecting when (or if) the workers took meal or rest breaks. The evidence also showed that after Networkers formally converted these workers to "employee" status, it did not implement any rest or meal break policy, or give any notification to the workers about their entitlement to take meal or rest breaks.
>
> Under *Brinker*, plaintiffs' legal challenge to these uniform practices involves common factual and legal issues that are amenable to class treatment. "An employer is required to authorize and permit the amount of [rest and meal] break time[s] called for under the wage order for its industry. If it does not ... it has violated the wage order and is liable." Claims alleging a "uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."

*Bradley v. Networkers Internat*., *LLC*, 211 Cal. App. 4th 1129, 1149 (2012), as modified on denial of reh'g (Jan. 8, 2013).  The exact same analysis applies here.  Tellingly, Defendants make no effort to distinguish *Bradley*; indeed, although Plaintiffs cited it in support of class certification, Defendants' oppositions ignore the case all together.

The cases Defendants do cite are inapposite as they concerned the application of the law to meal and rest break policies that were already in place, not a common *lack* of a policy. *See In re: Autozone, Inc.*, No. 3:10-md-2159-CRB, 2016 WL 4208200, at *10-13 (N.D. Cal. Aug. 10, 2016) (concluding class decertification was not appropriate because Autozone's policy was not in place throughout the entire class period); *Ordonex v. Radio Shack, Inc.*, No. CV 10-7060-CAS (JCGx), 2013 WL 210223, at *7 (C.D. Cal. Jan. 17, 2013) (concluding individual questions predominated because the defendant's written meal break policy complied with California law and some of the putative class members claimed they were provided meal breaks in accordance with the policy and others asserted they were not); *Washington v. Joe's Crab Shack*, 271 F.R.D. 629, 641 (N.D. Cal. Dec. 13, 2010) (similarly concluding that individualized analyses were required as to why certain workers took breaks and others did not under the defendant's written policy to provide a meal period of a least 30 minutes and a 10 minute rest period every four hours).

SCI also contends that individual questions predominate because the Labor Code section 512 meal break requirement does not apply where an employee has lengthy breaks between work periods or shifts. The case it cites, however, involves breaks between shifts, that is, uncompensable time. *See Culley v. Lincare*, 236 F.Supp.3d 1184, 1190 (E.D. Cal. 2017). Here, there is one continuous 24-hour shift and there is a common issue of whether that entire shift is compensable. If so, the meal break requirements apply. And it is undisputed that Serenity uniformly did nothing to ensure that the drivers were able to take meal and rest breaks.

Accordingly, if the trier of fact finds that on-call time is compensable, common issues predominate the meal and rest break claims.

### 4.     *Expense Reimbursement*

Plaintiffs seek reimbursement for their vehicles, fuel, maintenance, mandatory insurance, supplies, and deductions from pay. "An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties..." Cal. Labor Code § 2802(a).

Serenity requires all drivers to purchase "van-like" vehicles or lease Serenity owned vehicles, obtain a business license, purchase insurance, pay for fuel and vehicle maintenance, obtain specialized equipment such as sheets and gurneys, and deducts certain costs from drivers' pay – such as any damage to the radio dispatch system. These requirements were uniformly applied to each driver. Similarly, the amount of mileage reimbursement, which varied over time, was applied uniformly to all drivers. Whether each of these categories was a necessary expense is subject to common proof.

Serenity's lament that some drivers did not incur vehicle or mileage expense when they were serving as "an assist" does not change the predominance analysis. Whether class members incurred a particular expense at a particular time is a question of damages not liability. And Serenity's argument that the mileage reimbursement rates vary because some drivers were reimbursed for every mile in excess of 20 miles and other drivers in excess of 30 miles fails because the change in mileage reimbursement was a change that was common to the entire class: between January 2011 and December 2016 drivers were reimbursed for each mile driven in excess of 30 miles and reimbursed for each mile driven in excess of 20 miles since January 2017. Further, Serenity concedes that it has a common policy of charging drivers for a variety of deductions including "filing of late paperwork and other similar types of deductions." (Dkt. No. 234 at 25.) Whether Serenity should reimburse those class members who incurred those expenses is a common question. Serenity offers no evidence or argument as to why the liability answer will differ among class members.

Serenity's heavy reliance on *Guifu Li v. A Perfect Day Franchise, Inc*., 2011 WL 4635198 (N.D. Cal. Oct. 5, 2011) at oral argument is misplaced. Serenity contends that *Guifui Li* holds that certification was not appropriate because "not all expenses have been incurred by all potential plaintiffs." (Dkt. No, 234 at 6:16-25.) Wrong. In *Guifu Li* the court concluded the Section 2802 claim was not susceptible to resolution by common proof because the complaint did not "narrow Plaintiffs' claim to any specific expenses or category of expenses, and as a result, Plaintiffs claim reimbursement over a wide and divergent range of items" which in turn necessitated individual inquiries. *Id*. at *14. Further, there was a factual dispute as to what the defendant's

24

reimbursement policy was.  *Id.*  Here, there is no such dispute: Serenity did not reimburse except for certain mileage reimbursement which was applied uniformly to all drivers.  Further, unlike *Guifi Li*, the Independent Contractor Agreement clearly specifies what drivers are required to obtain to perform their work and the claimed expenses are cabined.

Accordingly, common questions predominate Plaintiffs' expense reimbursement claim.

### 5. *Wage Statement and Waiting Time Violations*

If the drivers were employees and not independent contractors—a question the Court has already decided is subject to common proof—the wage statement and waiting time claims are also subject to common proof.  Accordingly, Plaintiffs' wage statement and waiting time claims are suitable for common resolution.

Serenity argues Plaintiffs' wage statement claim lacks common proof because there is "a significant dispute about the number of hours drivers worked."  But as the Court understands it, Serenity did not provide statements identifying *any* hours worked; thus, if the drivers are employees, Serenity violated the wage statement law regardless of how many hours any particular driver worked.  Serenity does not dispute this fact.  Indeed, in the cases Serenity cites the courts found the claim appropriate for certification. *See Guifi Li v. A Perfect Franchise, Inc.*, 2011 WL 4635198, at *14 (N.D. Cal. Oct. 5, 2011) (concluding class certification was appropriate because there was no company policy to provide wage statements); *Norris-Wilson*, 27 F.R.D. at 610 ("For the same reasons that claims for overtime pay can be adjudicated on a class-wide basis, then, claims alleging inadequate wage statements can also be so adjudicated.")

### B.  Superiority

Factors relevant to the superiority requirement include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "A consideration of these factors require the court to focus on the efficiency and economy elements of the class action so that cases allowed under subdivision (b)(3) are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir.2001) (internal citation omitted).

A class action will achieve economies of time, effort and expense and promote uniformity. There is no similar litigation already underway elsewhere that weighs against proceeding as a class, nor any reason not to try the class action in this District. Further, a class action is more manageable because several claims turn on Serenity's common policies or lack thereof, which can be proven through evidence that will be applicable to the entire class.

Defendants argue a class action is not superior because: (1) each driver will have to demonstrate he was not able to engage in personal activities or take breaks, (2) that the numbers of hours that Plaintiffs represent they spent on calls is "inflated and miscalculated" and based on a small sample of "cherry-picked" individuals that would "impermissibly skew the results," (3) individual civil actions are superior given that the availability of damages and attorneys' fees creates enough of an incentive for any person who truly feels aggrieved, and (4) a DLSE hearing would be superior as it "can be a quick procedure." (Dkt. No. 223 at 32-35.)

Defendants' arguments are unpersuasive. The Court has already addressed the first and second arguments by concluding that the question of whether the on-call time is compensable is a question common to the entire class. If the answer is no, the Court agrees with Defendants that individual questions would then predominate Plaintiffs' claims. If the answer is yes, then the individual questions are issues of damages not liability. *See Levy v. Medline*, 716 F.3d 510, 510 (9th Cir. 2013) (concluding "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)"). Further, Plaintiffs' claims turn on Serenity's on-call time policies, not the number of hours Plaintiffs spent on calls, and "uniform corporate policies will often bear heavily on questions of predominance and superiority." *In re Wells Fargo*, 571 F.3d at 959 (noting that "comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes"). Finally, individual lawsuits or a series of DLSE hearings are not superior because they would unnecessarily burden the judiciary and an

26

United States District Court
Northern District of California

administrative agency and be a less efficient method of resolving the claims. *See Hanlon*, 150 F.3d at 1023; *see also Valentino v. Carter-Wallace Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation.")

In addition to some of the arguments addressed above, SCI also argues a class action is not a superior form of adjudication because (1) one of the drivers, Mr. Goodman, does not want to be part of the class action and other drivers have pursued claims through the Labor Commissioner, and (2) damages will exceed several hundreds of thousands of dollars per class member. These arguments, too, are unpersuasive. Drivers such as Mr. Goodman who do not want to be part of the class action or who prefer to pursue their claims through the Labor Commissioner may opt out of the class action; no driver is required to participate as a member of the class. Further, while one of the named Plaintiffs, Mr. Curt Johnson, represents that he is owed over $200,000 dollars in damages, there is no evidence before the Court that each driver will be entitled to this amount, given the amount of recovery depends upon the length of time drivers worked for Serenity. Further, *Zinser v. Accufix Research Insitute Inc.*, concluded that class certification was not a superior method of adjudication, not only because of the amount in controversy for each putative class member, but also because the remaining superiority factors weighed against class certification. 253 F.3d 1180, 1191-1192 (9th Cir. 2001). Not so here.

* * *

Accordingly, Plaintiffs' motion for class certification as to the Serenity Defendants, including David Friedel, is GRANTED on the issues of (1) misclassification, (2) whether on-call time is compensable, (3) the expense reimbursement claim, and (4) and the wage statement, waiting time penalty and unfair competition claims to the extent they are derivative of any of these claims/issues. Should the trier of fact find that the on-call time is compensable, the overtime, minimum-wage, and meal and rest break claims (and any derivative claims) may proceed on a class-wide basis as well. If the trier of fact finds that it is not compensable, the drivers may still have valid overtime, minimum-wage and meal and rest break claims, but those claims must proceed on an individual basis.

## II.     CLASS CERTIFICATION AS TO THE SCI SUBCLASS

Plaintiffs also seek to certify the following subclass as to the SCI Defendants: "all persons from the class who were made available to SCI/SCI Cal between January 1, 2015 through class certification." (Dkt. No. 225 at 2:11-16.)

Plaintiffs argue that the SCI Defendants are liable under California Labor Code Section 2810.3, which states in relevant part "[a] client employer shall share with a labor contractor all civil legal responsibility and civil liability for all workers supplied by that labor contractor for…the payment of wages." Cal. Labor. Code § 2810.3(b). The SCI Defendants argue that "[p]enalties for waiting time or wage statement violations, or reimbursements for purported business expenses do not constitute 'wages,' and are not compensable under Section 2810.3." However, Plaintiffs are not seeking to hold the SCI Defendants liable for the expense reimbursement or wage statement claims; instead, they allege the SCI Defendants are liable under Section 2810.3 for the minimum wage, overtime, and meal and rest breaks claims. (Dkt. No. 269 at 47:17-24.) Therefore, the Court shall evaluate the motion for class certification as to the SDI Defendants as to only these claims.

## I.      Rule 23(a)

The SCI Defendants do not challenge numerosity or adequacy of counsel; instead, they argue that the subclass is overbroad, Plaintiffs cannot demonstrate commonality or typicality, individual issues predominate as to the on-call time and meal and rest break claims, and a class action is not a superior method of adjudication. The Court has already addressed most of the arguments above, but what the SCI Defendants characterize as the "scope" of the sub-class presents different questions.

SCI argues the subclass is overbroad because: (1) the compensation for missed meal and rest periods are not wages under Section 2810.3, and (2) the subclass is not limited to drivers who actually performed work for SCI, but also includes those who were merely made available to SCI.

### A.      Meal and Rest Periods

Labor Code Section 226.7(b) awards employees one hour of pay if their employer fails to

provide meal or rest breaks. Cal. Labor Code § 226.7(b). Plaintiffs argue that SCI is liable for that additional one hour of pay, if owed, pursuant to Labor Code Section 2810.3 and thus seek certification of their meal and rest break claims as to SCI. SCI opposes certification of the meal and rest break claims on the grounds that the additional one hour of pay required for a Section 226.7 violation is not a wage that triggers liability under Section 2810.3. SCI's opposition, however, is a merits argument rather than an argument as to why certification is not appropriate under Rule 23: SCI is not liable under Labor Code section 2810.3 for meal and rest break violations. It is thus more appropriately characterized as a summary judgment argument. That argument, however, presents a common question that applies equally to all drivers; thus, this issue is not a reason the proposed subclass cannot be certified.

### B.    Work Actually Performed

The SCI Defendants next argue that the proposed sub-class is too broad because it includes time the drivers were not performing removals for the SCI Defendants, and even drivers who never performed removals for the SCI Defendants. Plaintiffs respond that the SCI Defendants are responsible for the on-call time during which Plaintiffs were made available to SCI, but not for the time Plaintiffs were making deliveries for non-SCI entities.

Section 2810.3 provides that "[a] client employer shall share with a labor contractor all civil legal responsibility and civil liability for all workers supplied by that labor contractor for ... [t]he payment of wages." Cal. Lab. Code § 2810.3(b)(1). A "client employer" is defined as "a business entity, regardless of its form, that obtains or is provided workers to perform labor within its usual course of business from a labor contractor." Cal. Lab. Code § 2810.3(a)(1)(A). A "labor contractor" is defined as "an individual or entity that supplies, either with or without a contract, a client employer with workers to perform labor within the client employer's usual course of business." Cal. Lab. Code § 2810.3(a)(3). "'Usual course of business' means the regular and customary work of a business, performed within or upon the premises or worksite of the client employer." Cal. Labor Code § 2810.3(a)(6).

A plain reading of the statute does not support the broad relief Plaintiffs seek. Plaintiffs request that the Court read into Section 2810.3 liability for "gap time"-- time drivers spent waiting

for dispatch to send them on a call to any Serenity client, including SCI, but not the drivers' time actually delivering for other clients. However, the statute's definitions of "client employer," "labor contractor," and "usual course of business" each reference work that is *performed*. In particular, "usual course of business" means work "performed within or upon the premises or worksite of the client employer." The time a driver spends waiting for a call from dispatch to send the driver to a Serenity client is not work "performed on the premises or worksite" of SCI. Thus, the SCI defendants are not liable for work not performed on their worksite or premises, that is, they are not liable for wages owed for on-call time. To hold otherwise would mean that many entities could be held liable for the same on-call time; each Serenity client for whom a driver was available to be called for a removal would be liable for the wages Serenity owed the drivers for that time. Yet, there is nothing in section 2810.3 that suggests it contemplates such a scenario, that is, that more than one client employer can be held liable under the statute for the same owed wages.

Plaintiffs' reliance on the Court's earlier summary judgment order (Dkt. No. 175 at 3) is misplaced. In that Order the Court did not address a client employer's liability for work not performed on its premises or worksite; instead, the Court addressed whether SCI was exempt from Labor Code Section 2810.3 in its entirety because Serenity never "supplied" more than five workers to SCI at any given time. The Court held that it could not conclude as a matter of law that SCI was so exempt. The question now presented is different: given that SCI is not exempt from liability pursuant to section 2810.3(a)(1)(B)(ii), is it liable for wages for work not performed on its premises or worksite? As explained above, the plain language of the statute does not support such liability. In other words, a labor contractor may "supply" five or more workers to a business entity for purposes of section 2810.3(a)(1)(B)(ii) at any given time, but those workers may not be performing work upon the premises or worksite of the client employer during that given time.

To the extent there is an ambiguity in the statute, the statute's legislative history does not support the broad expansion of liability urged by Plaintiffs. *See Stanton v. Panish*, 28 Cal.3d 107, 115 (1980). The California legislature enacted Section 2810.3 in response to "an increase in the number of employers who are moving away from a traditional employment model towards a

business model that utilizes 'subcontracted' or 'contingent' workers." California Bill Analysis, A.B. 1897 Assem., 5/7/2014. The statute seeks to hold "client companies liable for serious violations of workers' rights, such as failure to pay wages, necessary contributions, and workers compensation, committed by their own labor suppliers, to workers on their premises." California Bill Analysis, A.B. 1897 Sen., 6/11/2014. The legislature noted that California's temporary workers "face a 50 percent higher risk for injury on the job and are twice as likely as regular workers to be stricken by heat exhaustion." *Id*.

The legislature further noted that "[i]n a traditional employment relationship, an employer directly hires its own workers, pays their wages and provides their benefits, and controls their day-to-day work," however, "a variety of other employment models have developed over the years." California Bill Analysis, A.B. 1897 Sen., 8/14/2014. It acknowledged that "[n]umerous terms are used to describe these alternative types of work arrangements: contingent work, nonstandard work, contractual work, seasonal work, freelance work, "just-in-time" or "temp employment," or "permatemps." *Id*. "Contingent work can take several forms and is prominent in many industries." *Id*. The legislature cited two examples: the garment and agricultural industries. *Id*. It noted the garment industry has been "reliant on subcontracting for years to manufacture, sew and press garments." *Id*. Further, "farm labor contractors are used to hire agricultural workers to harvest and perform work on farms." *Id*. The legislature also observed that "contingent or temporary work has expanded into other sectors from professional occupations like nursing, accounting, and computer programming to warehouse work in transportation and material moving, housekeeping and landscaping, and manufacturing." *Id*.

The legislative history of Section 2810.3 does not support an inference that the legislature intended client employers to be liable for the on-call "gap time" of waiting to be engaged by one of several business entities. Indeed, when enacting Section 2810.3, the legislature was likely considering labor contractors that are providing workers to work at a single company rather than the situation here: labor contractors with workers on call for several client companies. There may be sound policy reasons for extending liability to that situation, but the Court's reading of section 2810.3 does not suggest that the California legislature has yet made that policy decision in the way

Plaintiffs contend.

Having determined that the SCI Defendants may be held liable for wages owed for work performed on their premises or worksite, but not for time the drivers spent waiting for Serenity's dispatch to send them to *any* Serenity client, it follows that common questions do not predominate as to the overtime, minimum wage and meal and rest break claims against the SCI Defendants. While an individual driver may be able to prove that the driver is owed overtime or minimum wages based on time spent on SCI removals, such an inquiry will be highly individualized. The same for whether the driver was owed a meal or rest break while performing SCI removals. Accordingly, Plaintiffs' motion for class certification of the SCI subclass is DENIED.

## CONCLUSION

Plaintiffs' motion for class certification is GRANTED as to all of Plaintiffs' claims against Serenity as set forth in this Order. The motion to certify the claims against the SCI Defendants is DENIED.

This Order disposes of Docket No. 225.

**IT IS SO ORDERED.**

Dated: August 1, 2018

JACQUELINE SCOTT CORLEY
United States Magistrate Judge